# ATTACHMENT 1

 **Davis Wright Tremaine LLP**

21st Floor
1251 Avenue of the Americas
New York, NY 10020-1104

**Robert D. Balin**
212-489-8230 tel
212-489-8340 fax

robbalin@dwt.com

December 12, 2018

**VIA FEDERAL EXPRESS & E-MAIL**

Daniel C. Richenthal
Senior Trial Counsel
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007
Daniel.Richenthal@usdoj.gov

Re:   *United States v. Ashe, et al.*, No. 1:15-cr-00706-VSB (S.D.N.Y.)
       Touhy Request of Fairfax Media and Australian Broadcasting Corporation

Dear Mr. Richenthal:

This firm is counsel to Fairfax Media, Ltd. and the Australian Broadcasting Corporation. Pursuant to the Department of Justice *Touhy* regulations, 28 C.F.R. § 16.21 *et seq.*, we write to request that the United States Attorney's Office for the Southern District of New York (the "USAO") produce certain documents related to the above-captioned criminal action, as more fully-set forth in the enclosed Affidavit of Robert D. Balin (the "*Touhy* Request"). We ask that you direct the *Touhy* Request to the appropriate official in the USAO to make a prompt disclosure of the requested materials.

We thank you for your attention to this matter. Please contact me should you have any questions.

Best regards,

Davis Wright Tremaine LLP

Robert D. Balin

4835-2509-6322v.2 0112212-000001

Anchorage | Bellevue | Los Angeles | New York
Portland | San Francisco | Seattle | Washington, D C

## **AFFIDAVIT OF ROBERT D. BALIN**

STATE OF NEW YORK  )
         ) ss:
COUNTY OF NEW YORK  )

    ROBERT D. BALIN, being duly sworn, deposes and says:

    1.   I am a partner at Davis Wright Tremaine LLP, and U.S. counsel to The Australian

Broadcasting Corporation ("ABC") and Fairfax Media Publications Pty Limited ("Fairfax")

(together with ABC, "Requesters"), who are respondents in an Australian libel action brought

against them in the Federal Court of Australia by Dr. Chau Chak Wing (the "Australian Libel

Action"). A copy of the Amended Statement of Claim in the Australian Libel Action is annexed

hereto as Exhibit A. In support of their defenses in the Australian Libel Action, Requesters seek

discovery from the United States Attorney's Office for the Southern District of New York

pursuant to 28 C.F.R. § 16.22(c). I submit this affidavit to set forth the scope and relevance of

the discovery sought by Requesters.

    2.   Requesters seek limited discovery pertaining to the identity of unindicted co-

conspirator "CC-3" from the criminal case *United States of America v. John Ashe, et al.*, No.

1:15-cr-00706 (VB) (the "Ashe Proceedings"), who is widely reported to be Chinese-Australian

billionaire, Dr. Chau Chak Wing ("Dr. Chau").[1] Requesters also seek documents evidencing Dr.

Wing's involvement in a scheme to bribe then-President of the United Nations General

---

[1] On May 22, 2018, Andrew Hastie, who is a member of the Australian Parliament and Chairman of the
Parliament's Joint Committee on Intelligence and Security, disclosed on the floor of Parliament that Dr. Chau is the
"CC-3" referenced in the Complaint in the Ashe Proceedings. MP Hastie's identification of Dr. Chau as CC-3 has
been widely reported in Australia, the United States, and around the world. *See, e.g.*, Emily Baumgaertner &
Jacqueline Williams, *In Australia, Fears of Chinese Meddling Rise on U.N. Bribery Case Revelation*, N.Y. TIMES
(May 22, 2018), https://www.nytimes.com/2018/05/22/world/australia/bribery-un-china-chau-chak-wing.html; Amy
Remeikis & Katharine Murphy, *Chinese-Australian billionaire involved in UN bribery case, MP claims*, THE
GUARDIAN (May 22, 2018), https://www.theguardian.com/world/2018/may/22/chinese-australian-billionaire-
involved-in-un-bribery-case-mp-claims; Associated Press, "Australian lawmaker accuses billionaire in UN bribe
scandal," Fox News (May 23, 2018), http://www.foxnews.com/world/2018/05/23/australian-lawmaker-accuses-
billionaire-in-un-bribe-scandal.html. News reports are not, however, an admissible form of identification in the
Australian Libel Action.

Assembly John Ashe, to which bribery scheme Shiwei Yan and Heidi Hong Pao pled guilty in the Ashe Proceedings. Specifically, Requesters seek the following:

  a. An unredacted version of the diplomatic note from the U.S. State Department to the Embassy of Antigua and Barbuda, dated January 6, 2016, a redacted version of which was attached to the filed Sentencing Submission of Shiwei Yan as Exhibit #3 in the Ashe Proceedings (PACER Doc. No. 219-4) (the "Diplomatic Note"). Specifically, Requesters seek release of a copy of the Diplomatic Note from which is removed the redaction of the name of "CC-3" that appears in paragraph number 9 on page 6 of the exhibit that was filed by Shiwei Yan. A copy of the redacted Diplomatic Note that was publicly filed with the Court in the Ashe Proceeding is attached hereto as Exhibit B.

  b. All e-mails, bank records, wire transfer records, and other documents obtained via search warrants, subpoenas (excluding grand jury subpoenas), or other discovery methods from Defendant Shiwei Yan, Defendant Heidi Hong Piao, Defendant John Ashe, or any other individual or institution, that evidence the $200,000 wire transfer payment made by one of "CC-3's" companies to Ashe, referenced in Paragraph 49 (including subparts (a)-(g)) of the Complaint in the Ashe Proceedings (PACER Doc. No. 1). A copy of the Complaint in the Ashe Proceedings (the Complaint") is attached hereto as Exhibit C. Additionally, a table listing the key documents sought in this request is annexed to this Affidavit as Exhibit D.

  c. All other documents in the possession of the U.S. Attorney's Office for the Southern District of New York that identify the name and activities of the person referred to as "CC-3" in Paragraph 49 (including subparts (a) – (g)) of the criminal Complaint in

the action *United States of America v. John W. Ashe, et al.*, No. 1:15-cr-00706-VSB (S.D.N.Y.). *See* Exhibit C, ¶ 49.

       d.      Deposition testimony or a mutually acceptable sworn statement from Senior Trial Counsel and Assistant U.S. Attorney Daniel C. Richenthal, or another equally competent representative of the U.S. Attorney's Office for the Southern District of New York, authenticating the documents itemized in paragraphs 2(a) through 2(c) above, and confirming that Dr. Chau Chak Wing is the CC-3 referenced in the Complaint in the Ashe Proceedings.

       3.      The requested discovery pertains to the prosecutions of only two defendants – Shiwei Yan and Heidi Hong Piao – and concerns only one of the overt acts outlined in the Complaint in the Ashe Proceedings. Specifically, the Complaint in the Ashe Proceedings charged that "Yan and Piao arranged for a $200,000 wire to a bank account belonging to the President of the UN General Assembly [John Ashe] from another co-conspirator not named as a defendant herein in exchange for the President attending a private conference in his official capacity." *See* Exhibit C ¶ 3(d). The Complaint identifies this other co-conspirator only as "CC-3" and describes him as a "Chinese real estate developer." Exhibit C ¶ 49.

       4.      On January 20, 2016, Yan pled guilty to one count of bribery set forth in a Superseding Information; and on July 29, 2016, Yan was sentenced to 20 months in prison. *See* Press Release, Dep't of Justice, U.S. Attorney's Office, Southern District of New York, *Former Head of Foundation Sentenced to 20 Months in Prison for Bribing Then-Ambassador and President of United Nations General Assembly* (July 29, 2016), https://www.justice.gov/usao-sdny/pr/former-head-foundation-sentenced-20-months-prison-bribing-then-ambassador-and-president.

3

5.     On January 14, 2016, Piao pled guilty to five counts (conspiracy to commit bribery; bribery; conspiracy to commit money laundering; money laundering; and willful failure to file reports of foreign bank and financial records) set forth in a Superseding Information; and Piao is scheduled to be sentenced on January 25, 2019. *See* PACER Doc. No. 870.

6.     The discovery sought is absolutely critical and needed by Requesters to adequately defend themselves in the ongoing Australian Libel Action. The Amended Statement of Claim in the Australian Libel Action challenges the truthfulness of statements made in a June 5, 2017 broadcast of the television news magazine *Four Corners*, jointly produced by Fairfax and the ABC, titled "Power and Influence." The *Four Corners* newscast reported that "CC-3," the unnamed co-conspirator in the Ashe Proceedings whose company allegedly paid $200,000 to Mr. Ashe to attend the private conference in China, is Dr. Wing. *See* Exhibit A.

7.     Specifically, the program reported that "[t]he FBI alleged that Yan bribed the UN General Assembly President to speak at [the luxury Imperial Springs Resort], at a conference hosted by Dr. Wing. A sealed indictment from a New York Court against Sheri Yan refers to Dr. Wing using a codename – CC-3." The newscast made clear that though "under U.S. bribery law it was illegal for Ashe as [a] UN official to receive this payment . . . There is no suggestion Dr. Wing knew it was illegal." *See* "Power and Influence," *Four Corners* (June 5, 2017), http://www.abc.net.au/4corners/power-and-influence-promo/8579844.

8.     Nevertheless, Dr. Wing brought a libel suit against Requesters in the Federal Court of Australia claiming, *inter alia*, that the newscast falsely states that he paid a $200,000 bribe and that he was knowingly involved in the corrupt scheme. *See* Exhibit. C, ¶ 5(g) and (h).

9.     The above-referenced documents and testimony from the U.S. Attorney's Office for the Southern District of New York are essential to Requesters' ability to defend themselves in

4

the Australian libel Action, and are undoubtedly relevant.  Specifically, these documents and authentication testimony will confirm, in admissible form, and through the actual Court papers at issue, the truth of the underlying allegations that Dr. Wing is "CC-3" and that he was involved in the $200,000 payment to the late Mr. Ashe.  This discovery would be dispositive of a substantial portion of the libel claim asserted in the Australian Libel Action.

10.     None of the factors set forth in 28 C.F.R. § 16.26 that could justify non-disclosure exist here.  Requesters do not seek any grand jury material, and disclosure of the materials sought by Requesters would not violate any statute (such as income tax laws), any rules or procedures (such as the grand jury secrecy rule of Fed. R. Crim. P. 6(e)), or any other specific regulation.  *Id.* § 16.26(b)(1) & (2).  None of the requested materials are classified, none of the materials would reveal a confidential source or informant, none would reveal trade secrets, and none could possibly interfere with enforcement proceedings or disclose investigative techniques or procedures.  *Id.* § 16.26(b)(3)-(6).  Indeed, both Ms. Yan and Ms. Piao have already pled guilty to bribing Ashe via the $200,000 payment made by CC-3's company, and Mr. Ashe died on June 22, 2016.  Further, Dr. Wing has put his name directly in issue by bringing a libel suit claiming that it was false and defamatory for Requesters to have identified him as CC-3. Moreover, members of Australian Parliament and various international news agencies have identified Dr. Wing as CC-3.  No other individuals are implicated in any manner in the bribery scheme described in Paragraph 49 of the Complaint.  *See* Exhibit C.

11.     Wherefore, Requesters respectfully submit that 28 C.F.R. § 16.21 *et seq.* compels the United States Attorney's Office for the Southern District of New York to produce the documents and provide the authenticating testimony requested in Paragraph 2 of this Affidavit.

ROBERT D. BALIN

Sworn to before me
this 12th day of December 2018.

Notary Public

**ZORAIDA DEFEX**
NOTARY PUBLIC-STATE OF NEW YORK
No. 01DE6316650
Qualified in Bronx County
My Commission Expires December 15, 2018

# Exhibit A

# NOTICE OF FILING

This document was lodged electronically in the FEDERAL COURT OF AUSTRALIA (FCA) on 23/08/2017 11:37:31 AM AEST and has been accepted for filing under the Court's Rules. Details of filing follow and important additional information about these are set out below.

### Details of Filing

| | |
|---|---|
| Document Lodged: | Statement of Claim - Form 17 - Rule 8.06(1)(a) |
| File Number: | NSD1088/2017 |
| File Title: | CHAU CHAK WING v THE AUSTRALIAN BROADCASTING CORPORATION & ORS |
| Registry: | NEW SOUTH WALES REGISTRY - FEDERAL COURT OF AUSTRALIA |



Dated: 23/08/2017 11:37:37 AM AEST                                  Registrar

### Important Information

As required by the Court's Rules, this Notice has been inserted as the first page of the document which has been accepted for electronic filing. It is now taken to be part of that document for the purposes of the proceeding in the Court and contains important information for all parties to that proceeding. It must be included in the document served on each of those parties.

The date and time of lodgment also shown above are the date and time that the document was received by the Court. Under the Court's Rules the date of filing of the document is the day it was lodged (if that is a business day for the Registry which accepts it and the document was received by 4.30 pm local time at that Registry) or otherwise the next working day for that Registry.

Form 17
Rule 8.05(1)(a)

## <u>Amended</u> Statement of Claim

No.        of 2017

Federal Court of Australia
District Registry: New South Wales
Division: General Division

**Dr Chau Chak Wing**

Applicant

**The Australian Broadcasting Corporation**

First Respondent

**Fairfax Media Publications Pty Limited ACN 003357720**

Second Respondent

**Nick McKenzie**

Third Respondent

The Applicant relies on the following facts and assertions:

### THE RESPONDENTS

1        The First Respondent is and was at all material times:

   (a) a statutory corporation duly incorporated pursuant to section 5 of the *Australian Broadcasting Corporation Act 1983* (Cth) and is liable to be sued in its own corporate name and style;

   (b) the holder of a commercial television broadcasting licence in respect of the television stations known as News 24 and ABC1;

   (c) the broadcaster, and thereby the publisher, of a television program called 'Four Corners' (**Four Corners**);

   (d) a producer of Four Corners, which is produced for publication throughout all of the States and Territories within Australia;

{00303669.docx-v}

| | |
|---|---|
| Filed on behalf of (name & role of party) | Dr Chau Chak Wing, Applicant |
| Prepared by (name of person/lawyer) | Mark Geoffrey O'Brien |
| Law firm (if applicable) | Mark O'Brien Legal |
| Tel      +61 2 9216 9828 | Fax |
| Email      mark.obrien@markobrienlegal.com.au | |
| **Address for service** (include state and postcode) | Level 3, 44 Martin Place, Sydney NSW 2000 |

[Form approved 01/08/2011]

  (e) a distributor of Four Corners, which it distributed for publication throughout all of the States and Territories within Australia; and

  (f) the proprietor, publisher and operator of the website www.abc.net.au.

2  The Second Respondent was at all material times:

  (a) a corporation entitled to be sued in its own corporate name and style; and

  (b) the publisher of material on the website located at URL address www.smh.com.au and the associated website located at URL address www.m.smh.com.au **(The SMH Websites**) which are made available for downloading and publication in the Australian Capital Territory, New South Wales and all of the other States and Territories within Australia.

3  The Third Respondent was at all material times a journalist employed by the Second Respondent.

## FIRST MATTER COMPLAINED OF

4  On or about 5 June 2017, the Respondents published, by television broadcast, on the "Four Corners Program" words and images of and concerning the Applicant, in all of the States and Territories within Australia, a transcript of which is set out at Annexure "**A**" hereto (**the first matter complained of**). The Applicant relies upon the images and accompanying words and text.

### *Particulars of Publication*

  (a) The first matter complained of was first published on the First Respondent's ABC1 channel at or about 8.30pm on the program Four Corners.

  (b) The first matter complained of was re-published on the First Respondent's ABC1 channel at or about 6 June 2017 at 10.00am and 7 June 2017 at 11pm.

  (c) The first matter complained of was also re-published on the First Respondent's ABC News 24 channel at or about 10 June 2016 at 8.00pm.

  (d) The Respondents published the first matter complained of to audiences in all the States and Territories within Australia.

  (e) The first matter complained of was promoted and published as a joint investigation between the First and Second Respondents.

  (f) The Third Respondent presented the first matter complained of.

  (g) Further particulars of publication of the first matter complained of will be supplied following discovery and interrogatories.

5        The first matter complained of, in its natural and ordinary meaning, was defamatory of
         the Applicant.

### Particulars of Imputations

The first matter complained of conveyed the following defamatory meanings (or
meanings which did not differ in substance therefrom):

(a) *The Applicant betrayed his country, Australia, ~~and its interests~~ in order to serve
    the interests of a foreign power, China, and the Chinese Communist Party by
    engaging in espionage on their behalf.*

~~In the alternative to (a)~~

(b) ~~The Applicant is a disloyal person prepared to betray his country, Australia and
    its interests in order to serve the interests of a foreign power, China, and the
    Chinese Communist Party.~~

(c) ~~The Applicant broke the pledge of loyalty he took to Australia on becoming an
    Australian citizen by secretly advancing the interests of a foreign power at the
    expense of the interests of Australia.~~

(d) *The Applicant is a member of the Chinese Communist Party and of an advisory
    group to that party the People's Political Consultative Conference (**CPCCC**) and,
    as such, carries out the work of a secret lobbying arm of the Chinese Communist
    Party, the United Front Work Department.*

(e) *The Applicant donated enormous sums of money to Australian political parties as
    bribes intended to influence politicians to make decisions to advance the
    interests of the Republic of China, the Chinese government and the Chinese
    Communist Party.*

(f) *The Applicant ~~employed~~ paid Sheri Yan, whom he knew to be a corrupt
    espionage agent of the Chinese government, in order to assist him in infiltrating
    the Australian government on behalf of the Chinese Communist Party.*

(g) *The Applicant paid a \$200,000 bribe to the President of the General Assembly of
    the United Nations, John Ashe.*

(h) *The Applicant was knowingly involved in a corrupt scheme to bribe the President
    of the General Assembly of the United Nations.*

### Particulars of parts of the matter complained of

The Applicant relies on the whole of the first matter complained of as giving rise to
each of the imputations pleaded. In particular, the Applicant relies on the following

4

parts of the first matter complained of, adopting the paragraph numbering in Annexure "**A**" hereto and consisting of words and accompanying images, as follows:

(a) Imputation 5(a): [10], [12], [31], [32], [58], [59], [60], [64], [65], [129], [130];

(b) Imputation 5(b): [10], [12], [31], [32], [58], [59], [60], [64], [65], [129], [130];

(c) Imputation 5(c): [10], [12], [31], [32], [58], [59], [60], [64], [65], [129], [130];

(d) Imputation 5(d): [43], [44], [59], [61], [62], [63], [64], [129], [130];

(e) Imputation 5(e): [12], [31], [32], [38], [43], [44], [48], [56], [57], [58], [59], [138];

(f) Imputation 5(f): [72], [73], [74], [75], [85], [86];

(g) Imputation 5(g): [110], [111], [112], [113], [114], [115], [116], [117], [118], [119], [120], [121], [124];

(h) Imputation 5(h): [72], [75], [83], [99], [109], [110], [111], [112], [113], [114], [115], [116], [117], [118], [120], [121], [123], [124].

6    In  the alternative to [5] above, and in so far as and to the extent that the meanings set out in particulars 5(a), 5(b) and 5(c) to the said paragraph was were not conveyed in the natural and ordinary meaning of the first matter complained of, they were it was conveyed as a true innuendos to persons who were aware of the following fact:

(a) On becoming a citizen, the Applicant made the pledge of loyalty which is required of all persons on becoming Australian citizens and which is in the following terms:

*From this time forward I pledge my loyalty to Australia and its people, whose democratic beliefs I share, whose rights and liberties I respect, and whose laws I will uphold an obey*

7    Further, and in the alternative to paragraph 5 above, the first matter complained of with the aid of the extrinsic fact particularised below was defamatory of the Applicant, and was understood to convey the imputation particularised below to persons who were aware of the fact.

### *Particulars of Imputation*

The first matter complained of conveyed the following defamatory meaning (or meaning/s which did not differ in substance therefrom):

(a) *The Applicant broke the pledge of loyalty he took to Australia on becoming an Australian citizen by secretly advancing the interests of a foreign power at the*

*expense of the interests of Australia.* [10], [12], [31], [32], [58], [59], [60], [64], [65], [129], [130];

### Particulars of Extrinsic Fact

On becoming a citizen, the Applicant made the pledge of loyalty which is required of all persons on becoming Australian citizens and which is in the following terms:

*From this time forward I pledge my loyalty to Australia and its people, whose democratic beliefs I share, whose rights and liberties I respect, and whose laws I will uphold and obey*

## SECOND MATTER COMPLAINED OF

8      On or about 5 June 2017 and thereafter, the Respondents published and/or caused to be published of and concerning the Applicant an article entitled *'Power and influence: the hard edge of China's soft power'* a copy of which is set out in Annexure "**B**" hereto **(the second matter complained of)**. The article was accompanied by a video, being a copy of the first matter complained of, in the same words and images as set out in Annexure 'A' hereto.

### *Particulars of Publication*

(a) The second matter complained of was published by the First Respondent by uploading to and/or causing the uploading to, and thereby making the publication available and/or causing the publication to be made available for download to a large number of users in each State and Territory of Australia of the website http://www.abc.net.au/4corners/stories/2017/06/05/4678871.htm

(b) The second matter complained of was in fact downloaded and read in each State and Territory of Australia and, by reason of the large numbers of users, it is to be inferred that the second matter complained of was published to a substantial number of readers and viewers in each State and Territory of Australia.

(c) The second matter complained of was on the website from on or about 5 June 2017 and as at the date of the filing of the Statement of Claim, remains available online.

(d) The second matter complained of was promoted and published as a joint investigation between the First and Second Respondents.

(e) The Third Respondent presented the first and second matters complained of.

(f) Further particulars of publication of the second matter complained of will be supplied following discovery and interrogatories.

9    The second matter complained of, in its natural and ordinary meaning, was defamatory of the Applicant.

### Particulars of Imputations

See paragraph 5 above.

### Particulars of parts of the matter complained of

The Applicant relies on the whole of the first matter complained of as giving rise to each of the imputations pleaded. In particular, the Applicant relies on the following parts of the second matter complained of, adopting the paragraph numbering in Annexure "**B**" hereto and consisting of words and accompanying images, as follows:

(a) Imputation 5(a): [1], [6], [7], [9], [10], [16], [18], [37], [38], [60], [61], [62], [66], [67], [129], [130];

(b) Imputation 5(b): [1], [6], [7], [9], [10], [16], [18], [37], [38], [60], [61], [62], [66], [67], [129], [130];

(c) Imputation 5(c): [1], [6], [7], [9], [10], [16], [18], [37], [38], [60], [61], [62], [66], [67], [129], [130];

(d) Imputation 5(d): [49], [50], [61], [63], [64], [65], [66], [129], [130];

(e) Imputation 5(e): [18], [37], [38], [44], [49], [50], [53], [58], [59], [60], [61], [138];

(f) Imputation 5(f): [74], [75], [76], [77], [86], [87];

(g) Imputation 5(g): [111], [112], [113], [114], [115], [116], [117], [118], [119], [120], [121], [122], [124];

(h) Imputation 5(h): [72], [75], [83], [99], [109], [110], [111], [112], [113], [114], [115], [116], [117], [118], [120], [121], [123], [124].

10    Further, and in the alternative to paragraph 9 above, the second matter complained of with the aid of the extrinsic fact particularised below was defamatory of the Applicant, and was understood to convey the imputation particularised below to persons who were aware of the fact. In the alternative to [8] above, and in so far as and to the extent that the meanings set out in the paragraph 5(a) of the particulars to the said paragraph was were not conveyed in the natural and ordinary meaning of the second matter complained of, they were it was conveyed as a true innuendos to persons who were aware of the following fact:

{00303669.docx-v}

(a) On becoming a citizen, the Applicant made the pledge of loyalty which is required of all persons on becoming Australian citizens and which is in the following terms:

*From this time forward I pledge my loyalty to Australia and its people, whose democratic beliefs I share, whose rights and liberties I respect, and whose laws I will uphold an obey.*

.Further, the second matter complained of was defamatory of the Applicant and understood to convey the imputation particularised below to persons who were aware of the fact particularised in the paragraph 10 above.

### *Particulars of Imputation*

See paragraph 7 above.

### **Particulars of Extrinsic Fact**

See paragraph 7 above.

The second matter complained of conveyed the following defamatory meaning (or meaning/s which did not differ in substance therefrom):

(b) *The Applicant broke the pledge of loyalty he took to Australia on becoming an Australian citizen by secretly advancing the interests of a foreign power at the expense of the interests of Australia.*

## DAMAGE

11     By reason of publication of the first and second matters complained of, the Applicant has been greatly injured and his business, personal and professional reputation has been and will be brought into public disrepute, odium, ridicule and contempt.

12     The Applicant claims damages, including aggravated damages, interest and costs.

### *Particulars of Aggravated Damages*

(a) The Applicant's knowledge of the falsity of the imputations.

(b) The conduct of the Respondent in presenting the publication of the first and second matters complained of in an over-sensationalised manner.

(c) The conduct of the Respondents in making the allegations in the matter complained of when they knew or ought to have known that those allegations were false.

(d) The failure of the First Respondent to remove the second matter complained of, including the video of the first matter complained of, from its website despite

{00303669.docx-v}

8

being informed by the Applicant that the matter is defamatory in his solicitors letter of 22 June 2017.

(e) The failure of the Respondents to apologise despite the request by the Applicant in his solicitors letter of 22 June 2017.

(f) The persistence of the First Respondent in publishing over the internet the defamatory matter after being informed by the Applicant that it was defamatory.

(g) Further particulars of aggravated damages will be provided in due course.

Date: 23 August 2017

Signed by Mark Geoffrey O'Brien
Lawyer for the Applicant

This pleading was prepared by B R McClintock SC and M Richardson

## Certificate of lawyer

I, Mark Geoffrey O'Brien, certify to the Court that, in relation to the amended statement of claim filed on behalf of the Applicant, the factual and legal material available to me at present provides a proper basis for each allegation in the pleading.

Date: 23 August 2017

Signed by Mark Geoffrey O'Brien
Lawyer for the Applicant

" A '

## 4 Corners – 'Power and Influence'

1. MIKE MCCAUL, CHAIRMAN, HOMELAND SECURITY COMMITTEE: It's almost like out of a spy novel. These are very dangerous, clandestine figures in Chinese intelligence and, there was a concerted effort to, to influence our elections.

2. BILL CLINTON: Hi Johnny, how are you? Good to see you. How you doing?

3. PROF. JOHN FITZGERALD, THE FORD FOUNDATION, BEIJING, 2008 – 2013: Well, every government of course has an interest in promoting itself abroad. To extending its soft power. I guess what's different about China is the way in which it's run through these clandestine operations. It's just not out there and open. It's out to silence dissent.

4. PETER JENNINGS, EXECUTIVE DIRECTOR, AUSTRALIAN STRATEGIC POLICY INSTITUTE: I think that this type of, frankly, naked influence buying, is something, which is damaging to Australia's political system.

5. MIKE MCCAUL, CHAIRMAN, HOMELAND SECURITY COMMITTEE: The critical issue here is allowing a foreign government to influence your elections, and in this case, China, is the, the, the biggest offender.

6. CHRIS UHLMANN: Welcome to 4 Corners, I'm Chris Uhlmann. For six months, the world has watched the unfolding story of how the Russian government and its agents sought to subvert the US election, and possibly helped deliver the presidency to Donald Trump.

7. Extraordinary though that story is, it's not unique. America is not the only democracy to have been targeted in this way, and Russia is not the only country accused of such subversion.

8. Just ten days ago, the head of Australia's peak intelligence agency ASIO warned that espionage and foreign interference are occurring here on an unprecedented scale, with the potential to cause serious harm to this nation's sovereignty, its security and, he added, the integrity of our political system.

9. Duncan Lewis didn't name the key suspect. But we can tonight - the Chinese Communist Party.

10. A joint investigation by a team of journalists from 4 Corners and Fairfax Media has exposed a concerted campaign by the Chinese government and its proxies to infiltrate the Australian political process to promote its own interests.

11. Its targets include our universities, local student and community groups, the Chinese language media, and - most disturbing of all - some of our nation's leading politicians.

12. This investigation reveals that business leaders allied to Beijing are using millions in political donations to the major parties to buy access and influence, and in some cases to push policies that may be contrary to Australia's national interests.

13. Nick McKenzie has the story.

14. NICK MCKENZIE, REPORTER: In the early hours of a cold morning in October 2015, a team of counter espionage officers breaks into a Canberra flat.

15. Their target is a Chinese born woman, who is married to a former high ranking Australian intelligence official.

16. ASIO suspects the woman is involved in spying for the Chinese Government.

17. PROF. RORY MEDCALF, NATIONAL SECURITY COLLEGE, ANU: For such an action to be taken you would assume it would need the authorisation of the Attorney General, it would need a warrant, and it would need essentially a decision involving many parts of the Australian National Security Community.

18. So it would reflect deep and real concern about Chinese espionage in Australia.

19. NICK MCKENZIE, REPORTER: The woman's name is Sheri Yan ... a socialite with connections to the senior levels of government, here and abroad.

20. Did you think she might be a Chinese intelligence operative of some sort?

21. PROF. JOHN FITZGERALD, THE FORD FOUNDATION, BEIJING, 2008 - 2013: I understand that Sheri Yan is very closely connected with some of the most powerful and influential families and networks in China.

22. Once you know that you don't need to know much more.

23. NICK MCKENZIE: Sheri Yan's husband, Roger Uren, was until 2001 Assistant Secretary at Australia's Office of National Assessments, the agency which provides secret intelligence briefings to the Prime Minister.

24. During the raid, ASIO seized computers and documents.

25. They discovered classified Australian Government files on the work of Chinese intelligence.

26. Uren is being investigated for the removal of these files, which may have been illegal.

27. PROF. RORY MEDCALF: This material is normally held very tightly held.

28. Presumably it relies on intelligence sources and methods, which can't be compromised.

29. It also could potentially reveal some of the deepest intelligence and analytical judgements of either Australia or indeed of Australia's allies and partners.

30. So it's material that has to be protected at all costs.

31. NICK MCKENZIE: In the weeks before the raid, ASIO analysts had been tracking links between political donors in Australia and the Chinese Communist Party.

32. The donations provided access to the most powerful politicians in the land.

33. ASIO chief Duncan Lewis was so worried, he organised meetings with the Directors of the Liberal and National parties, as well as the Federal Secretary of the ALP, to warn them that the donors could compromise the major parties.

34. NICK MCKENZIE: How unusual is it for a Director-General of ASIO to take such a step?

35. PROF. RORY MEDCALF: Oh it's certainly unusual.

36. And if that is indeed the case, it would reflect very real, very real concern.

37. NICK MCKENZIE: When he briefed the party officials, Duncan Lewis said the donors being examined by ASIO were breaking no laws.

38. But he warned their strong connections to the Chinese Communist Party meant their donations might come with strings attached.

39. ASIO also briefed then Prime Minister Tony Abbott.

40. PETER JENNINGS, EXECUTIVE DIRECTOR, AUSTRALIAN STRATEGIC POLICY INSTITUTE: I think that this type of, frankly, naked influence buying, is something, which is damaging to Australia's political system.

41. I, i would far rather have a regime in place whereby we, the tax payer, pay for the cost of our elections than relying on parties to get donations from foreign sources, where ever they may come from.

42. But, you know, notably those foreign sources are primarily linked to Chinese business.

43. NICK MCKENZIE: ASIO singled out two billionaire donors with especially close ties to the Chinese Communist Party.

44. The first was enigmatic property developer Dr Chau Chak Wing, a man who keeps a low profile except when it comes to his big donations.

45. PETER MATTIS, FORMER CIA CHINA EXPERT: He sort of appeared out of nowhere.

46. There's very little in his biography that predates his, his appearance and his, his entry onto the Australian and China business scene.

47. UNKNOWN FEMALE: This is perhaps the most spectacular view isn't it?

48. NICK MCKENZIE, REPORTER: Dr Chau's extraordinary generosity has given him access to Australia's political elite.

49. PETER COSGROVE, GOVERNOR GENERAL: Well, may I congratulate you on your wonderful, wonderful philanthropy [indecipherable].

50. NICK MCKENZIE, REPORTER: Dr Chau donated $20 million dollars to build a Frank Gehry designed building at the University of Technology Sydney, which was opened by the Governor General in 2015.

51. PETER COSGROVE, GOVERNOR GENERAL: Well you must be thrilled to see this come to fruition?

52. NICK MCKENZIE, REPORTER: At the unveiling of the Dr Chau Chak Wing building, the billionaire politely posed with the famous architect.

53. UNKNOWN FEMALE: Can we get one more photo with Dr Chau, yourself and our...

54. NICK MCKENZIE, REPORTER: Not content with having a building named after him, Dr Chau splashed $70 million dollars on Australia's most expensive home in 2015.

55. A six story mega mansion he bought from James Packer.

56. Dr Chau's money allowed him to regularly rub shoulders with the great and good of Australian politics.

57. He's donated more than $4 million to the major parties over the past decade.

58. The question ASIO has been probing is what he wants from his donations?

59. PROF. RORY MEDCALF: We don't know whether the donations are, are somehow driven, or centrally encouraged, by the Chinese Communist Party, or whether in fact you've got enthusiastic individuals freelancing to make donations that they think will resonate well when they report back to China, or if they report back to China that these donations were made, and that there's a change taking place in the Australian political discourse.

60. NICK MCKENZIE: Dr Chau is an Australian citizen.

61. Back in his homeland China, he was also a member of a communist party advisory group known as a people's political consultative conference or CPPCC.

62. This group carries out the work of an opaque lobbying arm of the Party called the United Front Work Department.

63. PROF. RORY MEDCALF: We have to assume that individuals like that have really deep and serious connections to the Chinese Communist Party.

64. And even if they're not receiving any kind of direction, they would feel some sense of obligation, or indeed some desire to make the right impression on the powers that be in China, to demonstrate that they're being good members of the party, that they're, that they're pursuing the party's interests.

65. PETER MATTIS: In a sense, you could say in Australia that with wealth comes responsibility, and that responsibility is to respond to the party when they ask you to do a favour for them.

66. GEOFF RABY, AUSTRALIAN AMBASSADOR TO CHINA, 2007 - 2011: Well I think it's mainly to do with their own business interests in Australia.

67. Also, it's very much in the nature of the way Chinese do business, making gifts.

68. And most of these business developers and, and, and the sorts of people who are doing this, they, they crave the prestige and the status of being photographed standing next to politicians, on both sides of politics.

69.    So, it's about their influence and status and image.

70.    Which they see as helping their business first and foremost, giving their family respect.

71.    It's a very much a traditional Chinese way of operating.

72.    NICK MCKENZIE: 4 Corners has learned ASIO's interest in Dr Chau arose partly from his association with a woman described as an 'old friend - the socialite and lobbyist Sheri Yan.

73.    It was Sheri Yan who ASIO suspected of spying and whose Canberra apartment the agency raided.

74.    PETER MATTIS: Sheri Yan, or Yan Shiwei, is an Australian-Chinese businesswoman who's made her livelihood out of building connections between China and the outside world and acting as a go-between, between sort of foreign businessmen, foreign government officials who are trying to get things done in China, or find their way among the bureaucratic and political land mines that are there.

75.    NICK MCKENZIE: Dr Chau used Sheri Yan as a consultant, somebody able to open up the right doors.

76.    GEOFF RABY: She's very, active person.

77.    And many people come through the place, through Beijing.

78.    And she's a, dynamic, active person, speaks both languages perfectly, is charming, and comes from a well-connected background, which I don't know what those connections are, I only understand that's the case.

79.    PETER MATTIS: It appears her father was a PLA officer at one point in the very early days, so she's connected to sort of the core of the CCP in a sense.

80.    And no one can really explain sort of where her sort of original money, original connections, her original ways of opening the doors in China comes from.

81.    NICK MCKENZIE: Sheri Yan divided her time between New York, Beijing and Canberra, and moved with ease among the A-listers.

82.    Her contacts included high flying businessmen and Australia's former New York consul general Phil Scanlan.

83.    She was also close to the President of the United Nations General Assembly, John Ashe.

84.    UNKNOWN MALE: We are having a fantastic day today and say how amazing Sheri [indecipherable].

85.    PETER MATTIS, FORMER CIA CHINA EXPERT: Someone who knows how to work that landscape is useful not only for getting things done, not only for injecting Chinese perspectives into it, but also for being able to say, "Here are the players. Here are the people who are important.

86.    "Here are their, here are their personal foibles."

87.    NICK MCKENZIE, REPORTER: As Sheri Yan relentlessly networked, her husband Roger Uren was often proudly by her side.

88.    Uren's previous work as a high ranking Australian intelligence official with top security clearance meant he was trusted in Canberra.

89.    But not everyone trusted Sheri Yan.

90.    PROF. JOHN FITZGERALD: In times past I was advised to stay well clear of Sheri Yan.

91.    NICK MCKENZIE: Why?

92.    PROF. JOHN FITZGERALD: I'm not entirely sure why.

93.    I was advised by an old friend in Australia's security establishment.

94.    NICK MCKENZIE: To stay clear of Sheri Yan?

95.    PROF. JOHN FITZGERALD: To stay clear of Sheri Yan.

96.    PREET BHARARA, NEW YORK ATTORNEY GENERAL: Good morning.

97.    NICK MCKENZIE: In October 2015, the Sheri Yan story took a sudden and dramatic twist in New York.

98.    PREET BHARARA, NEW YORK ATTORNEY GENERAL: Today, together with our law enforcement partners, we expose yet another wide-ranging corruption scheme, one that is simultaneously local and global and it is centred at the United Nations.

99.    NICK MCKENZIE: At the same time her Canberra apartment was being raided, Sheri Yan was arrested in the US, accused of bribing the UN general assembly president.

100.   Yan's arrest stunned her associates, including former Australian ambassador Geoff Raby.

101.   GEOFF RABY: Well I was obviously very surprised. I, I, I couldn't believe it when I heard it. But she had been out of Beijing largely for a couple of years.

102.   JOURNALIST: Minister, can I just ask if you are aware of Sheri Yin? She was arrested in the US last week over bribery allegations with the UN.

103.   She is a bit of a mystery, it seems that she lives here in Canberra, or at least may be a dual citizen, but no one is quite sure. I just wonder whether you have got any. Is it a consular case?

104.   JULIE BISHOP, MINISTER FOR FOREIGN AFFAIRS: I have been briefed on the matter, it's a matter that the Department of Foreign Affairs and Trade is focussing on but I'm not going to go into individual cases at this point, but it is a matter upon which I've been briefed.

105.   JOURNALIST: Can you say if she's an Australian-Chinese?

106.   JULIE BISHOP, MINISTER FOR FOREIGN AFFAIRS: I'll leave that sort of detail to our consular staff. I've obviously been briefed on the matter but it's a fairly complex issue, I don't want to compromise any of the investigations which are underway.

107.   JOURNALIST: Alright, thanks.

108.   JULIE BISHOP, MINISTER FOR FOREIGN AFFAIRS: Thank you.

109.   NICK MCKENZIE, REPORTER: One of the events that led to Sheri Yan's arrest unfolded at the luxury Imperial Springs Resort, which is owned by none other than the Australian political donor Dr Chau Chak Wing.

110.   The FBI alleged Yan bribed the UN general assembly President to speak at the resort, at a conference hosted by Dr Chau.

111.   A sealed indictment from a New York Court against Sheri Yan refers to Dr Chau using a codename - CC3.

112.   Sheri Yan was alleged to have told the UN President

113.   FEMAL VOICE OVER: [CC3's] office emailed me the invitation.

114.   I will ask $200,000 for this trip...

115.   NICK MCKENZIE: A draft invitation sent to the United Nations president and allegedly approved by Dr Chau stated his desire to make the UN chief his "sincere friend in Guangdong Province"

116.   MALE VOICE OVER: And your friend here has the pleasure to offer you a permanent convention venue for the UN meetings...

117.   NICK MCKENZIE: The UN president's bank account was then wired $200,000 by one of Dr Chau's companies.

118.   Under US bribery law it was illegal for Ashe, as a UN official, to receive this payment.

119.   There is no suggestion Dr Chau knew it was illegal.

120.    PETER MATTIS: At least some of the money that was moving through Sheri Yan, or that she was facilitating, came from him.

121.    And it doesn't mean that there was necessarily anything untoward about it, but just the fact of large amounts of money being moved or paid to people because of introductions or the activities of Sheri Yan make it, make it somewhat suspect.

122.    SHERI YAN: What we tried to do is...

123.    NICK MCKENZIE: Sheri Yan pleaded guilty to bribery charges and was jailed last year.

124.    Dr Chau has never been charged with any offence and denies any wrongdoing.

125.    ASIO's interest in Sheri Yan is just one of many suspected foreign interference and intelligence cases being probed by Australian agencies, and which lead back to Beijing.

126.    PROF. RORY MEDCALF: It's fair to say that agencies like ASIO are really quite alive and alert to these issues.

127.    The challenge for them is that their mandate is essentially to monitor, and to report to government what's happening.

128.    They don't have a mandate, and it's, it's not clear who within the Australian system has a mandate to act on this information.

129.    NICK MCKENZIE: In Washington, concerns about the Chinese Communist Party interfering in Australian politics is growing.

130.    There, senior officials believe Australia is open to compromise, including through foreign donations.

131.    MIKE MCCAUL, CHAIRMAN, HOMELAND SECURITY COMMITTEE: Well, you know, in the United States we prohibit that expressly.

132.    I think there's a reason for that.

133.    We don't want the influence of foreign money in our elections and foreign governments to influence our elections.

134.    I think that's a wise policy.

135.    Quite frankly, I was a bit surprised that Australia does allow foreign contributions, and, and, and if you look at the numbers, which I was privy to, a lot, a lot of these donations are coming from China.

136.    China has a very strong influence in the region.

137.    They want to influence Australia.

138.    They want a stronger presence in Australia, and what better way to do that then to influence political figures through, through foreign contributions.

139.    NICK MCKENZIE: Republican congressman Mike McCaul is chairman of the Homeland Security Committee.

140.    In the 1990s while a prosecutor at the US Justice Department, he investigated a scandal known as 'China-gate'.

141.    Chinese spies funnelled donations into the Clinton presidential campaign.

142.    BILL CLINTON: Hi Johnny, how are you? Good to see you. How you doing?

143.    MIKE MCCAUL: It's almost like out of a spy novel.

144.    I mean, it's the most interesting case I ever prosecuted.

145.    These are very dangerous, clandestine figures in Chinese intelligence and there was a concerted effort to, to influence our elections.

146. NICK MCKENZIE: McCaul warns Australia is badly exposed, unless our laws are changed.

147. MIKE MCCAUL: The critical issue here is allowing a foreign government to influence your elections.

148. I think at a minimum, closing off foreign contributions from a foreign government to, to influence elections, and in this case, China is the, the, the biggest offender.

149. NICK MCKENZIE: Chinese Premier Li Keqiang's visit here in March came as Australia grapples with a shifting world order post the election of Donald Trump, and an emboldened Chinese Communist Party no longer content to hide its strength and bide its time.

150. In Australia's diplomatic and security community, debate is raging about why and to what extent the one-party state is seeking influence in Australian institutions.

151. In Canberra, local students were bussed in by the Chinese Embassy, to welcome Premier Li.

152. NICK MCKENZIE: The young patriots drown out those there to protest against the Chinese government.

153. Lupin Lu is President of the Chinese students' association at the University of Canberra. She organised 200 of her classmates for the rally.

154. LUPIN LU, PRESIDENT, CHINESE STUDENTS AND SCHOLARS ASSOCIATION, UC: Chinese Embassy, they support us or sponsor us by providing flags, food.

155. NICK MCKENZIE: The flags?

156. LUPIN LU: Yes.

157. NICK MCKENZIE: The food?

158. LUPIN LU: Transportation.

159. NICK MCKENZIE: Transportation.

160. LUPIN LU: And like legal help as well, lawyer.

161. NICK MCKENZIE: For, for the event, for the day?

162. LUPIN LU: Yes, because there is politics involved.

163. Sometimes there may be conflict with the police.

164. NICK MCKENZIE: The Chinese government and its proxies monitor Chinese student associations at most Australian universities.

165. This oversight has a dark side.

166. Students organising anti-communist party protests may be reported to the Chinese Embassy.

167. LUPIN LU: I guess as the president of Chinese Students Scholars Association and as a Chinese, I would do this for the safety of other members, other students.

168. NICK MCKENZIE: You would tell the embassy that some students were organising a human rights protest, for instance?

169. LUPIN LU: Yes. I would definitely, just to keep all the students safe and to do it for China as well.

170. NICK MCKENZIE: Brisbane student and democracy activist Anthony Chang believes he is being monitored by the Chinese Government.

171. He fled China three years ago after he was arrested and interrogated for putting up posters supporting independence for Taiwan.

172.   ANTHONY CHANG, STUDENT ACTIVIST: When they took me to the police station, I was still frightened.

173.   I had my hands over my head, and I said, "I will absolutely obey you, just make sure you don't shoot me".

174.   As you can see, I was scared of them.

175.   NICK MCKENZIE: He didn't expect to come to the attention of the Chinese authorities, here too.

176.   But after he spoke in Brisbane at this pro Hong Kong democracy rally, his parents back in China were visited by state security officials, who demanded their son cease his Australian activism.

177.   ANTHONY CHANG: My parents are very worried.

178.   They are worried that it might affect them, for example their work.

179.   They could lose their job.

180.   They could go to jail because of my activities.

181.   NICK MCKENZIE: One of the fiercest critics of communist party interference in Australia is Sydney academic Dr Feng Chongyi.

182.   While Premier Li was being feted in Australia, Dr Feng was back in China to meet with human rights lawyers – work he knew would draw attention.

183.   DR FENG CHONGYI: We know that it's an open secret that we are, our telephone is tapped, we are followed everywhere that but that is a routine that we have to accept if we want to work in China.

184.   NICK MCKENZIE, REPORTER: But Dr Feng did not expect what happened next.

185.   At his hotel in the city of Kunming, he was tracked down by agents from the Ministry of State Security.

186.   Over the next 10 days he was subjected to intensive videotaped questioning ... for up to 6 hours a day.

187.   Many of the questions involved his activities in Sydney.

188.   NICK MCKENZIE: They wanted to know about your democracy activism in Sydney.

189.   DR FENG CHONGYI: In Sydney, yes that's right.

190.   NICK MCKENZIE: They wanted to know about your associates in Sydney?

191.   DR FENG CHONGYI: That's right.

192.   NICK MCKENZIE: They, they knew about your family in Sydney?

193.   DR FENG CHONGYI: That's right.

194.   NICK MCKENZIE: They knew specific details about names?

195.   DR FENG CHONGYI: Actually, for my family members they, they got everything.

196.   They got everything.

197.   NICK MCKENZIE: Dr Feng was accused of endangering state security.

198.   Only after the intervention of the Turnbull government was he told he was finally free to return home to Sydney.

199.   He believes he was targeted by the Chinese Communist Party as a warning to others in Australia not to challenge the party.

200. DR FENG CHONGYI, ASSOCIATE PROFESSOR, CHINA STUDIES, UTS: There are several messages they are sending on.

201. One thing directly related to my work, that the academics better stay away from sensitive issues or sensitive topics, otherwise they can get you into deep trouble, detention or other punishment.

202. NICK MCKENZIE: While Dr Feng was trapped in China, back in Australia, Premier Li was the guest of honour at a Chinese community event held at the Sydney Town Hall.

203. Sitting at the head table opposite Premier Li was Dr Chau Chak Wing.

204. A couple of seats over from him was another Chinese billionaire - Huang Xiangmo.

205. Like Dr Chau, Mr Huang has come to the attention of ASIO.

206. Mr Huang is the second donor named by ASIO in its secret warning to the Coalition and Labor about the danger of Chinese Communist Party interference in Australian politics.

207. PROF. JOHN FITZGERALD: When we look at other business people contributing say to Australian political parties, we can go back through the company records and establish where that money came from.

208. In the case of Mr Huang it's not quite so clear.

209. NICK MCKENZIE: Mr Huang's rise is a classic rags to riches story.

210. From a poor rural family, he built his billion-dollar fortune as a property developer in provincial China.

211. Mr Huang arrived in Australia in 2011 in near total obscurity.

212. But that didn't last for long.

213. ANDREW ROBB, MINISTER FOR TRADE AND INVESTMENT, 2013 - 2016: How about we thank Mr Huang with three cheers for his generosity today? Hip Hip.

214. CROWD: Hooray.

215. ANDREW ROBB, MINISTER FOR TRADE AND INVESTMENT, 2013 - 2016: Hip Hip.

216. CROWD: Hooray.

217. ANDREW ROBB, MINISTER FOR TRADE AND INVESTMENT, 2013 - 2016: Hip Hip.

218. CROWD: Hooray.

219. NICK MCKENZIE: Mr Huang, and his property development firm Yuhu, began donating millions of dollars to health and education initiatives, earning the praise of politicians from both parties.

220. ANDREW ROBB, MINISTER FOR TRADE AND INVESTMENT, 2013 - 2016: I thought I'd just say a couple of words about Mr Huang.

221. I think it's important to get a sense of the man.

222. He is a, a man of many dimensions from what I've already been able to determine.

223. He, A, thoughtful, he's a very thoughtful cerebral fellow.

224. He's a man who thinks, about, about life and about how we can improve it.

225. He's a man comfortable in his own skin, he's a man with a sense of humour which is a good thing.

226. He's a visionary.

227. NICK MCKENZIE: Mr Huang became a major political donor too.

228.   Getting to know Tony Abbott - he gave $770,000 to the Liberals before the 2013 election.

229.   A big chunk of that went to Julie Bishop's home state of Western Australia.

230.   Mr Huang and his associates also gave to the Trade Minister Andrew Robb .... $100,000 to his campaign fundraising vehicle, as Robb signed off on the China Australia Free Trade deal.

231.   And $1.8 million went towards an Australia China Research Institute. Mr Huang became its chairman, its director - former Foreign Minister Bob Carr.

232.   PROF. JOHN FITZGERALD: First, he's seeking to establish his position, his status in the Chinese Australian community.

233.   Secondly, I think he's trying to secure some standing for the Chinese Australian community with various Australian governments at state and federal level and third through those community organisations, to secure outcomes that are favourable to Chinese State Policy.

234.   NICK MCKENZIE: In the right company, Mr Huang makes no secret of his devotion to the Chinese Communist Party.

235.   At an event celebrating 66 years of one party rule in China, Mr Huang took to the stage

236.   HAUGN XIANGMO: We overseas Chinese unswervingly support the Chinese Government's position to defend our nations sovereignty and territorial integrity.

237.   We support the development of the motherland always, and take on an important role in building One Belt, One Road.

238.   NICK MCKENZIE: Mr Huang oversees a communist party aligned Council which supports Beijing's territorial claims over Taiwan, Hong Kong and the South China Sea.

239.   It's called the Australian Council for the Promotion of the Peaceful Reunification of China, and Mr Huang is President.

240.   DR FENG CHONGYI: That means he's a key member supported by the Chinese authorities including the Embassy or the Consulate here.

241.   That, as I said, is the most influential organisation or association in the Chinese [indecipherable] community in Australia.

242.   Whoever took the position as the head of that organisation means he can be identified as the leader, the most influential figure within the Chinese community.

243.   Enjoys very high status.

244.   NICK MCKENZIE: Mr Huang's Council is dedicated to pushing the Communist Party's interests in China and abroad.

245.   PROF. JOHN FITZGERALD: Well every government of course has an interest in promoting itself abroad. To extending its soft power.

246.   I guess what's different about China is the way in which it's run through these clandestine operations.

247.   It's just not out there and open.

248.   Secondly, it's really not out to win an argument, it's out to silence dissent and other countries generally don't operate that way.

249.   They expect to win an argument on its strengths, not to silence all opposition.

250.   The way the Chinese Government or Party through the United Front Department and the Overseas Chinese Bureau operates is effectively to control and silence dissent.

251. NICK MCKENZIE: Mr Huang chaperoned the top Communist Party official in charge of Overseas Chinese, and who was accompanying Premier Li on his Australian visit.

252. UNKNOWN CHINESE MALE VOICE: What are your expectations for our work her in Australia?

253. QUI YUANPING: As we say, "a mother always worries about her traveling child." To all overseas Chinese, including students, you will always be an important member of the global Chinese family.

254. NICK MCKENZIE: Mr Huang has made something of an artform of juggling his Chinese Communist Party ties with his cultivation of Australian political figures.

255. DR FENG CHONGYI: Obviously, he has two identities.

256. One of course is a businessman, quite a smart businessman.

257. Again, the other identity he's, he's trying to be a political figure.

258. He does have his own political ambition.

259. NICK MCKENZIE: One of Mr Huang's advisors on the peaceful reunification Council is NSW Labor politician Ernest Wong.

260. A close ally and friend, the pair travelled to Taiwan together on Reunification Council business.

261. In November 2012, Mr Huang and two other reunification council members, donated half a million dollars to the NSW ALP.

262. Six months later, the ALP put Ernest Wong into the NSW Upper House seat formerly held by Labor's Eric Roozendaal.

263. Roozendaal went on to get a job with Mr Huang.

264. PROF. JOHN FITZGERALD: Well Mr Huang is very generous to all parties.

265. He could hardly be called partisan; he contributes to the Liberal Party as well as to the Labor Party.

266. He's also a very generous employer of former party operatives.

267. NICK MCKENZIE: Another of Mr Huang's political allies, and a fellow member of the Peaceful Reunification Council, is active ALP identity Simon Zhou.

268. Zhou was given the last place on the Labor party's senate ticket at last year's election, a month after two of his business associates donated $60,000 to the ALP.

269. Mr Huang was at the announcement.

270. HUANG XIUANGMO: As China's power keeps rising, the status of overseas Chinese is also rising.

271. Now Overseas Chinese realise that they need to make their voices heard in politics.

272. To safe guard Chinese interests, and let Australian society pay more attention to the Chinese.

273. This is a very good thing.

274. NICK MCKENZIE: Within Labor, Sam Dastyari was Mr Huang's key contact.

275. As the Party's NSW General Secretary, and then as a Senator, Dastyari has welcomed hundreds of thousands of dollars in donations from Mr Huang.

276. SAM DASTYARI, LABOR SENATOR: Demonstration Mr Huang of how highly you're respected, how much all of us respect you and the work you do.

277.  NICK MCKENZIE: An incident that occurred in June 2016 leaves little doubt that Mr Huang expects something in return for his donations.

278.  In the lead up to the federal election, he promised the ALP $400,000 in donations.

279.  But then, at the National Press Club, Labor's defence spokesman Stephen Conroy criticised Beijing over its land grabs in the South China Sea, flagging the ALP would take a more aggressive approach in the disputed territory.

280.  STEPHEN CONROY, LABOR DEFENCE SPOKESMAN: Now, when it comes to regional security challenges like the South China Sea, the Turnbull government are sitting behind ambiguous language while refusing to be upfront with the Australian people.

281.  By contrast, we believe our defence force should be authorised to conduct freedom of navigation operations consistent with international law.

282.  NICK MCKENZIE: After this speech, Mr Huang reacted decisively to the apparent attack on one of the Chinese Communist Party's core policies.

283.  4 Corners has learned, that Mr Huang called the ALP and told them that because of Conroy's comments, he was cancelling his promised $400,000 donation.

284.  PROF. RORY MEDCALF: It's precisely the kind of example of economic inducement being turned into economic leverage or coercion.

285.  In other words, it's a classic example of a benefit being provided, but then withheld as a way of punishment, and as a way of influencing Australian policy independence.

286.  NICK MCKENZIE: Just one day after Stephen Conroy's comments, Mr Huang appeared at a press conference alongside his Labor mate.

287.  Contradicting his Party's position, Senator Dastyari told the Chinese media that Australia shouldn't meddle with China's activities in the South China Sea.

288.  When his comments were reported several weeks later, he tried to explain.

289.  JOURNALIST: Why did you hold that press conference and make those comments on the South China Sea?

290.  SAM DASTYARI: OK. This is a, a, separate matter and I want to get to this.

291.  I support, I, I support, the Labor Party position on the South China Sea.

292.  I support the Labor Party position. I support an international rules based system with international norms, where the rule of law is applied.

293.  Now that has been my position.

294.  That remains my position, that is the Labor Party position on the issue of the South China Sea.

295.  JOURNALIST: It wasn't in that press conference was it?

296.  JOURNALIST: Then why did you say that it's a matter for China?

297.  SAM DASTYARI, LABOR SENATOR: Look, well look, look. Now, I'm not, I'm not, I. While I can't be held directly to words there were held at a press conference that I don't have a transcription of in front of me, now let me be clear, I support the Labor Party position on this issue, no no no no no, Andrew, Andrew.

298.  JOURNALIST: Why did you hold a press conference then?

299.  NICK MCKENZIE: Amid the media storm, the press seized on Mr Huang's previous payment of $5000 to Senator Dastyari to pay an ALP legal bill.

300.  Another Chinese donor had given him $1600 for a travel bill.

301.   The Senator fell on his sword.

302.   SAM DASTYARI: So look, I am going to be making a short statement, and I won't be taking any questions.

303.   This has been a difficult week and this afternoon I have made a difficult decision.

304.   Today I spoke to my leader Bill Shorten and offered my resignation from the front bench, which he accepted.

305.   NICK MCKENZIE: Last year Mr Huang sought more political help.

306.   He had applied for Australian citizenship, but his application had stalled.

307.   It was being secretly scrutinised by ASIO.

308.   Mr Huang began lobbying his political contacts for assistance.

309.   4 Corners has learned of one politician who agreed to help.

310.   Labor Senator Sam Dastyari.

311.   NICK MCKENZIE: 4 corners can reveal that after multiple requests from the billionaire donor, Dastyari's office cointacted the immigration department to query the progress of Mr Huang's citizenship application.

312.   In the lead up to the election, Dastyari's office made four separate approaches to the Department.

313.   It's understood Dastyari made two of these calls himself.

314.   4 Corner's has made several requests to Mr Huang for an interview. He's declined. Nevertheless, we caught up with him in Sydney.

315.   JOURNALIST: ABC 4 Corner's, we would like to ask you about your relationship to the Chinese Communist Party?

316.   HUANG XIJANGMO: I don't have a relationship with them.

317.   JOURNALIST: Why have you asked Australian politicians to help you get a passport?

318.   HUANG XIUANGMO: I am not going to answer any questions.

319.   NICK MCKENZIE: In a statement, Mr Huang said he took strong objection to any suggestion he had linked his donations to any foreign policy outcome.

320.   Mr Huang's citizenship application is still being reviewed by ASIO.

321.   The signing of the China Australia Free Trade Agreement cemented our vital relationship with the world's new economic super power.

322.   As Trade Minister, Andrew Robb spent years negotiating the deal.

323.   His position brought him in contact with another Chinese billionaire - Ye Cheng, head of the Landbridge Group.

324.   UNKNOWN FEMALE SPEAKER: Investment agreement between Landbridge Group and Westside Corporation Limited.

325.   NICK MCKENZIE: Landbridge recently spent $506million to secure a 99-year lease for the Port of Darwin, a hugely controversial deal in light of the company's close ties to the Chinese Communist Party.

326.   PETER JENNINGS: I think Chinese companies understand that if they can actually help to satisfy the strategic and political objectives of the communist party that will insure their prosperity.

327.   It will give them access to cheap finance and it's something which makes the senior leadership of those firms, you know, more prominent and successful in the context of, of Beijing politics.

328.    SPEAKER: The Minister for Trade and Investment.

329.    ANDREW ROBB, FORMER TRADE MINSTER: Thank you very much Mr. Speaker.

330.    NICK MCKENZIE: Before Last year's election, Andrew Robb stepped down from Government, and his final senior position as Australia's Special Envoy on Trade.

331.    A few months later it was revealed he'd been appointed as an economic advisor to Landbridge.

332.    JOURNALIST: And what about your own role at Landbridge because the Prime Minister said that he, he hadn't been notified about?

333.    ANDREW ROBB, FORMER TRADE MINSTER: No why should I? He said to me why? He. I've now left. I'm sorry I've now left politics right?

334.    JOURNALIST: Well we've got, we've got the Australian Defence Association. Well we've now got the Australian Defence Association and the opposition, they are jumping up and down about...

335.    ANDREW ROBB, FORMER TRADE MINSTER: No. Well, they're all playing politics,

336.    JOURNALIST: ...questions about ministerial conduct and all that sort of thing.

337.    ANDREW ROBB: Well, again, they're, they're, they're implying that I will act unethically and, and where's the evidence?

338.    I mean, I've, I've been a senior cabinet Minister, I know the responsibilities that I've got.

339.    I've got no intention of breaching those responsibilities.

340.    NICK MCKENZIE: Andrew Robb's confidential consulting deal can now be revealed.

341.    Robb was on the Landbridge payroll from July 1 - the day before the election.

342.    From that date, he's be paid $73,000 a month, or $880,000 a year, plus expenses.

343.    Andrew Robb declined an interview, but told 4 Corners he has acted in line with his obligations as former Trade Minister.

344.    PETER JENNINGS: I respect as the Prime Minister said, that you know, Mr Robb has a right to go out and earn a living once he's left parliament but, you know, he was a cabinet minister for many years and I think now providing advice to the leadership of the Landbridge Group was possibly a step too far too quickly in terms of his departure from politics.

345.    NICK MCKENZIE: Questions around how Australia and its leaders manage the relationship with China are central to the nation's most important foreign policy debate.

346.    Australia must maintain its growing ties to its most important economic partner.

347.    But we also must confront the fact that some of the interests and practices of the authoritarian one party state conflict with our own.

348.    PROF. RORY MEDCALF: There's an awareness of a problem, but the agencies themselves don't have the mandate or the wherewithal to manage the problem.

349.    All they can do is sound the alarm and alert the political class.

350.    The political class needs to take a set of decisions in the interest of Australian sovereignty, in the interest of Australia's independence policy making, to restrict and limit foreign influence in Australian decision making.

351.    CHRIS UHLMANN: After being briefed on the 4 Corners-Fairfax investigation, the Attorney General sent us a statement revealing the Prime Minister has asked him to conduct a major inquiry into Australia's espionage and foreign interference laws.

352.    Senator Brandis said, "the threat of political interference by foreign intelligence services is a problem of the highest order and it's getting worse."

353.    Senator Brandis says he will examine whether the espionage offences in the criminal code are adequate and expects to brief Cabinet on possible changes to the law before the end of the year.

354.    We will watch with interest. Good night.

" B "

Print    Email    Share    Transcript    Background Information

## Power and Influence

### By Nick McKenzie, Sashka Koloff, Anne Davies

*Updated June 6, 2017 15:13:00*



**Monday 5 June 2017**

**Power and Influence: The hard edge of China's soft power.**

1 *"They want to influence Australia. They want a stronger presence in Australia."*

2 It's a tale of secrets, power and intimidation.

3 *"ASIO are really quite alive and alert to these issues... of Australian national security."*

4 China is our most important trading partner, making a strong relationship vital to Australia's national interest. But there are growing concerns about covert Chinese actions taking place on Australian soil.



Power and Influence

5  *"Every government has an interest in promoting itself abroad to extending its soft power, I guess what's different about China is the way in which its run through these clandestine operations."*

6  Five months in the making, this joint *Four Corners/Fairfax Media* investigation uncovers how China's Communist Party is secretly infiltrating Australia.

7  The investigation tracks the activities of Beijing-backed organisations and the efforts made to intimidate opponents of the Chinese Communist party.

8  *"The way the Chinese Government operates is effectively to control and silence dissent."*

9  And investigates the influence of individuals who have access to political and business leaders.

10  *"Even if they're not receiving any kind of direction, they would feel some sense of obligation, or indeed make the right impression on the powers that be in China, to demonstrate that they're being good members of the party, that they're pursuing the party's interests."*

11  The findings will be released in a series of stories through *Fairfax Media* and ABC platforms, reported by Fairfax's Nick McKenzie and the ABC's Chris Uhlmann, culminating in the *Four Corners* broadcast on Monday night, detailing the full revelations.

**Power and Influence, reported by Nick McKenzie and presented by Sarah Ferguson, goes to air on Monday 5th June at 8.30pm EDT.** It is replayed on Tuesday 6th June at 10.00am and Wednesday 7th at 11pm. It can also be seen on ABC NEWS channel on Saturday at 8.00pm AEST, ABC iview and at abc.net.au/4corners.

Hide transcript

## Transcript

**Power and Influence - Monday 5 June 2017**

12  CHRIS UHLMANN: For six months, the world has watched the unfolding story of how the Russian government and its agents sought to subvert the US election, and possibly helped deliver the presidency to Donald Trump.

13  Extraordinary though that story is, it is not unique. America is not the only democracy to have been targeted in this way, and Russia is not the only country accused of such subversion.

14  Just ten days ago, the head of Australia's peak intelligence agency ASIO warned that espionage and foreign interference are occurring here on an unprecedented scale, with the potential to cause serious harm to this nation's sovereignty, it's security and, he added, the integrity of our political system.

15  Duncan Lewis did not name the key suspect. But we can tonight - the Chinese Communist Party.

16  A joint investigation by a team of journalists from 4 Corners and Fairfax Media has exposed a concerted campaign by the Chinese government and its proxies to infiltrate the Australian political process to promote its own interests.

17  Its targets include our universities, local student and community groups, the Chinese language media, and - most disturbing of all - some of our nation's leading politicians.

18  This investigation reveals that business leaders allied to Beijing are using millions in political donations to the major parties to buy access and influence, and in some cases to push policies that may be contrary to Australia's national interests.

19  Nick McKenzie has the story.

20  NICK MCKENZIE, REPORTER: In the early hours of a cold morning in October 2015, a team of counter espionage officers breaks into a Canberra flat.

21  Their target is a Chinese born woman, who is married to a former high ranking Australian intelligence official.

22 ASIO suspects the woman is involved in spying for the Chinese Government.

23 PROF. RORY MEDCALF, NATIONAL SECURITY COLLEGE, ANU: For such an action to be taken you would assume that it would need the authorization of the Attorney General, it would need a warrant, and it would need essentially a decision involving many parts of the Australian National Security Community.

24 So it would reflect deep and real concern about Chinese espionage in Australia.

25 NICK MCKENZIE, REPORTER: The woman's name is Sheri Yan ... a socialite with connections to the senior levels of government, here and abroad.

26 Did you think she might be a Chinese intelligence operative of some sort?

27 PROF. JOHN FITZGERALD, THE FORD FOUNDATION, BEIJING, 2008 - 2013: I understand that Sheri Yan is very closely connected with some of the most powerful and influential families and networks in China.

28 Once you know that you don't need to know much more.

29 NICK MCKENZIE: Yan's husband, Roger Uren, was until 2001 Assistant Secretary at Australia's Office of National Assessments, the agency which provides secret intelligence briefings to the Prime Minister.

30 During the raid, ASIO seized computers and documents.

31 They discovered classified Australian government files on the work of Chinese intelligence.

32 Uren is being investigated for the removal of these files, which may have been illegal.

33 PROF. RORY MEDCALF: This material is normally held very tightly held.

34 Presumably it relies on intelligence sources and methods, which can't be compromised.

35 It also could potentially reveal some of the deepest intelligence and analytical judgements of either Australia or indeed of Australia's allies and partners.

36 So it's material that has to be protected at all costs.

37 NICK MCKENZIE: In the weeks before the raid, ASIO analysts had been tracking links between political donors in Australia and the Chinese Communist Party.

38 The donations provided access to the most powerful politicians in the land.

39 ASIO chief Duncan Lewis was so worried, he organised meetings with the Directors of the Liberal and National parties, as well as the Federal Secretary of the ALP, to warn them that the donors could compromise the major parties.

40 NICK MCKENZIE: How unusual is it for a directed general of ASIO to take such a step?

41 PROF. RORY MEDCALF: Oh it's certainly unusual.

42 If that is indeed the case, it would reflect very real, very real concern.

43 NICK MCKENZIE: When he briefed the party officials, Lewis said the donors being examined by ASIO were breaking no laws.

44 But he warned their strong connections to the Chinese Communist Party meant their donations might come with strings attached.

45 ASIO briefed then Prime Minister Tony Abbott.

46 PETER JENNINGS, EXECUTIVE DIRECTOR, AUSTRALIAN STRATEGIC POLICY INSTITUTE: I think that this type of, frankly, naked influence buying, is something, which is damaging to Australia's political system.

47  I would far rather have a regime in place whereby we, the tax payer, pay for the cost of our elections than relying on parties to get donations from foreign sources, where ever they may come from.

48  Notably those foreign sources are primarily linked to Chinese business.

49  NICK MCKENZIE: ASIO singled out two billionaire donors with especially close ties to the Chinese Communist Party.

50  The first was enigmatic property developer Dr Chau Chak Wing, a man who keeps a low profile except when it comes to his big donations.

51  PETER MATTIS, FORMER CIA CHINA EXPERT: He sort of appeared out of nowhere.

52  There's very little in his biography that predates his appearance and his entry onto the Australian and China business scene.

53  NICK MCKENZIE, REPORTER: Dr Chau's extraordinary generosity has given him access to Australia's political elite.

54  Dr Chau donated $20 million dollars to build a Frank Gehry designed building at the University of Technology Sydney, which was opened by the Governor General in 2015.

55  At the unveiling of the Dr Chau Chak Wing building, the billionaire politely posed with the famous architect.

56  Not content with having a building named after him, Dr Chau splashed $70 million dollars on Australia's most expensive home in 2015.

57  A six story mega mansion he bought from James Packer.

58  Dr Chau's money allowed him to regularly rub shoulders with the great and good of Australian politics.

59  He's donated more than $4 million to the major parties over the past decade.

60  The question ASIO has been probing is what he wants from his donations?

61  PROF. RORY MEDCALF: We don't know whether donations are somehow driven, or centrally encouraged, by the Chinese Communist Party, or whether in fact you've got enthusiastic individuals freelancing to make donations that they think will resonate well when they report back to China, or if they report back to China that these donations were made, and that there is a change taking place in the Australian political discourse.

62  NICK MCKENZIE: Dr Chau is an Australian citizen.

63  Back in his homeland China, he was also a member of a communist party advisory group known as a people's political consultative conference or CPPCC.

64  This group carries out the work of an opaque lobbying arm of the Party called the United Front Work Department.

65  PROF. RORY MEDCALF: We have to assume that individuals like that have really deep, serious connections to the Chinese Communist Party.

66  Even if they're not receiving any kind of direction, they would feel some sense of obligation, or indeed some desire to make the right impression on the powers that be in China, to demonstrate that they're being good members of the party, that they're pursuing the party's interests.

67  PETER MATTIS: In a sense, you could say in Australia that with wealth comes responsibility, and that responsibility is to respond to the party when they ask you to do a favour for them.

68  GEOFF RABY, AUSTRALIAN AMBASSADOR TO CHINA, 2007 - 2011: Well I think it's mainly to do with their own business interests in Australia.

69  Also, it's very much in the nature of the way Chinese do business, making gifts.

70 And most of these business developers and sorts of people who are doing this, they crave the prestige and the status of being photographed standing next to politicians, on both sides of politics.

71 So, it's about their influence and status and image.

72 Which they see as helping their business first and foremost, giving their family respect.

73 It's very much a traditional Chinese way of operating.

74 NICK MCKENZIE: Four Corners has learned ASIO's interest in Dr Chau arose partly from his association with a woman described as an 'old friend - the socialite and lobbyist Sheri Yan.

75 It was Sheri Yan who ASIO suspected of spying and whose Canberra apartment the agency raided.

76 PETER MATTIS: Sheri Yan, or Yan Shiwei, is an Australian-Chinese businesswoman who's made her livelihood out of building connections between China and the outside world and acting as a go-between between foreign businessmen, foreign government officials who are trying to get things done in China, or find their way among the bureaucratic and political land mines that are there.

77 NICK MCKENZIE: Dr Chau used Sheri Yan as a consultant, somebody able to open up the right doors.

78 GEOFF RABY: She's a very active person.

79 Many people come through the place, through Beijing.

80 She's a, you know, dynamic, active person, speaks both languages perfectly, is charming, and comes from a well-connected background, which I don't know what those connections are, I only understand that's the case.

81 PETER MATTIS: It appears her father was a PLA officer at one point in the very early days, so she's connected to the core of the CCP in a sense.

82 No one can really explain where her original money, original connections, her original ways of opening the doors in China comes from.

83 NICK MCKENZIE: Sheri Yan divided her time between New York, Beijing and Canberra, and moved with ease among the A-listers.

84 Her contacts included high flying businessmen and Australia's former New York consul general Phil Scanlan.

85 She was also close to the President of the United Nations General Assembly, John Ashe.

86 PETER MATTIS, FORMER CIA CHINA EXPERT: Someone who knows how to work that landscape is useful not only for getting things done, not only for injecting Chinese perspectives into it, but also for being able to say, "Here are the players. Here are the people who are important.

87 "Here are their personal foibles."

88 NICK MCKENZIE, REPORTER: As Sheri Yan relentlessly networked, her husband Roger Uren was often proudly by her side.

89 Uren's previous work as a high ranking Australian intelligence official with top security clearance meant he was trusted in Canberra.

90 But not everyone trusted Sheri Yan.

91 PROF. JOHN FITZGERALD: In times, past I was advised to stay well clear of Sheri Yan.

92 NICK MCKENZIE: Why?

93 PROF. JOHN FITZGERALD: I'm not entirely sure why.

94  I was advised by an old friend in Australia's security establishment.

95  NICK MCKENZIE: To stay clear of Sheri Yan?

96  PROF. JOHN FITZGERALD: To stay clear of Sheri Yan.

97  NICK MCKENZIE: In October 2015, the Sheri Yan story took a sudden and dramatic twist in New York.

98  PREET BHARARA, NEW YORK ATTORNEY GENERAL: Today, together with our law enforcement partners, we expose yet another wide-ranging corruption scheme, one that is simultaneously local and global and it is centred at the United Nations.

99  NICK MCKENZIE: At the same time her Canberra apartment was being raided, Sheri Yan was arrested in the US, accused of bribing the UN general assembly president.

100  Yan's arrest stunned her associates, including former Australian ambassador Geoff Raby.

101  GEOFF RABY: Well I was obviously very surprised. I couldn't believe it when I heard it. But she had been out of Beijing largely for a couple of years.

102  JOURNALIST: Can I just ask if you are aware of Sheri Yin? She was arrested in the US last week for bribery allegations in the UN.

103  She is a bit of a mystery, it seems that she lives here in Canberra, or at least may be a dual citizen, but no one is quite sure.

104  Is it a consular case?

105  JULIE BISHOP, MINISTER FOR FOREIGN AFFAIRS: I have been briefed on the matter, it is a matter that the Department of Foreign Affairs and Trade is focussing on but I'm not going to go into individual cases at this point, but it is a matter upon which I've been briefed.

106  JOURNALIST: Can you say if she's an Australian-Chinese?

107  JULIE BISHOP, MINISTER FOR FOREIGN AFFAIRS: I'll leave that sort of detail to our consular staff.

108  It's a fairly complex issue, I don't want to compromise any of the investigations which are underway.

109  Thank you.

110  NICK MCKENZIE, REPORTER: One of the events that led to Sheri Yan's arrest unfolded at the luxury Imperial Springs Resort, which is owned by none other than the Australian political donor Dr Chau Chak Wing.

111  The FBI alleged Yan bribed the UN general assembly President to speak at the resort, at a conference hosted by Dr Chau.

112  A sealed indictment from a New York Court against Sheri Yan refers to Dr Chau using a codename - CC3.

113  Sheri Yan was alleged to have told the UN President

114  SHERI YAN: [CC3's] office emailed me with the invitation.

115  I will ask $200,000 for this trip...

116  NICK MCKENZIE: A draft invitation sent to the United Nations president and allegedly approved by Dr Chau stated his desire to make the UN chief his "sincere friend in Guangdong Province"

117  DRAFT INVITATION: And your friend here has the pleasure to offer you a permanent convention venue for the UN meetings...

118  NICK MCKENZIE: The UN president's bank account was then wired $200,000 by one of Dr Chau's companies.

119   Under US bribery law it was illegal for Ashe as UN official to receive this payment.

120   There is no suggestions Dr Chau knew it was illegal.

121   PETER MATTIS: At least some of the money that was moving through Sheri Yan, or that she was facilitating, came from him.

122   It doesn't mean that there was necessarily anything untoward about it, but just the fact of large amounts of money being moved or paid to people because of introductions or the activities of Sheri Yan make it, make it somewhat suspect.

123   NICK MCKENZIE: Sheri Yan pleaded guilty to bribery charges and was jailed last year.

124   Dr Chau has never been charged with any offence and denies any wrongdoing.

125   ASIO's interest in Sheri Yan is just one of many suspected foreign interference and intelligence cases being probed by Australia's agencies, and which lead back to Beijing.

126   PROF. RORY MEDCALF: it's fair to say that agencies like ASIO are really quite alive and alert to these issues.

127   The challenge for them is that their mandate is essentially to monitor, and to report to government what's happening.

128   They don't have a mandate, it's not clear who within the Australian system has a mandate to act on this information.

129   NICK MCKENZIE: In Washington, concerns about the Chinese Communist Party interfering in Australian politics is growing.

130   There, senior officials believe Australia is open to compromise, including through foreign donations.

131   MIKE MCCAUL, CHAIRMAN, HOMELAND SECURITY COMMITTEE: Well, you know, in the United States we prohibit that expressly.

132   I think there's a reason for that.

133   We don't want the influence of foreign money in our elections and foreign governments to influence our elections.

134   I think that's a wise policy.

135   Quite frankly, I was a bit surprised that Australia does allow foreign contributions, and if you look at the numbers, which I was privy to, a lot of these donations are coming from China.

136   China has a very strong influence in the region.

137   They want to influence Australia.

138   They want a stronger presence in Australia, and what better way to do that then to influence political figures through, through foreign contributions.

139   NICK MCKENZIE: Republican congressman Mike McCaul is chairman of the Homeland Security Committee.

140   In the 1990s while a prosecutor at the US Justice Department, he investigated a scandal known as 'China-gate'.

141   Chinese spies funnelled donations into the Clinton presidential campaign.

142   MIKE MCCAUL: It's almost like out of a spy novel.

143   I mean, it's the most interesting case I ever prosecuted.

144   These are very dangerous, clandestine figures in Chinese intelligence and there was a concerted effort to influence our elections.

145 NICK MCKENZIE: McCaul warns Australia is badly exposed, unless our laws are changed.

146 MIKE MCCAUL: The critical issue here is allowing a foreign government to influence your elections.

147 I think at a minimum, closing off foreign contributions from a foreign government to influence elections, and in this case, China is the biggest offender.

148 NICK MCKENZIE: Chinese Premier Li Keqiang's visit here in March came as Australia grapples with a shifting world order post the election of Donald Trump, and an emboldened Chinese Communist Party no longer content to hide its strength and bide its time.

149 In Australia's diplomatic and security community, debate is raging about why and to what extent the one-party state is seeking influence in Australian institutions.

150 In Canberra, local students were bussed in by the Chinese Embassy, to welcome Premier Li

151 NICK MCKENZIE: The young patriots drown out those there to protest against the Chinese government.

152 Lupin Lu is President of the Chinese students' association at the University of Canberra. She organised 200 of her classmates for the rally.

153 LUPIN LU, PRESIDENT, CHINESE STUDENTS AND SCHOLARS ASSOCIATION, UC: The Chinese Embassy, they support us or sponsor us by providing flags, food.

154 NICK MCKENZIE: The flags?

155 LUPIN LU: Yes.

156 NICK MCKENZIE: The food?

157 LUPIN LU: Transportation.

158 NICK MCKENZIE: Transportation.

159 LUPIN LU: And legal help as well, lawyer.

160 NICK MCKENZIE: For the event, for the day?

161 LUPIN LU: Yes, because there is politics involved.

162 Sometimes there may be conflict with the police.

163 NICK MCKENZIE: The Chinese government and its proxies monitor Chinese student associations at most Australian universities.

164 This oversight has a dark side.

165 Students organising anti-communist party protests may be reported to the Chinese Embassy.

166 LUPIN LU: I guess as the president of Chinese Students Scholars Association and as a Chinese, I would do this for the safety of other members, other students.

167 NICK MCKENZIE: You would tell the embassy that some students were organising a human rights protest, for instance?

168 LUPIN LU: Yes. I would definitely, just to keep all the students safe and to do it for China as well.

169 NICK MCKENZIE: Brisbane student and democracy activist Anthony Chang believes he is being monitored by the Chinese Government.

170 He fled China three years ago after he was arrested and interrogated for putting up posters supporting independence for Taiwan.

171) ANTHONY CHANG, STUDENT ACTIVIST: When they took me to the police station, I was still frightened.

172 I had my hands over my head, and I said, "I will absolutely obey you, just make sure you don't shoot me".

173 As you can see, I was scared of them.

174 NICK MCKENZIE: He didn't expect to come to the attention of the Chinese authorities, here too.

175 But after he spoke in Brisbane at this pro Hong Kong democracy rally, his parents back in China were visited by state security officials, who demanded their son cease his Australian activism.

176 ANTHONY CHANG: My parents, are very worried.

177 They are worried that it might affect them, for example their work.

178 They could lose their job.

179 They could be jail because of my activities.

180 NICK MCKENZIE: One of the fiercest critics of communist party interference in Australia is Sydney academic Dr Feng Chongyi.

181 While Premier Li was being feted in Australia, Dr Feng was back in China to meet with human rights lawyers - work he knew would draw attention.

182 DR FENG CHONGYI: We know that it's an open secret that we are, our telephone is tapped, we are followed everywhere but that is a routine that we have to accept if we want to work in China.

183 NICK MCKENZIE, REPORTER: But Dr Feng did not expect what happened next.

184 At his hotel in the city of Kunming, he was tracked down by agents from the Ministry of State Security.

185 Over the next 10 days he was subjected to intensive videotaped questioning ... for up to 6 hours a day.

186 Many of the questions involved his activities in Sydney.

187 NICK MCKENZIE: They wanted to know about your democracy activism in Sydney.

188 DR FENG CHONGYI: In Sydney, yes that's right.

189 NICK MCKENZIE: They wanted to know about your associates in Sydney?

190 DR FENG CHONGYI: That's right.

191 NICK MCKENZIE: They knew about your family in Sydney?

192 DR FENG CHONGYI: That's right.

193 NICK MCKENZIE: They knew specific details about names?

194 DR FENG CHONGYI: Actually, for my family members they, they got everything.

195 They got everything.

196 NICK MCKENZIE: Dr Feng was accused of endangering state security.

197 Only after the intervention of the Turnbull government was he told he was finally free to return home to Sydney.

198 He believes he was targeted by the Chinese Communist Party as a warning to others in Australia not to challenge the party.

199 DR FENG CHONGYI, ASSOCIATE PROFESSOR, CHINA STUDIES, UTS: there are several messages they are sending on.

200 One is directly related to my work, that the academics better stay away from sensitive issues or sensitive topics, otherwise they can get you into deep trouble, detention or other punishment.

201 NICK MCKENZIE: While Dr Feng was trapped in China, back in Australia, Premier Li was the guest of honour at a Chinese community event held at the Sydney Town Hall.

202 Sitting at the head table opposite Premier Li was Dr Chau Chak Wing.

203 A couple of seats over from him was another Chinese billionaire - Huang Xiangmo.

204 Like Dr Chau, Mr Huang has come to the attention of ASIO.

205 Mr Huang is the second donor named by ASIO in its secret warning to the Coalition and Labor about the danger of Chinese Communist Party interference in Australian politics.

206 PROF. JOHN FITZGERALD: When we look at other business people contributing say to Australian political parties, we can go back through the company records and establish where that money came from.

207 In the case of Mr Huang it's not quite so clear.

208 NICK MCKENZIE: Mr Huang's rise is a classic rags to riches story.

209 From a poor rural family, he built his billion-dollar fortune as a property developer in provincial China.

210 Mr Huang arrived in Australia in 2011 in near total obscurity.

211 But that didn't last for long.

212 NICK MCKENZIE: Mr Huang, and his property development firm Yuhu, began donating millions of dollars to health and education initiatives, earning the praise of politicians from both parties

213 ANDREW ROBB, MINISTER FOR TRADE AND INVESTMENT, 2013 - 2016: I thought I'd just say a couple of words about Mr Huang.

214 I think it's important to get a sense of the man.

215 He is a man of many dimensions from what I've already been able to determine.

216 Thoughtful, he's a very thoughtful cerebral fellow.

217 He's a man who thinks, about life and about how we can improve it.

218 He's a man comfortable in his own skin, he's a man with a sense of humour which is a good thing.

219 He's a visionary.

220 NICK MCKENZIE: Mr Huang became a major political donor too.

221 Getting to know Tony Abbott - he gave $770,000 to the Liberals before the 2013 election.

222 A big chunk of that went to Julie Bishop's home state of Western Australia.

223 Mr Huang and his associates also gave to the Trade Minister Andrew Robb .... $100,000 to his campaign fundraising vehicle, as Robb signed off on the China Australia Free Trade deal.

224 And $1.8 million went towards an Australia China Research Institute. Mr Huang became its chairman, its director - former Foreign Minister Bob Carr.

225 PROF. JOHN FITZGERALD: First, he's seeking to establish his position, his status in the Chinese Australian community.

226 Secondly, I think he's trying to secure some standing for the Chinese Australian community with various Australian governments at state federal level and third through those community organisations, to secure outcomes that are favourable to the Chinese State Policy.

227 NICK MCKENZIE: In the right company, Mr Huang makes no secret of his devotion to the Chinese Communist Party.

228 At an event celebrating 66 years of one party rule in China, Mr Huang took to the stage

229 HAUGN XIANGMO: We overseas Chinese unswervingly support the Chinese Government's position to defend our nations sovereignty and territorial integrity.

230 We support the development of the motherland always, and take on an important role in building One Belt One Road.

231 NICK MCKENZIE: Mr Huang oversees a communist party aligned Council which supports Beijing's territorial claims over Taiwan, Hong Kong and the South China Sea.

232 It's called the Australian Council for the Promotion of the Peaceful Reunification of China, and Mr Huang is President.

233 DR FENG CHONGYI: That means he's a key member supported by the Chinese authorities including the Embassy or the consulate here.

234 That as I said is the most influential organisation or association in the Chinese diaspora community in Australia.

235 Whoever took the position as the head of that organisation means he can be identified as the leader, the most influential figure in the Chinese community.

236 Enjoys very high status.

237 NICK MCKENZIE: Mr Huang's Council is dedicated to pushing the Communist Party's interests in China and abroad.

238 PROF. JOHN FITZGERALD: Well every government of course has an interest in promoting itself abroad to extending its soft power.

239 I guess what's different about China is the way in which its run through these clandestine operations.

240 It's just not out there and open.

241 Secondly, it's really not out to win an argument, it's out to silence dissent and other countries generally don't operate that way.

242 They expect to win an argument on its strengths, not to silence all opposition.

243 The way the Chinese Government or Party through the United Front Department and the Overseas Chinese Bureau operates is effectively to control and silence dissent.

244 NICK MCKENZIE: Mr Huang chaperoned the top Communist Party official in charge of Overseas Chinese, and who was accompanying Premier Li on his Australian visit.

245 QUI YUANPING: Of course, as we say, "a mother always worries about her traveling child." To all our overseas Chinese, including students, you will always be an important member of the global Chinese family.

246 NICK MCKENZIE: Mr Huang has made something of an artform of juggling his Chinese Communist Party ties with his cultivation of Australian political figures.

247 DR FENG CHONGYI: Obviously, he has two identities.

248 One of course is a businessman, quite a smart businessman.

249 Then again, the other identity he's trying to be a political figure.

250 He does have his own political ambition.

251 NICK MCKENZIE: One of Mr Huang's advisors on the peaceful reunification Council is NSW Labor politician Ernest Wong.

252 A close ally and friend, the pair travelled to Taiwan together on Reunification Council business.

253 In November 2012, Mr Huang and two other reunification council members, donated half a million dollars to the NSW ALP.

254 Six months later, the ALP put Ernest Wong into the NSW Upper House seat formerly held by Labor's Eric Roozendaal.

255 Roozendaal went on to get a job with Mr Huang.

256 PROF. JOHN FITZGERALD: Well Mr Huang is very generous to all parties.

257 He could hardly be called partisan; he contributes to the Liberal Party as well as to the Labor Party.

258 He's also a very generous employer of former party operatives.

259 NICK MCKENZIE: Another of Mr Huang's political allies, and a fellow member of the Peaceful Reunification Council, is active ALP identity Simon Zhou.

260 Zhou was given the last place on the Labor party's senate ticket at last year's election, a month after two of his business associates donated $60,000 to the ALP.

261 Mr Huang was at the announcement.

262 HUANG XIUANGMO: As China's power keeps rising, the status of overseas Chinese is also rising.

263 Now Overseas Chinese realise that they need to make their voices heard in politics.

264 To safe guard Chinese interests, and let Australian society pay more attention to the Chinese.

265 This is a very good thing."

266 NICK MCKENZIE: Within Labor, Sam Dastyari was Mr Huang's key contact.

267 As the Party's NSW general secretary, and then as a Senator, Dastyari has welcomed hundreds of thousands of dollars in donations from Mr Huang.

268 SAM DASTYARI, LABOR SENATOR: A demonstration MR Huang of how highly you're respected, how much all of us respect you and the work you do.

269 NICK MCKENZIE: An incident that occurred in June 2016 leaves little doubt that Mr Huang expects something in return for his donations.

270 In the lead up to the federal election, he promised the ALP 400 thousand dollars in donations.

271 But then, at the National Press Club, Labor's defence spokesman Stephen Conroy criticised Beijing over its land grabs in the South China Sea, flagging the ALP would take a more aggressive approach in the disputed territory.

272 STEPHEN CONROY, LABOR DEFENCE SPOKESMAN: When it comes to regional security challenges like the south china sea the Turnbull government are sitting behind ambiguous language while refusing to be upfront with the Australian people.

273 By contrast, we believe our defence force should be able to conduct freedom of navigation operations consistent with international law.

274 NICK MCKENZIE: After this speech, Mr Huang reacted decisively to this apparent attack on one of the Chinese Communist Party's core policies.

275 Four Corners has learned, that Mr Huang called the ALP and told them that because of Conroy's comments, he was cancelling his promised $400,000 donation.

276 PROF. RORY MEDCALF: It's precisely the kind of example of economic inducement being turned into economic leverage or coercion.

277 In other words, it's a classic example of a benefit being provided, but then withheld as a way of punishment, and as a way of influencing Australian policy independence.

278 NICK MCKENZIE: Just one day after Stephen Conroy's comments, Mr Huang appeared at a press conference alongside his Labor mate.

279 Contradicting his Party's position, Senator Dastyari told the Chinese media that Australia shouldn't meddle with China's activities in the South China Sea.

280 When his comments were reported several weeks later, he tried to explain.

281 JOURNALIST: Why did you hold that press conference and make those comments on the south china sea?

282 SAM DASTYARI: This is a separate matter and I want to get to this.

283 I support the Labor Party position on the south china sea.

284 I support the Labor Party position. I support an international rules based system with international norms, where the rule of law is applied.

285 Now that has been my position.

286 That remains my position, that is the Labor Party position on the issue of the South China Sea.

287 JOURNALIST: Then why did you say that it's a matter for china?

288 SAM DASTYARI, LABOR SENATOR: Now, while I can't be held directly to words there were held at a press conference that I don't have a transcription of in front of me, now let me clear, I support the labor party position on this issue, no no no no no, Andrew, Andrew.

289 JOURNALIST: Why did you hold a press conference then?

290 NICK MCKENZIE: Amid the media storm, the press seized on Mr Huang's previous payment of $5000 to Senator Dastyari to pay an ALP legal bill.

291 Another Chinese donor had given him $1600 for a travel bill.

292 The senator fell on his sword.

293 SAM DASTYARI: So I am going to be making a short statement, and I won't be taking any questions.

294 This has been a difficult week and this afternoon I have made a difficult decision.

295 Today I spoke to my leader Bill Shorten and offered my resignation from the front bench, which he accepted.

296 NICK MCKENZIE: Last year Mr Huang sought more political help.

297 He had applied for Australian citizenship, but his application had stalled.

298 It was being secretly scrutinised by ASIO.

299 Mr Huang began lobbying his political contacts for assistance.

300 Four Corners has learned of one politician who agreed to help.

301 Labor Senator Sam Dastyari.

302 NICK MCKENZIE: Four corners has learned that after multiple requests from the billionaire donor, Dastyari's office called the immigration department to question the progress of Mr Huang's citizenship application.

303 In the lead up to the election, Dastyari's office made four separate approaches to the Department.

304 It's understood Senator Dastyari made two of these calls himself.

305 NICK MCKENZIE: In a statement, Mr Huang said he took strong objection to any suggestion he had linked his donations to any foreign policy outcome.

306 Mr Huang's citizenship application is still being reviewed by ASIO.

307 The signing of the China Australia Free Trade Agreement cemented our vital relationship with the world's new economic super power.

308 As Trade Minister, Andrew Robb spent years negotiating the deal.

309 His position brought him in contact with another Chinese billionaire - Ye Cheng, head of the Landbridge Group.

310 NICK MCKENZIE: Landbridge recently spent $506million to secure a 99-year lease for the Port of Darwin, a hugely controversial deal in light of the company's close ties to the Chinese Communist Party.

311 PETER JENNINGS: I think Chinese companies understand that if they can actually help to satisfy the strategic and political objectives of the communist party that will insure their prosperity.

312 It will give them access to cheap finance and it's something, which makes the senior leadership of those firms more prominent and successful in the context of Beijing politics.

313 NICK MCKENZIE: Before Last year's election, Andrew Robb stepped down from Government, and his final senior position as Australia's Special Envoy on Trade.

314 A few months later it was revealed he'd been appointed as an economic advisor to Landbridge.

315 JOURNALIST: And what about your own role at Landbridge because the Prime Minister said that he hadn't been notified?

316 ANDREW ROBB, FORMER TRADE MINSTER: No why should I? I'm sorry I've now left politics.

317 JOURNALIST: Well we've now got the Australian Defence Association and the opposition are jumping up and down.

318 Questions about ministerial conduct and that sort of thing.

319 ANDREW ROBB: Again, they're implying that I will act unethically and where's the evidence?

320 I mean, I've been a senior cabinet Minister, I know the responsibilities that I've got.

321 I've got no intention of breaching those responsibilities.

322 NICK MCKENZIE: Andrew Robb's confidential consulting deal can now be revealed.

323 Robb was on the Landbridge payroll from July 1 - the day before the election.

324 From that date, he's be paid $73,000 a month, or $880,000 a year, plus expenses.

325 Andrew Robb declined an interview, but told Four Corners he has acted in line with his obligations as former Trade Minister.

326 PETER JENNINGS: I respect as the Prime Minister said, Mr Robb has a right to go out and earn a living once he's left parliament but he was a cabinet minister for many years and I think now providing advice to the leadership of the Landbridge Group was possibly a step too far too quickly in terms of his departure from politics.

327 NICK MCKENZIE: Questions around how Australia and its leaders manage the relationship with China are central to the nation's most important foreign policy debate.

328 Australia must maintain its growing ties to its most important economic partner.

329 But we also must confront the fact that some of the interests and practices of the authoritarian one party state conflict with our own.

330 PROF. RORY MEDCALF: There's an awareness of a problem, but the agencies themselves don't have the mandate or the wherewithal to manage the problem.

331 All they can do is sound the alarm and alert the political class.

332 The political class needs to take a set of decisions in the interest of Australian sovereignty, in the interest of Australia's independence policy making, to restrict and limit foreign influence in Australian decision making.

333 CHRIS UHLMANN: After being briefed on the Four Corners-Fairfax investigation, the Attorney General sent us a statement revealing the Prime Minister has asked him to conduct a major inquiry into Australia's espionage and foreign interference laws.

334 Senator Brandis said, "the threat of political interference by foreign intelligence services is a problem of the highest order and it is getting worse."

335 Senator Brandis says he will examine whether the espionage offences in the criminal code are adequate and expects to brief Cabinet on possible changes to the law before the end of the year.

336 We will watch with interest. Good night.

337 **END**

338 | Hide background information |

339 ## Background Information

340 **STATEMENTS**

341 - **Statement from Attorney-General, George Brandis** | 2 Jun 2017 - Read a statement sent to Four Corners from George Brandis in relation to the Four Corners report 'Power and Influence'.

342 - **Statement from Senator Dastyari** | May 2017 - Read the response to questions sent to NSW Senator Sam Dastyari, from Four Corners.

343 - **Statement from WestSide Corporation** | 31 May 2017 - Read the full statement sent to Four Corners from Mike Hughes, Managing Director of Westside Corporation.

344 - **Additional Responses to the Four Corners investigation 'Power & Influence'** - Read responses sent to Four Corners from **Mr Xiangmo Huang, former Trade Minister Andrew Robb, and Dr Chau Chak Wing**.

345 **ABC NEWS AND FAIRFAX REPORTING**

346 **ASIO investigation targets Communist Party links to Australian political system - A joint Four Corners-Fairfax investigation** | ABC News | 5 Jun 2017 - http://www.abc.net.au/news/2017-06-05/asio-china-spy-raid/8589094

347 **ASIO warns political parties over foreign donations - A joint Four Corners-Fairfax investigation** | ABC News | 5 Jun 2017 - http://www.abc.net.au/news/2017-06-05/asio-warns-political-parties-over-foreign-donations/8590162

348 **Sheri Yan, jailed for bribing UN official, was target of secret ASIO raid in 2015** | ABC News | 5 Jun 2017 -
http://www.abc.net.au/news/2017-06-05/sheri-yan-suspected-of-being-spy-secret-asio-raid/8585278

349 **The Chinese Communist Party's power and influence in Australia** | ABC News | 4 Jun 2017 -
http://www.abc.net.au/news/2017-06-04/the-chinese-communist-partys-power-and-influence-in-australia/8584270

350 **Australian sovereignty under threat from influence of China's Communist Party** | ABC News | 4 Jun 2017 -
http://www.abc.net.au/news/2017-06-04/australian-sovereignty-under-threat-from-chinese-influence/8583832

351 **SPECIAL FEATURE China's Operation Australia: The Party Line** | The Age | Jun 2017 -
http://www.theage.com.au/interactive/2017/chinas-operation-australia/soft-power.html

352 BACKGROUND

353 **COMMENT If Australia listened to our hawks on China, we'd have been hung out to dry, by Bob Carr** | SMH |
24 May 2017 - http://www.smh.com.au/comment/if-australia-listened-to-our-hawks-on-china-wed-have-been-hung-
out-to-dry-20170523-gwaw1w.html

354 **Chinese influence 'challenging fundamentals' of Australia, says Stephen FitzGerald** | ABC News | 28 Sep
2016 - http://www.abc.net.au/news/2016-09-28/former-australia-ambassador-to-china-warns-government-of-
beijing/7885140

355 **Sam Dastyari steps down from Labor frontbench after accepting money from Chinese donors** | ABC News |
8 Sep 2016 - http://www.abc.net.au/news/2016-09-07/sam-dastyari-steps-down-from-labors-front-bench/7823970

356 **Sam Dastyari backs Labor policy on South China Sea amid ongoing donations row** | ABC News | 5 Sep 2016
- http://www.abc.net.au/news/2016-09-05/dastyari-rejects-govt-claims-on-his-position-on-south-china-sea/7816530

357 **Domestic spy chief sounded alarm about donor links with China last year** | ABC News | 1 Sep 2016 -
http://www.abc.net.au/news/2016-09-01/asio-chief-sounded-alarm-about-donor-links-with-china-last-year/7804856

358 **Sam Dastyari admits he was wrong to let China-linked company pay office bill** | ABC News | 31 Aug 2016 -
http://www.abc.net.au/news/2016-08-31/dastyari-says-he-was-wrong-to-let-china-linked-company-pay-bill/7800930

359 **Australian businesses with close ties to China donated $5.5m to political parties, investigation shows** | ABC
News | 22 Aug 2016 - http://www.abc.net.au/news/2016-08-21/australian-groups-strong-ties-china-political-
donations/7768012

360 **Chinese donors to Australian political parties: who gave how much? By Chris Uhlmann** | ABC News | 21 Aug
2016 - http://www.abc.net.au/news/2016-08-21/china-australia-political-donations/7766654

361 **Chinese donors to Australian political parties: who gave how much? by Chris Uhlmann** | ABC News | 21 Aug
2016 - http://www.abc.net.au/news/2016-08-21/china-australia-political-donations/7766654

362 **Ex-UN General Assembly president John Ashe dies amid ongoing bribery scandal, lawyer says** | ABC News |
23 Jun 2016 - http://www.abc.net.au/news/2016-06-23/ex-un-general-assembly-president-in-us-bribery-case-
dies/7536262

363 PAPERS

364 **China's economic leverage: perception and reality, by Rory Medcalf** | ANU National Security College | 2 Mar
2017 - http://nsc.anu.edu.au/documents/policy-options-paper2.pdf

365 **Chinese Language Media in Australia, by Wanning Sun** | The Australia-China Relations Institute | UTS | 2016 -
www.australiachinarelations.org/....pdf

366 **Inside the 'Flower Vase': The Chinese People's Political Consultative Conference, by Minglu Chen** | Sydney
University | 2011 -
https://sydney.edu.au/arts/government_international_relations/downloads/documents/1_2_Chen_Paper.pdf

367 **Tags:** business-economics-and-finance, government-and-politics, law-crime-and-justice, australia, china

*First posted June 5, 2017 12:41:00*

# Exhibit B

# EXHIBIT 3

DEPARTMENT OF STATE

WASHINGTON

The Department of State wishes to call the attention of the Embassy of

Antigua and Barbuda to the criminal case of Mr. John William Ashe, presently

pending in United States District Court for the Southern District of New York. In

this regard, the Department expresses its appreciation for the October 14, 2015,

letter from the Government of Antigua and Barbuda's Ministry of Legal Affairs to

the United States Attorney for the Southern District of New York ("United States

Attorney's Office"). The October 14, 2015, letter expresses the deep concern of

the Government regarding this case and the Government's intention to cooperate in

a full manner with the United States Attorney's Office.

As the Embassy is aware, Mr. Ashe, a former employee at the Permanent

Mission of Antigua and Barbuda to the United Nations, is accused of subscribing

to false and fraudulent United States individual income tax returns as part of a

conspiracy by Mr. Ashe and others involving bribery and money laundering. The

United States Attorney's Office has asked the Department of State to request the

assistance of the Government of Antigua and Barbuda in two respects as described

below.

A&B – 2016 -01

DIPLOMATIC NOTE

First, the Department of State requests the Government of Antigua and Barbuda waive, via diplomatic note, any immunity Mr. Ashe might enjoy with regard to the acts listed in attachment A in connection with the criminal activity described in the Complaint and Indictment in this case. In addition, if the Government of Antigua and Barbuda is of the view that none of the acts listed in Attachment A was an official act performed in the exercise of Mr. Ashe's functions as a member of the mission, the Department requests the Government's confirmation of that conclusion.

Additionally, the United States Attorney's Office requests copies of certain documents relevant to the issues in the case which it intends to present to the United States District Court. A list of these documents is at Attachment B. To the extent, if any, that these documents may be covered by archival immunity enjoyed by the Government of Antigua and Barbuda, the Department requests that the Government provide an express waiver of that immunity in order to permit the introduction of these documents to the United States District Court. Alternatively, if the Government's view is that no archival immunity is applicable, the Department would appreciate the Government's confirmation of that conclusion.

The Department notes that this is sensitive law enforcement information and requests that due care be given by the Government in this regard.

The Department appreciates the cooperation of the Embassy and of the Government of Antigua and Barbuda in this important matter and, in the spirit of the Government's October 14, 2015, letter, expresses its hope that a positive response to these requests will be forthcoming.

Enclosure:

    As stated.



Department of State,

    Washington, January 6, 2016

Attachment A

(1) Arranging for the appointment of ▮▮▮▮▮▮▮▮▮ as a Goodwill
Ambassador for Antigua and Barbuda on or about April 26, 2012.

(2) Arranging for the appointment of ▮▮▮▮▮▮▮▮▮▮▮▮ as Economic
Envoy and/or head of the Antigua and Barbuda Investment Office in Hong Kong
on or about March 6, 2013.

(3) Appointing Shiwei Yan, a/k/a "Sheri Yan" ("Yan") and Heidi Hong Piao, a/k/a
"Heidi Park" ("Piao") as Advisers to the Office of the Prime Minister of Antigua
and Barbuda on or about October 29, 2013.

(4) Appointing Yan and Piao as Advisers to the Office of the President of the
General Assembly on or about October 29, 2013.

(5) Signing and submitting an original and revised United Nations Document
Number A/66/748, the revised version of which is attached.

(6) Advocating within the United Nations and elsewhere for the development of a conference center in Macau, China, to be built by ████████████ between in or about 2011 and in or about December 2014.

(7) Advocating for the interests of ████████ (referred to as CC-1 in the Complaint and in the Indictment) in Antigua and Barbuda in or about Summer 2012.

(8) Advocating for the business interests of ████████████ (referred to as CC-2 in the Complaint and in the Indictment) and/or the company with whom he was affiliated, ████████████████████████████ (referred to as Chinese Security Company in the Complaint) in Antigua and Barbuda and elsewhere between in or about Fall 2013 and in or about Spring 2014.

(9) Accepting an invitation to attend, attending, and speaking at a November 2013 conference organized by ████████████████████ (referred to as CC-3 in the Complaint and the Indictment) in Guangzhou, China.

(10) Advocating for the business interests of ████████████████

████████████████████ and other affiliated entities, of Ng Lap Seng, a/k/a "David Ng," a/k/a "David Ng Lap Seng," Francis Lorenzo, a/k/a

"Frank Lorenzo," and/or Jeff C. Yin, a/k/a "Yin Chuan," between in or about 2011 and in or about December 2014.

(11) Advocating for the business interests of Global Sustainable Development Foundation, Global Sustainability Foundation, and other affiliated entities of Shiwei Yan, a/k/a "Sheri Yan," and Heidi Hong Piao, a/k/a "Heidi Park" between in or about Spring 2012 and in or about October 2015.

Attachment B

(1) Tax returns of John W. Ashe between 2009 and 2015 submitted to the Government of Antigua and Barbuda.

(2) E-mails within his Antigua and Barbuda e-mail account, and other correspondence, between John W. Ashe and officials in Antigua and Barbuda concerning: (a) the appointments of ████████, Shiwei Yan, a/k/a "Sheri Yan," Heidi Hong Piao, a/k/a "Heidi Park," and/or ████████ ████ as representatives of Antigua and Barbuda, and/or (b) the interests of ████████ and/or ████████ ████████ including correspondence with the ████ and/or others at the Ministry of National Security.

(3) Memoranda of Understanding between Antigua and Barbuda and ████ ████████ ██ ████████████ including that signed between ██ and the Ministry of National Security on or about April 6, 2014.



## GOVERNMENT OF ANTIGUA AND BARBUDA

**Ministry of Legal Affairs**
**Office of the Attorney General**
**Government Office Complex**
**Parliament Drive**
**St. John's, ANTIGUA W.I.**

Telephone: (268) 462-0017
Fax: (268) 462-2465
Email: legalaffairs@ab.gov.ag

14th October, 2015

Mr. Preet Bharara
United States Attorney
United States Attorney's Office
One St. Andrews Plaza
New York, NY 10007
United States of America

Dear Sir:

### Re: Former United Nations General Asembly President
### Dr. John Ashe and Others Charged in Bribery Scheme

Our attention has been drawn to the United States Attorney's Office for the Southern District of New York Press Release of Tuesday October 6, 2015.

The press release stated that former Antigua and Barbuda Ambassador to the United Nations and former President of the 68th United Nations General Assembly, Dr. John Ashe along with five others, were charged with a million dollar bribery scheme.

The press release further stated that Dr. John Ashe used some of the moneys received by him from the scheme to make bribe payments to former Prime Minister Baldwin Spencer.

The Government of Antigua and Barbuda is deeply concerned about this development and the possible negative implications and image that it holds for Antigua and Barbuda. In this regard, the Government intends to co-operate fully with your Office in its investigations and stands ready to comply with any law requests you may make in this regard.

.../2

-2-

Please be informed that under the Constitution of Antigua and Barbuda Mr. Anthony Armstrong, the Director of Public Prosecutions, is solely responsible for the conduct of criminal matters in this State.

In those circumstances, if you so desire, you may contact Mr. Anthony Armstrong directly at the following address:-

> **Mr. Anthony Armstrong**
> **Director of Public Prosecutions**
> **Government Office Complex**
> **Parliament Drive**
> **St. John's**
> **Antigua**

I am accordingly extending an invitation to you for a meeting, should you desire so to do, with the appropriate persons or body concerning possible criminal prosecutions at a convenient date. You may also contact The Director of Public Prosecutions at these telephone numbers *1-268-462-2464/1-268-462-0017* or by email dpp@ab.gov.ag.

Please be guided accordingly.

Very truly yours,

**HON. STEADROY C.O. BENJAMIN**
**Attorney General and Minister**
**of Legal Affairs, Public Safety**
**and Labour**

**SCOB/cp**

c.c.    Mr. Anthony Armstrong
        Director of Public Prosecutions
        Government Office Complex
        Parliament Drive
        St. John's
        Antigua



EMBASSY OF ANTIGUA & BARBUDA
WASHINGTON, D.C.

EMB/07/2016

The Embassy of Antigua and Barbuda presents its compliments to the Department of State and has the honour to refer to the latter's Note A&B-2016-01 dated 6th January 2016 requesting certain information pertaining to John Ashe, a former employee at the Permanent Mission of Antigua and Barbuda to the United Nations.

The Government of Antigua and Barbuda apologizes for the delay in formally responding to the State Department's Note, and explains that since the current Administration in Antigua and Barbuda was not in office at the time that the incidents occurred, it had to seek clarification and explanations from the former Prime Minister and Foreign Minister, Mr. Baldwin Spencer. The Government has been awaiting Mr. Spencer's communication which it received only on 17th March 2016.

The Embassy of Antigua and Barbuda has been instructed to transmit to the State Department the official communication from Mr. Baldwin Spencer to the Prime Minister of Antigua and Barbuda, the Honourable Mr. Gaston Browne. Mr. Spencer's letter dated March 16, 2016 is herewith attached.

The Government of Antigua and Barbuda releases the letter to the State Department for its appropriate use by agencies of the Government of the United States as identified in Note A&B-2016-01 of 6th January 2016.

The Embassy of Antigua and Barbuda avails itself of this opportunity to renew to the State Department the assurances of its highest consideration.

Washington, D.C.
18 March 2016

Department of State
Washington, D.C.





**OFFICE OF**
**THE LEADER OF THE OPPOSITION**

P.O. Box 2379
St. John's
Antigua

TEL: 268-736-9023
EMAIL: oppositionleaderano@gmail.co

March 16, 2016

Honourable Prime Minister, Gaston Browne
Office of the Prime Minister
Queen Elizabeth Highway
St. John's, Antigua
Antigua & Barbuda

**Re: Dr. John W. Ashe Official Acts as Permanent Representative to the United Nations**

Dear Sir:

Pursuant to our conversations and the request made regarding the above referenced matter kindly take note of the following.

Dr. Ashe in his official capacity as Antigua & Barbuda's Permanent Representative to the United Nations between 2004 and 2014 acted for and on the behalf of the State in the following matters.

1. The appointment of ▮▮▮▮ as a Goodwill Ambassador for Antigua & Barbuda.
2. The appointment of ▮▮▮▮ as Economic Envoy and/or head of Antigua and Barbuda Investment Office in Hong Kong.
3. The appointment of Shiwei Yan and Heidi Hong Piao as Advisers to the Office of the Prime Minister.
4. Sought to bring investment to Antigua & Barbuda through ▮▮▮▮
5. Sought to bring investment to Antigua & Barbuda through ▮▮▮▮ .
6. Building a relationship between Antigua & Barbuda and ▮▮▮▮▮▮
   ▮▮▮▮ .

It is important to note that none of the appointments or actions in seeking investment required any quid pro quo exchange of any kind.

INDEPENDENCE AVE, ST. JOHN'S, ANTIGUA, WEST INDIES

I wish to further point out that actions taken by Dr. Ashe while he was the President of the United Nations General Assembly that were done in the interest and for the good of Antigua and Barbuda are also deemed acts done in his official capacity.

Respectfully yours

Winston Baldwin Spencer
Leader of the Opposition
Parliamentary Representative SJRW

# Exhibit C

ORIGINAL

Approved: _Doug Richthal / Rahul Mukhi / _____
 DANIEL C. RICHENTHAL/RAHUL MUKHI/JANIS M. ECHENBERG
 Assistant United States Attorneys

Before:   THE HONORABLE HENRY B. PITMAN
          United States Magistrate Judge
          Southern District of New York

15 MAG 3562

- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :    **SEALED COMPLAINT**
                                 :
   - v. -                        :    Violations of
                                 :    18 U.S.C. §§ 371, 666,
                                 :    1956, and 2; and
JOHN W. ASHE,                    :    26 U.S.C. § 7206(1)
FRANCIS LORENZO,                 :
NG LAP SENG,                     :
  a/k/a "David Ng,"              :    COUNTIES OF OFFENSE:
JEFF C. YIN,                     :
  a/k/a "Yin Chuan,"             :    NEW YORK
SHIWEI YAN,                      :    WESTCHESTER
  a/k/a "Sheri Yan," and         :
HEIDI HONG PIAO,                 :
  a/k/a "Heidi Park,"            :
                                 :
             Defendants.         :
                                 :
- - - - - - - - - - - - - - - - x



U.S. DISTRICT COURT
FILED
OCT 05 2015
D.S.
S.D. OF N.Y.

SOUTHERN DISTRICT OF NEW YORK, ss.:

     JASON P. ALBERTS, being duly sworn, deposes and says that he
is a Special Agent with the Federal Bureau of Investigation ("FBI"),
and charges as follows:

### COUNT ONE

(Conspiracy to Bribe a United Nations Official)

     1.   From at least in or about 2011, up to and including in or
about December 2014, in the Southern District of New York and
elsewhere, FRANCIS LORENZO, NG LAP SENG, a/k/a "David Ng," JEFF C.
YIN, a/k/a "Yin Chuan," SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG
PIAO, a/k/a "Heidi Park," the defendants, and others known and
unknown, willfully and knowingly did combine, conspire, confederate,
and agree together and with each other to violate Title 18, United
States Code, Section 666.

2.     It was a part and an object of the conspiracy that FRANCIS LORENZO, NG LAP SENG, a/k/a "David Ng" ("NG"), JEFF C. YIN, a/k/a "Yin Chuan," SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," the defendants, and others known and unknown, would and did corruptly give, offer, and agree to give a thing of value to a person, with the intent to influence and reward an agent of an organization, in connection with a business, transaction, and series of transactions of such organization, involving a thing of value of $5,000 and more, while such organization was in receipt of, in a one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, in violation of Title 18, United States Code, Section 666(a)(2), to wit, LORENZO, NG, YIN, YAN, and PIAO agreed to pay and to facilitate the payment of bribes to an individual serving as President of the United Nations General Assembly and the Permanent Representative to the United Nations ("UN") for Antigua and Barbuda ("Antigua"), in exchange for official actions on behalf of businessmen.

### Overt Acts

3.     In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

a.     On or about February 24, 2012, defendants FRANCIS LORENZO, NG LAP SENG, a/k/a "David Ng," and JEFF C. YIN, a/k/a "Yin Chuan," caused the Permanent Representative to the UN for Antigua, in exchange for payments, to introduce a document at the UN in support of a real estate project being developed by NG.

b.     On or about June 3, 2014, NG, LORENZO, and YIN arranged for a $200,000 wire payment to a private bank account belonging to the President of the UN General Assembly in exchange for the President making a foreign visit to NG in his official capacity in order to discuss progress on the real estate project being developed by NG.

c.     On or about July 25, 2012, YAN and PIAO arranged for a $300,000 wire from a co-conspirator not named as a defendant herein ("CC-1") to a private bank account belonging to the Permanent Representative to the UN for Antigua in exchange for advocating for CC-1's business interests with Antiguan government officials.

d.     On or about November 4, 2013, YAN and PIAO arranged for a $200,000 wire to a bank account belonging to the President of

2

the UN General Assembly from another co-conspirator not named as a defendant herein in exchange for the President attending a private conference in his official capacity.

(Title 18, United States Code, Section 371.)

## COUNT TWO

(Payment of Bribes)

4.    From at least in or about 2011, up to and including in or about December 2014, in the Southern District of New York and elsewhere, FRANCIS LORENZO, NG LAP SENG, a/k/a "David Ng,", JEFF C. YIN, a/k/a "Yin Chuan," SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," the defendants, corruptly gave, offered, and agreed to give a thing of value to a person, with the intent to influence and reward an agent of an organization, in connection with a business, transaction, and series of transactions of such organization, involving a thing of value of $5,000 and more, while such organization was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, to wit, LORENZO, NG, YIN, YAN, and PIAO, facilitated and arranged for the payment of bribes to an individual serving as the President of the United Nations General Assembly and the Permanent Representative to the United Nations for Antigua in exchange for official actions on behalf of businessmen.

(Title 18, United States Code, Sections 666(a)(2) and 2.)

## COUNT THREE

(Conspiracy to Commit Transportation Money Laundering)

5.    From at least in or about 2011, up to and including in or about December 2014, in the Southern District of New York and elsewhere, SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1956(a)(2)(A).

6.    It was a part and an object of the conspiracy that SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," the defendants, and others known and unknown, would and did knowingly transport, transmit, and transfer, and attempt to transport,

3

transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside of the United States and to a place in the United States from and through a place outside of the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, the bribery of a public official, in violation of Title 18, United States Code, Section 1956(a)(2)(A), to wit, YAN and PIAO agreed to transmit payments to the then-Prime Minister of Antigua through Antigua's Ambassador to the United Nations in return for official actions.

(Title 18, United States Code, Section 1956(h).)

## COUNTS FOUR AND FIVE

(Subscribing to False and Fraudulent U.S. Individual Income Tax Returns)

7.    On or about the dates identified below, in the Southern District and elsewhere, JOHN W. ASHE, the defendant, willfully and knowingly, did make and subscribe to U.S. Individual Income Tax Returns, Forms 1040, for the tax years set forth below, which returns contained and were verified by the written declaration of ASHE that they were made under penalties of perjury, and which returns ASHE did not believe to be true and correct as to every material matter, to wit, ASHE fraudulently omitted a total of more than $1.2 million of income from his tax returns, including bribes received and the purported salary ASHE paid himself as President of the United Nations General Assembly, thereby substantially understating his total income as set forth below for the years set forth below:

| Count | Approximate Filing Date | Tax Year | Approximate Income Omitted |
|-------|-------------------------|----------|----------------------------|
| Four  | April 15, 2014          | 2013     | $462,350.00                |
| Five  | April 15, 2015          | 2014     | $796,329.28                |

(Title 26, United States Code, Section 7206(1), and Title 18, United States Code, Section 2.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

8.    I have been a Special Agent with the FBI for approximately six years, and I have been personally involved in the investigation of this matter, which has been handled jointly by Special Agents of the FBI and the Internal Revenue Service—Criminal Investigation.

4

9.    This affidavit is based in part upon my own observations, my conversations with other law enforcement agents and others, my review of email correspondence,[1] my analysis of bank of records, my examination of documents and reports by others, my interviews of witnesses, and my training and experience.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of the investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where specifically indicated otherwise.

## OVERVIEW

10.   As set forth in greater detail below, this case involves businesspeople paying bribes to defendant JOHN W. ASHE, at the time when he served as the United Nations Ambassador for Antigua and Barbuda and as the 68th President of the United Nations General Assembly. These bribes were facilitated by, among others, defendants FRANCIS LORENZO, NG LAP SENG, a/k/a "David Ng," JEFF C. YIN, a/k/a "Yin Chuan," SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," who arranged for the transmission and laundering of over $1 million of bribery money from sources in China.  In exchange for the bribes, ASHE agreed to and did perform official actions for businessmen who were seeking benefits from the UN and the government of Antigua and Barbuda.  Among other things, ASHE accepted over $500,000 of bribes facilitated by LORENZO and YIN from NG, who was seeking to build a multi-billion dollar, UN-sponsored conference center in Macau, China (the "UN Macau Conference Center").  In exchange for these payments from NG, among other actions, ASHE submitted a UN document to the UN Secretary General, which claimed that there was a purported need to build the UN Macau Conference Center.  In addition,  ASHE received over $800,000 in bribes from various Chinese businessmen arranged through YAN and PIAO and, in return for these bribes, ASHE supported these businessmen's interests within the United Nations and with senior Antiguan government officials, including the country's then-Prime Minister (the "Prime Minister"), with whom ASHE shared a portion of the bribe payments.

---

[1]    The emails cited herein were obtained pursuant to search warrants of the personal Yahoo, Gmail, and AOL email accounts for defendants JOHN W. ASHE, FRANCIS LORENZO, JEFF C. YIN, a/k/a "Yin Chuan," SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park."

11. To funnel and help conceal the bribes to defendant JOHN W. ASHE, defendants NG LAP SENG, a/k/a "David Ng," JEFF C. YIN, a/k/a "Yin Chuan," SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," along with others, used non-governmental organizations ("NGOs") in the United States, which were purportedly established to promote the UN's mission and/or development goals.

12. During the course of the scheme, defendant JOHN W. ASHE solicited and received bribes in various forms, including payments to third-parties to cover ASHE's personal expenses, such as a family vacation and construction of a basketball court at his house in Dobbs Ferry, New York. ASHE also solicited a portion of his bribes to be paid to two business bank accounts that ASHE opened at two major American banks, in the name "John Ashe dba John Ashe PGA 68," and "Office of the President of the General Assembly PGA 68 Operating Account," for the purported purpose of raising money for his UN General Assembly Presidency ("PGA Account-1" and "PGA Account-2," together, the "PGA Accounts"). ASHE was the sole signatory on both of the PGA Accounts. From in or about 2012, up to and including at least in or about 2014, ASHE received over $3 million in the PGA Accounts from both foreign governments and individuals. During the same time period, ASHE withdrew more than $1,000,000 from the PGA Accounts and transferred the money to his and his wife's personal bank accounts. ASHE also used money transferred from the PGA Accounts to pay for his personal expenses, such as paying the mortgage on his house in Dobbs Ferry, paying his BMW lease payments, and buying luxury items such as Rolex watches. The majority of the funds that ASHE withdrew from the PGA Accounts were in the form of checks made out to ASHE that ASHE signed himself, and had "salary" listed in the check memo line. During the same period of time, ASHE failed to report sufficient income to the Internal Revenue Service ("IRS") to account for the self-described salary and other funds he withdrew from the PGA Accounts. In total, ASHE underreported his income to the IRS by more than $1.2 million dollars in tax years 2013 and 2014 alone.

### RELEVANT INDIVIDUALS AND ENTITIES

#### *JOHN W. ASHE*

13. From in or about 1989, up to and including in or about December 2014, JOHN W. ASHE, the defendant, served in various positions at the Permanent Mission of Antigua to the UN, which is located in New York, New York.[2] Beginning in or about May 2004, ASHE

---

[2] ASHE no longer serves as a diplomat representing Antigua or any

6

served as the Permanent Representative of Antigua to the UN. During all times relevant to this Complaint, ASHE has been a lawful permanent resident ("LPR") of the United States and has maintained a house in Dobbs Ferry, New York, which is located in Westchester County. Based on my review of ASHE's immigration file, I have also learned that when ASHE applied to become an LPR, in or about October 2000, ASHE waived in writing his assertion of any immunity that would otherwise accrue to him based on his occupational status as a diplomat.

14. I know from witness interviews and my review of publicly available sources that on or about June 13, 2013, JOHN W. ASHE, the defendant, was elected as the 68th President of the UN General Assembly ("UNGA") for a one-year term beginning in or about September 2013 and ending in or about September 2014. The UNGA is comprised of all 193 UN Member States, which elect a rotating President from one of the Member States on an annual basis. Among other things, the UNGA President presides over the current UNGA session and represents the UNGA at various international economic and cultural forums.

15. I know from publicly available records that during each of the years relevant to this Complaint, the United States Government provided the UN with federal funds in excess of $10,000.

**FRANCIS LORENZO, NG LAP SENG, a/k/a "David Ng," and JEFF C. YIN, a/k/a "Yin Chuan"**

16. From in or about 2004, up to and including the present, defendant FRANCIS LORENZO has been the Deputy Permanent Representative to the United Nations for the Dominican Republic. Based on my review of immigration records, I learned that LORENZO

---

other country. I understand from my discussions with the United States Department of State that, at most, ASHE enjoys residual official act immunity based on his former status as a diplomat from Antigua from in or about February 2000 to in or about December 2014 and as President of the United Nations General Assembly from in or about September 2013 to in or about October 2014. ASHE's service in these positions provides immunity only for conduct within the scope of his official positions, which must be affirmatively asserted in any judicial proceeding, to the extent he is permitted to do so notwithstanding an immunity waiver he executed in connection with becoming a U.S. legal permanent resident in or about October 2000. Official act immunity does not provide protection from arrest and does not cover conduct outside the scope of one's official position, such as the filing of false personal U.S. tax returns.

immigrated to the United States from the Dominican Republic in or about 1985. In or about 1991, LORENZO became a naturalized United States citizen. I understand from the United States Department of State that, like defendant JOHN W. ASHE, LORENZO enjoys official act immunity, which must be asserted affirmatively and provides for immunity from criminal prosecution only for official acts taken in connection with LORENZO's diplomatic position.

17. In addition to being the Deputy Permanent Representative to the United Nations for the Dominican Republic, investigation to date has revealed that, since in or about 2009, defendant FRANCIS LORENZO has also received funds from and served as an agent for defendant NG LAP SENG, a/k/a "David Ng," a Chinese national and the head of a major real estate development company based in Macau (the "Macau Real Estate Development Company"). In or about 2009, NG founded a particular NGO ("NGO-1") based in New York, New York, and made LORENZO the "Honorary President." Since that time, NG has regularly paid LORENZO a $20,000 monthly salary and has also sent additional payments to a company in the Dominican Republic for which LORENZO's sibling serves as the general manager. According to its website, NGO-1 is purportedly a "21st century media platform" whose mission is to advance the implementation of the UN's Millennium Development Goals. The NGO-1 website posts and links to content, largely from external sources, relating to the UN, development, and other topics. I know based on my review of documents that NG has funded NGO-1 since its creation, and has wired or caused to be wired more than $12 million from Macau to bank accounts of NGO-1 in New York, New York.

18. Defendant JEFF C. YIN, a/k/a "Yin Chuan," is the principal assistant to defendant NG LAP SENG, a/k/a "David Ng," and also has used the title of Assistant to the General Manager of NGO-1. YIN is a naturalized United States citizen who was originally born in China, and resides in China. For at least several years, YIN has assisted NG with, among other things, communicating on his behalf, wiring money to the United States, making travel plans to and from the United States, and arranging meetings for NG in the United States. YIN serves as NG's principal interpreter when NG is in the United States, travels with him to the United States, and is generally present for meetings NG has in the United States, taking notes and handling documents, among other things.

19. Based on my review of documents and my conversations with other law enforcement agents, I know that defendant JEFF C. YIN, a/k/a "Yin Chuan," has frequently traveled to the United States with defendant NG LAP SENG, a/k/a "David Ng," with large amounts of cash.

For example, on or about March 6, 2014, YIN and NG arrived at John F. Kennedy International Airport ("JFK") with $300,000 in cash. Approximately five weeks later, on or about April 18, 2014, YIN and NG arrived at JFK with $300,000 in cash. Approximately two months later, on or about June 13, 2014, YIN and NG arrived at Teterboro Airport in New Jersey with $390,000 in cash. More recently, on or about July 5, 2015, YIN and NG arrived by private plane in Anchorage, Alaska with $900,000 in cash. Two days later, YIN and NG flew on to New York City. On or about the following day, YIN and NG met with defendant FRANCIS LORENZO met at a hotel in New York, New York. Most recently, on or about September 16, 2015, YIN and NG arrived by private plane in Anchorage, Alaska with $500,000 in cash. They then flew on to New York.[3]

### SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park"

20.  Defendants SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," are naturalized United States citizens who were born in China and who reside principally in China. Based on my review of documents, I know that YAN and PIAO are associated with several businessmen in China. YAN is also the Chief Executive Officer of an NGO ("NGO-2"), previously based in Washington, D.C., now based in New York, New York, and PIAO is NGO-2's Finance Director. NGO-2 is purportedly an organization created to promote global and sustainable economic development. In August 2013, YAN and PIAO began paying defendant JOHN W. ASHE approximately $20,000 a month in connection with his serving as the "Honorary Chairman" of NGO-2.

---

[3]     Based on my participation in the arrests, I know that NG LAP SENG, a/k/a "David Ng," and JEFF C. YIN, a/k/a "Yin Chuan," the defendants, were arrested on or about September 19, 2015, and charged in Complaint 15 Mag. 3369 with conspiracy to make false statements and to defraud the United States arising from their travels to the United States with large amounts of cash and explanations provided to authorities regarding that cash.

## THE BRIBERY SCHEME

### *ASHE RECEIVES PAYMENTS ARRANGED BY LORENZO IN EXCHANGE FOR OFFICIAL ACTIONS ON BEHALF OF NG*

NG and LORENZO Make Payments to ASHE In Return For ASHE Promoting NG's Business Dealings With The Government of Antigua

21.  As described in more detail below, in or about the Spring of 2011, NG LAP SENG, a/k/a "David Ng," and FRANCIS LORENZO, the defendants, began making payments to JOHN W. ASHE, the defendant, and ASHE's wife in return for, among other things, ASHE using his official position to obtain for NG potentially lucrative investments in Antigua.

22.  Based on my review of emails and other documents, I have learned that in or about the Spring of 2011, defendant FRANCIS LORENZO asked defendant JOHN W. ASHE to travel to China to meet with defendant NG LAP SENG, a/k/a "David Ng," about potential investment opportunities for NG in Antigua.  After initially declining LORENZO's invitation, when it did not appear that ASHE would be compensated for taking the meeting, ASHE agreed to make the trip after LORENZO informed ASHE that NGO-1, which was at least in substantial part funded by NG, would pay for ASHE and ASHE's family to take an unrelated family vacation to New Orleans, Louisiana.  On or about April 4, 2011, after ASHE agreed to fly to China to meet NG, ASHE emailed LORENZO a travel itinerary for ASHE, his wife, and two children, which included first-class plane tickets from New York to New Orleans and a hotel reservation for $850.00 per night.  LORENZO later emailed ASHE that NGO-1 would pay for the trip through ASHE's travel agent.

23.  Based on my review of emails and travel records, I know that after defendant FRANCIS LORENZO told defendant JOHN W. ASHE that NGO-1 would pay for ASHE's family vacation to New Orleans, ASHE traveled to Hong Kong and Macau between April 17 and 20, 2011.  According to a post-trip report sent to LORENZO by another NGO-1 employee, during the trip, ASHE and others met with "private sector" individuals in Macau, which is where defendant NG LAP SENG, a/k/a "David Ng," was based.  On April 20, 2011, ASHE emailed LORENZO from the Hong Kong airport as ASHE was about to board his flight home and told LORENZO, "Thanks again to you and Ng for everything."  Shortly after arriving in New York from his meeting with NG in Macau, ASHE and his family left for the family vacation to New Orleans for which LORENZO agreed to pay.

10

24.  On April 26, 2011, less than a week after defendant JOHN
W. ASHE returned from Macau -- and the day after he returned from
the family vacation to New Orleans -- ASHE emailed defendant FRANCIS
LORENZO and offered to set up a meeting between defendant NG LAP SENG,
a/k/a "David Ng," and a particular Antiguan government minister
("Antiguan Minister-1").  Specifically, ASHE emailed LORENZO that
"[d]uring the visit to Macao/Hong Kong it just occurred to me that
it would be good idea if [Antiguan Minister-1] could visit and meet
Ng, [a second Chinese businessman] and possibly [a third Chinese
businessman].  Let me know what you think and if there's a date in
early June you would want me to suggest to the Minister."

25.  Based on my review of emails and travel records, I know
that following defendant JOHN W. ASHE's trip to Hong Kong and Macau
to meet with defendant NG LAP SENG, a/k/a "David Ng" (and the vacation
to New Orleans which he demanded in return), ASHE traveled to Antigua
between April 26, 2011 and April 29, 2011.  On or about April 30, 2011,
after ASHE returned from Antigua, ASHE emailed defendant FRANCIS
LORENZO to inform him that ASHE had arranged for the then-Antiguan
Prime Minister to meet with NG and others about "concrete investment
opportunities, including the immediate acquisition of hotel
properties."  In the same email, ASHE told LORENZO that ASHE was
expecting to spend $30,000 in connection with the upcoming
construction of a private basketball court at ASHE's house in Dobbs
Ferry, in Westchester County, New York, commenting "[l]et's discuss
on Monday."

26.  Based on my review of emails and travel documents, I know
that on or about June 20, 2011, defendant FRANCIS LORENZO and two
other NGO-1 employees made a trip to Antigua, which was arranged by
defendant JOHN W. ASHE.  E-mails reflect that during his trip to
Antigua, LORENZO met with the Prime Minister.  Following the trip,
ASHE sent an email to LORENZO about LORENZO's discussion with the
Prime Minister concerning the Prime Minister's travel to New York
in September 2011, nominally to attend an award ceremony to be hosted
by NGO-1.

27.  During the same period of time that defendant JOHN W. ASHE
agreed to arrange meetings between defendant NG LAP SENG, a/k/a "David
Ng," and defendant FRANCIS LORENZO and the Prime Minister, ASHE
continued to solicit payments from LORENZO in connection with the
construction of the private basketball court on ASHE's property.  For
example, on September 9, 2011, ASHE emailed LORENZO that his family
had "obtained final approval from our Village's Planning Board to
proceed with the construction of the basketball court" and that ASHE
would keep LORENZO informed about the estimated construction cost

11

from the contractor. On October 18, 2011, ASHE emailed LORENZO the contractor's proposal for the basketball court, which included a $20,000 down payment due to the contractor. ASHE told LORENZO that ASHE would be grateful if LORENZO "could make [arrangements] for a check in the amount be mailed directly to [the contractor] (at the address given at the top of the proposal) prior to [LORENZO's] departure to [Hong Kong]."

28. In addition to soliciting payments for his family vacation and basketball court installation, in or about May 2011, defendant JOHN W. ASHE arranged through defendant FRANCIS LORENZO to begin paying ASHE's wife as a purported "consultant" for NGO-1. On May 19, 2011, ASHE sent LORENZO an email stating "here's the banking information for the consultant option we decided on" followed by bank account information for an account belonging to ASHE's wife. I know from my review bank records, that between January 2011 and at least December 2014, NGO-1 paid ASHE's wife $2,500 per month. According to tax filings made by ASHE and ASHE's wife, ASHE's wife claims to work as a "climate change consultant" for NGO-1, although based on my review of NGO-1's documents and emails I have been unable to determine what actual work, if any, ASHE's wife has actually done for NGO-1. In fact, based on my review of emails, I know that LORENZO and other NGO-1 employees regularly emailed ASHE himself, and not ASHE's wife, when the monthly $2,500 check to ASHE's wife was ready to be picked up at NGO-1's offices in New York, New York.

29. At the same time that defendant JOHN W. ASHE and his wife were receiving payments and gifts from NGO-1, ASHE arranged for the Prime Minister to meet with defendant NG LAP SENG, a/k/a "David Ng," in New York. Based on my review of emails and travel records, at the request of ASHE, NGO-1 paid for first-class airline tickets for the Prime Minister and six other Antiguan officials to fly to New York during the week of September 2011, when both NGO-1's "award ceremony" and the annual UNGA meeting was taking place.[4] Based on my review of travel records and other documents, I know that the Prime Minister traveled to New York between September 18, 2011 and September 25, 2011 and NGO-1 paid for the airfare for the Prime Minister and his delegation as well as their hotel rooms in New York. Based on my review of travel records, I also know that NG arrived in New York on or about September 18, 2011. On September 20, 2011, ASHE emailed defendant FRANCIS LORENZO that "[t]he PM has confirmed his availability for

---

[4]    ASHE also requested that NGO-1 pay for the Prime Minister to travel to other cities within in the United States during the week following the UNGA meeting in 2011.

the proposed meeting with the investor on Thursday [September 22, 2011]."

## NG and LORENZO Continue Payments to ASHE and His Wife In Exchange For an Official UN Document From ASHE in Support of NG's Macau Conference Center

30.   As described below, beginning in or about September 2011, following payments to defendant JOHN W. ASHE from the NGO funded by defendant NG LAP SENG, a/k/a "David Ng," and arranged through defendant FRANCIS LORENZO, for ASHE's official action in promoting NG's business interests in Antigua, NG and LORENZO arranged for additional payments to ASHE so that ASHE would use his position representing a member state at the United Nations to cause the UN to promote a conference center in Macau being developed by NG.

31.   Based on my review of e-mails and other documents, I know that since at least 2010, defendant NG LAP SENG, a/k/a "David Ng," and the Macau Real Estate Company have been encouraging the development of an expansive conference facility in Macau, which they have touted as "The Permanent International Conference Center for the United Nations South-South Cooperation." According to a brochure for the UN Macau Conference Center, the multi-billion dollar center is proposed to house, among other things, a "Global Business Incubator," which "will serve as a facilitator to governments and the private sector to build the capacity of South-South countries to leverage innovation and creativity in achieving the Millennium Development Goals."

32.   I know based on my review of emails and other documents that in the months following September 2011 defendant JOHN W. ASHE began advocating for the development of the UN Macau Conference Center of defendant NG LAP SENG, a/k/a "David Ng." Based on my review of emails, I know that on November 11, 2011, a "development consultant" for NGO-1 (the "NGO-1 Development Consultant") drafted a letter purportedly addressed from the Antiguan Prime Minister (the "November 2011 Letter"), which highlighted the supposed importance of developing a Global Business Incubator such as the one anticipated to be housed by NG's UN Macau Conference Center. The NGO-1 Development Consultant emailed the November 2011 Letter to ASHE for his approval and copied defendant FRANCIS LORENZO. After receiving the November 2011 Letter, ASHE gave his approval for the November 2011 Letter and told the NGO-1 Development Consultant that NGO-1 was authorized to sign the letter on behalf of the Prime Minister.

13

33. Approximately one month after authorizing the November 2011 Letter in support of the Global Business Incubator being developed by defendant NG LAP SENG, a/k/a "David Ng," defendant JOHN W. ASHE solicited additional payments from NG through defendant FRANCIS LORENZO. Specifically, on or about December 19, 2011, ASHE emailed LORENZO and another employee of NGO-1 (the "NGO-1 Employee") to request that NG begin contributing funds to ASHE's anticipated UNGA Presidency. In the email, ASHE told LORENZO and the NGO-1 Employee, in sum and substance, that ASHE had recently received the endorsement of the UN Group of Latin American and Caribbean States, which he believed meant that his election as the UNGA President in June 2013, some 18 months later, was virtually guaranteed. ASHE further stated that NG had indicated when they met in China that NG would "assist" ASHE in "whatever way necessary" to make ASHE's Presidency a "success." ASHE then stated he was faced with the "daunting task" of raising sufficient funds to "ensure that my tenure as PGA is a successful one" and that "[a]gainst this backdrop, Ng's promise to assist is indeed very welcome and absolutely essential." ASHE attached to the email a document outlining his official powers as the expected UNGA President and ASHE's goal of soliciting more than $3,000,000 for his Presidency. ASHE asked LORENZO and the NGO-1 Employee to pass on the proposal to NG.

34. I know from my review of emails that on February 9, 2012, defendant FRANCIS LORENZO emailed defendant JOHN W. ASHE to propose that they meet the next day. Later that same night, the NGO-1 Development Consultant emailed LORENZO a draft document to be submitted by ASHE to the UN Secretary General claiming that Antigua and other countries had recently launched a Global Business Incubator such as the one proposed to be housed by defendant NG LAP SENG, a/k/a "David Ng's" UN Macau Conference Center (the "Draft UN Document"). On February 15, 2012, the NGO-1 Development Consultant sent LORENZO an updated version of the Draft UN Document, which LORENZO then forwarded to ASHE. Three minutes after sending ASHE the Draft UN Document, LORENZO sent ASHE an email stating, "John remember to send your driver tomorrow afternoon to pick up the check." Bank records reflect that on February 15, 2012, NGO-1 wrote a $2,500 check to ASHE's wife that was then deposited into ASHE and his wife's joint bank account on February 16, 2012.

35. I know from my review of emails that, between February 15, 2012 and February 23, 2012, defendants JOHN W. ASHE and FRANCIS LORENZO and the NGO-1 Development Consultant exchanged several revisions and comments to the Draft UN Document, which, in sum and substance, promoted the launching of a Global Business Incubator, identical to

14

the one defendant NG LAP SENG, a/k/a "David Ng," was seeking to be housed by the UN Macau Conference Center.

36.   On February 24, 2012, after defendant JOHN W. ASHE and his wife had received approximately $38,000 in cash payments from NGO-1, and had solicited other things of value such as a family vacation and the private basketball court described above, ASHE introduced a UN document in support of the Global Business Incubator, which was substantially identical to the Draft UN Document sent to ASHE by defendant FRANCIS LORENZO.  Specifically, on February 24, 2012, ASHE signed UN Document Number A/66748 (the "Official UN Document"), a letter from ASHE to the UN Secretary General concerning the Global Business Incubator.  In the Official UN Document, ASHE stated that the Antiguan Prime Minister and other heads of state had decided to launch a Global Business Incubator at a meeting hosted by NGO-1 on September 23, 2011.  The Official UN Document claimed that there was "a need for a Global Business Incubator, to harness the potential of small businesses through ICT [information and communications technologies] and through greater access to global markets. . . . The Global Business Incubator will serve as a facilitator for Governments and the private sector in building the capacity of developing countries to leverage innovation and creativity in achieving the [UN] Millennium Development Goals."  After submitting the Official UN Document, ASHE emailed a copy to LORENZO and stated, "As agreed, the request has been submitted."  On March 26, 2012, after the Official UN Document had been processed and assigned a formal document number, ASHE emailed a copy of the Official UN Document with the document number to LORENZO and said, "The final product."

37.   After defendant JOHN W. ASHE sent the Official UN Document in support of the UN Macau Conference Center to the UN Secretary General, defendant FRANCIS LORENZO, NGO-1, and defendant NG LAP SENG, a/k/a "David Ng," used the document to promote the building of the UN Macau Conference Center.  For example, March 20, 2012, LORENZO forwarded the Official UN Document to the Secretary General of the International Telecommunication Union, which is a specialized agency of the UN dedicated to information and communication technologies. On April 18, 2012, LORENZO forwarded the Official UN Document again, this time to an executive at UN Habitat.  And on October 23, 2012, LORENZO forward the Official UN Document to an investment banking firm based in Hong Kong. In each of these instances, LORENZO used the existence of the Official UN Document to imply that the conference center NG was seeking to develop was likely to be supported in some fashion by the United Nations.

LORENZO and YIN Arrange for Additional Payments From NG to ASHE and
His Wife To Obtain Additional Official UN Support for NG's UN Macau
Conference Center

38.   As described in more detail below, between in or about
January 2013 and through defendant JOHN W. ASHE's UNGA Presidency,
which ended in or about September 2014, defendants NG LAP SENG, a/k/a
"David Ng," JEFF C. YIN, a/k/a "Yin Chuan," and FRANCIS LORENZO
arranged for hundreds of thousands of dollars in additional payments
to ASHE so that ASHE would continue to push for UN support for NG's
Macau Conference Center.

39.   I know from my review of emails that, after defendant
FRANCIS LORENZO successfully arranged for defendant JOHN W. ASHE to
submit the Official UN Document in support of the UN Macau Conference
Center in or about February 2012, defendants NG LAP SENG, a/k/a "David
Ng," and JEFF C. YIN, a/k/a "Yin Chuan," later became impatient with
the pace of LORENZO's continued progress towards the development of
the UN Macau Conference Center.   For example:

a.   On January 5, 2013, YIN emailed LORENZO with the
subject line "From Ng."   YIN said that NG had instructed YIN to write
LORENZO and that NG wanted to meet with LORENZO in New York the
following week.   YIN added that NG's "top priority right now" was the
UN Macau Conference Center and that NG wanted LORENZO to prepare a
brochure for the UN Macau Conference Center that included the "UN's
approval document."

b.   On January 29, 2013, after LORENZO's meeting with NG
in New York earlier that month, YIN sent LORENZO another email with
the subject line "Urgent Matter."   YIN told LORENZO, "The urgent
matter as of now is that Mr. Ng has given you a deadline to complete
the task of obtaining approval for the Convention Center project."
YIN added that "your 30k for month of jan will be wired tomorrow,
along with Feb, so that makes it 60 to be received."   LORENZO replied
"Jeff I started working on it and I am waiting for the transfer to
speed the process."[5]

---

[5]   I know from my review of bank records and emails, that beginning
in or around this time LORENZO began receiving monthly wire transfers
from NGO-1 of $30,000 per month to a company based in the Dominican
Republic for which LORENZO's sibling serves as the general manager.
These payments were in addition to the approximately $20,000 per month
that LORENZO received from NGO-1 as his salary as President of NGO-1.

16

      c.   On June 1, 2013, YIN emailed LORENZO and told LORENZO that NG wanted to meet with him the next afternoon. YIN told LORENZO that one of the topics to be discussed with NG was a "project update."

    40.   Following these repeated demands from defendants JEFF C. YIN, a/k/a "Yin Chuan," and NG LAP SENG, a/k/a "David Ng," that progress be made on the UN Macau Conference Center, defendant FRANCIS LORENZO arranged for defendant JOHN W. ASHE to approve a revised Official UN Document (the "Revised Official UN Document"), which specifically promoted NG's Macau Real Estate Company as the developer for the proposed Global Business Incubator. Specifically, I have learned the following from my review of emails and other documents:

      a.   On May 23, 2013, LORENZO emailed ASHE a draft of the Revised Official UN Document, which was substantially similar to the original Official UN Document, except that, in addition to promoting the Global Business Incubator, ASHE's letter to the UN Secretary General added a paragraph that stated, "I am pleased to inform you that in response to the recommendation [for a Global Business Incubator], [the Macau Real Estate Company] of China has welcomed the initiative and will serve as the representative for the implementation of the permanent Expo and meeting Center for the country of the south [sic]. This is one of the first centres in the network of incubator centres in a public-private partnership with the support of and leading partner [NGO-1]." In his email to ASHE, LORENZO told ASHE that, "[a]fter speaking with [a particular UN official ('UN Official-1')] in reference to the paragraph that need to be inserted in the letter he said that the letter will be the same the only thing that they will do is put Rev.1 and add the paragraph. He said that it will be easy this way."

      b.   On June 5, 2013, after emailing the document to ASHE, LORNEZO emailed the draft Revised Official UN Document to UN Official-1 and added in the body of the email: "As per our conversation enclose [sic] see the letter that I sent you before so you can advise me if it is ready." UN Official-1 emailed LORENZO back the next morning and told him that the document would be issued by Monday, June 10, 2013.

      c.   On Monday, June 10, 2013, another UN employee emailed LORENZO and ASHE the final Revised Official UN Document. The Revised Official UN Document was substantially similar to the draft version sent by LORENZO to ASHE as described above. Specifically, the Revised Official UN Document was a letter from ASHE to the Secretary General promoting the development of a center built by NG's Macau Real Estate

17

Company to host a Global Business Incubator. The Revised Official UN Document had the same UN document number as the original Official UN Document but contained a footnote claiming that the document was supposedly reissued for "technical reasons."

        d. I know from my review of bank records that between on or about January 1, 2013 and the date that ASHE's Revised Official UN Document was issued, ASHE and his wife received approximately $100,000 from NGO-1. In addition to ASHE's wife monthly $2,500 payment, on February 15, 2013, NGO-1 wrote a $25,000 check to ASHE directly. Moreover, beginning in or about April 2013, ASHE started receiving $10,000 a month from another NGO related to NGO-1 for which LORENZO is also the President ("NGO-3").

    41. After defendants JOHN W. ASHE and FRANCIS LORENZO arranged for the Revised Official UN Document in support of defendant NG LAP SENG, a/k/a "David Ng's" UN Macau Conference Center, NG and defendant JEFF C. YIN, a/k/a "Yin Chuan," continued to demand that further progress be made towards the development of the project. For example, I know from my review of emails the following:

        a. On July 22, 2013, YIN emailed LORENZO and told LORENZO that NG wanted a "[p]rogression report for the Expo/Meeting Center" as soon as possible. On July 25, 2013, LORENZO emailed YIN that "[i]n reference to the Center I am waiting for you to send me the proposal so I can move forward with the [NGO-1] Unit and UN HABITAT I have met with them already and they are waiting to see the proposal with the financing."

        b. On August 29, 2013, YIN emailed LORENZO and told LORENZO that NG would be in New York the next day to discuss with LORENZO the update on the "Expo/Meeting center."

        c. On November 19, 2013, YIN sent LORENZO another email demanding that progress be reported on the UN Macau Conference Center because NG was "extremely un-satisfied with the progression." YIN further told LORENZO that unless progress was made, "[t]he wire will be on halt."

    42. Following these continued demands by defendants JEFF C. YIN, a/k/a "Yin Chuan," and NG LAP SENG, a/k/a "David Ng," that defendant FRANCIS LORENZO show progress on the development Macau Conference Center, LORENZO arranged for defendant JOHN W. ASHE to travel to Macau with other UN officials to meet with NG in exchange

for a $200,000 payment to one of ASHE's PGA Accounts. Specifically, I have learned the following:

      a.    On or about January 22, 2014, LORENZO emailed YIN and told him that LORENZO had met with ASHE's office and that the best dates for ASHE to visit Macau were March 22 and 23, 2014. YIN responded, "Let me confirm with Ng, is this an official or un-official visit?" LORENZO responded, "Un official." Later, on or about February 18, 2014, YIN wrote LORENZO again and said that NG had changed his mind and was requesting that ASHE's visit to Macau be an "official visit."

      b.    On or about March 3, 2014 -- three days before NG and defendant YIN landed at JFK with $300,000 in United States currency, as described in paragraph 19 -- YIN emailed LORENZO and told LORENZO to meet NG at a restaurant on March 6, 2014. YIN further told LORENZO "we have a few things that have been outstanding for a long time: . . . Iternary [sic] and flight info for the PGA [President of General Assembly] group, to confirm arrival time March 22 . . .[and]  History and progression of the approval document for the Expo Center."

      c.    On March 4, 2014, LORENZO emailed ASHE a formal "Special Invitation" from the Macau Real Estate Company and NGO-1 for ASHE to travel to Macau between March 22 and March 23, 2014. According to the invitation, ASHE would be accompanied on the trip by ASHE's "Chef de Cabinet," who is also the Permanent Representative of a different country to the UN, and ASHE's Special Assistant to the President. According to the "Preliminary Agenda" for the trip, on March 22, 2014, ASHE and the other UN officials were scheduled to arrive at the Hong Kong Airport, where they would be greeted by the Macau Real Estate Company, and then they would be flown by helicopter to Macau. Later that day they would attend a meeting and presentation by the Macau Real Estate Company at one of the company's real estate development sites to be followed by a "formal dinner." After spending the night at a luxury hotel in Macau, ASHE's delegation would then fly back home the next day.

      d.    On March 5, 2014, ASHE emailed LORENZO in response to the formal invitation. ASHE wrote that "I am asking [NG] to make a contribution the the [sic] Office of the PGA if he wants me to go out of my way to visit Macau to see his project. . . . Even though Ng has made a lot of empty promises in the past, I am willing to travel to Macau to see his project, since it is important to him. But it has to made absolutely clear to him that I will not go unless I see the funds - funds which are NOT for my personal use but to help run the PGA office. Period. Please let them know that I am requesting

somewhere between $100 K and $250K to be deposited in the following account: [information for PGA Account-2]." As described above, and set forth in detail below, even though ASHE claimed that the funds he was requesting from NG in order to travel to Macau were not for his personal use, the PGA Accounts were set up by ASHE personally and he transferred almost $1,000,000 from the PGA Accounts to his other personal bank accounts.

   e. On or about March 20, 2014, YIN sent an email to an email account that appeared to belong to a travel company based in Hong Kong. YIN's email stated, among other things, "My guests are from the United Nations," and then listed four individuals, including ASHE, LORENZO, ASHE's Chef de Cabinet, and ASHE's Special Assistant.

   f. I know from my review of travel records, that ASHE, ASHE's Chef de Cabinet, and ASHE's Special Assistant flew to Hong Kong on or about March 22, 2014 and flew back to New York on or about March 23, 2014, which is consistent with the agenda contained in the "Special Invitation" from NG's Macau Real Estate Company and NGO-1 to ASHE.

   g. In April 2014, shortly after ASHE and LORENZO's meeting with NG in Macau, NG set up a non-profit Delaware corporation (the "Delaware Corporation") with NG as its Chairman and LORENZO as its President. According to documents I have reviewed, the Delaware Corporation is purportedly "a nonprofit organization that was launched during the sixty-sixth session of the General Assembly, in response to the [Revised Official UN Document]. [The Delaware Corporation] has been appointed to serve as the representative for the implementation of the permanent expo center. It is one of the first centres in the network of incubator centres in public-private partnership, with the support of leading partner [NGO-1]."

   h. On or about May 22, 2014, approximately two months after ASHE's visit to meet NG in Macau, LORENZO emailed YIN the following: "Jeff[,] see the bank account of the PGA [President of General Assembly] office. Try to send that wire as soon possible and when you send it let me know so I can advise him. There are a lot of things that need to be done here. He want to know when Ng will come here[.] I am working to get the things we need[.]" Following the text of the email, LORENZO listed the bank account information for ASHE's PGA Account-2. On June 2, 2014, ASHE forwarded the information for PGA Account-2 to LORENZO again.

i.    I know based on my review of bank records that, on or about June 3, 2014, NGO-1 wired $200,000 to ASHE's PGA Account-2.[6] I also know that between January 2014 and June 2014, during the time that ASHE agreed to meet with NG and visit his project in Macau with other UN officials, NGO-1 and NGO-3 had paid approximately $50,000 to ASHE and his wife.

42.    Based on, among other things, my review of emails, I know that construction has not yet started on the UN Macau Conference Center.  I know from my review of a brochure for the UN Macau Conference Center that the project had been scheduled to "launch" at an event hosted by the Macau Real Estate Company on December 20, 2014, in conjunction with a "High-Level Partnership Forum On The Importance of Creative Economy South-South Cooperation and ICT To Achieve Sustainable Development."  According to the brochure, the "Opening Address" for this program was scheduled to be given by ASHE.

43.    On or about September 19, 2015, following his arrest on the charge described above, defendant JEFF C. YIN, a/k/a "Yin Chuan," waived his *Miranda* rights and was interviewed by the FBI.  During the interview, which was recorded, YIN told FBI agents, among other things, that his co-defendant, NG LAP SENG, a/k/a "David Ng," viewed the building of the UN Macau Conference Center as NG's "legacy" in Macau.  YIN further admitted that NG, assisted by YIN, had made payments to obtain official action from the UN on this project.

### YAN AND PIAO ARRANGE PAYMENTS TO ASHE IN EXCHANGE FOR OFFICIAL ACTIONS ON BEHALF OF VARIOUS CHINESE BUSINESSMEN

44.    Based on my review of emails and travel records, I know that defendant JOHN W. ASHE traveled to Hong Kong in April 2012, where ASHE met with defendants SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park."  ASHE's meeting with YAN and PIAO was in or around the same time period that ASHE had stated to defendant FRANCIS LORENZO, in sum and substance, that ASHE was virtually assured of being elected the UNGA President and that he was hoping to secure more than $3,000,000 for his Presidency.  After meeting ASHE in Hong Kong, YAN and PIAO, as described in more detail below, arranged for hundreds of thousands of dollars of bribes to be paid to ASHE in return for, among other things, ASHE taking official action on behalf of

---

[6]    Five days later, on or about June 8, 2014, ASHE emailed LORENZO and stated: "Going to Antigua on Thursday to vote and would need to take something for the PM.  Hope I can have the $26 K in cash before then."

21

various Chinese businessmen seeking to obtain lucrative investments and government contracts in Antigua and elsewhere.

### YAN and PIAO Facilitate a $300,000 Bribe to ASHE On Behalf Of a Chinese Media Executive

45.    Shortly after JOHN W. ASHE, the defendant, met with defendants SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park" in Hong Kong in April 2012, YAN and PIAO facilitated a $300,000 payment to ASHE on behalf of a co-conspirator not charged herein ("CC-1"), a Chinese media executive seeking to invest in Antigua and potentially to obtain Antigua citizenship for himself or others. Specifically, I have learned the following based on my review of emails, bank records, and other documents:

a.    On or about May 29, 2012, YAN emailed ASHE to report that "I think we have secured USD3M," to which ASHE responded "[in] view of the new and positive developments, I look forward to meeting with you in New York or somewhere else if that is possible."

b.    On or about July 17, 2012, ASHE met with YAN and PIAO in New York. The next day, ASHE emailed YAN and PIAO the account information for PGA Account-1 and stated "please find below the related info for the matter we discussed yesterday to get the ball rolling." ASHE added that "this will be the account for the PGA funding as well." YAN emailed ASHE back, "Great! Thanks!" and PIAO emailed ASHE, "I shall get to work on it right away."

c.    On July 23, 2012, YAN sent the following email to ASHE, copying PIAO: "Dear John, a quick note to let you know that I will send first $300.000 to the account this week. Sheri." The next day, on July 24, 2012, PIAO sent an email to ASHE, with a copy to YAN, stating the following: "Just got the notice that the $300,000 will be in your account by tomorrow, please check to receive. This 300,000 is from [CC-1], 10% of 3M just to show his goodwill." In response ASHE wrote "Will inform the bank. Thanks for the efforts."

d.    On or about July 25, 2012, PGA Account-1 received a $300,000 wire from a particular individual ("Individual-1") who is an American citizen based in the United States and is a business associate of YAN and PIAO, who YAN and PIAO have repeatedly asked to wire money on their behalf at times relevant to this Complaint. Following receipt of the wire, ASHE wrote to YAN and PIAO: "I wish to confirm receipt of the first tranche of funds in the amount of $300,000."

22

e.  The next day, on July 26, 2012, ASHE sent an email
to YAN and PIAO telling them, in sum and substance, that ASHE would
travel to Antigua to advocate for CC-1's business interests with
Antiguan government now that CC-1 had paid $300,000.  In particular,
ASHE stated the following to YAN and PIAO, in relevant part:

.   .   .   .

This bring [*sic*] me then to [CC-1] and more
importantly this initial contribution of
$300,000.  As I recall from our discussions,
these funds were intended as a show of "good
faith" by him re. his interest in developing a
base/hub in Antigua and Barbuda AND (equally
important) enable me to demonstrate to my
interlocutors that he is indeed serious.  To be
totally upfront then, the funds in question will
allow me to "start the conversation" (my exact
words when we last met) when I visit Antigua in
the next week or so.

.   .   .

After our discussions last week, and given the
long lead time it takes to get things moving -
even in a small country such as my own - I had
already alerted my interlocutors in Antigua to
anticipate [CC-1]'s "show-of-good faith."  It
was against this backdrop that my visit to
Antigua was planned.

f.  On August 4, 2012, ASHE emailed YAN and PIAO that he
would be traveling to Antigua in the coming days.  ASHE told YAN and
PIAO that he was traveling to Antigua in order "to begin the
'conversation' on [CC-1's] initiative with the folks down there.  As
you can see it is a very short visit, the sole purpose of which is
to get my superiors to focus on the this [*sic*] important initiative
and to lay the groundwork for [CC-1's] future meeting with the decision
makers on my side.  Most - if not all - of the initial contribution
you have forward to account will be used on this trip so any additional
contribution(s) to the account before Thursday would be most
welcomed."

g.  Three days later, on or about August 7, 2012, ASHE
sent an email to YAN and PIAO stating, in relevant part:

23

I am trying to . . . opening a direct channel to the top decisionmaker, the Prime Minister (with whom I will be meeting, one-on-one when I arrive in Antigua on Thursday). The plan is to sell [the Prime Minister] on the initiative AND arrange for him to meet with [CC-1] (and co.), either here in NY in September, when he (the PM) comes up for the UN General next month, to be followed by a visit by [CC-1] (and co) to Antigua in early October.  This way, the PM will determine whether or not he needs to involve other levels of government and at what time.

. . .

. . . As an aside, my brother heads the Financial Services Regulatory Commission (FSRC), which is the independent authority responsible for approving the establishment of offshore banks (a goal of [CC-1], you may recall) and the Minister of Finance is a high school classmate of mine. The point here is that, after [CC-1] meets the Prime Minister and he subsequently travels to Antigua, he will be able to meet all the folks who matter.

     h.   ASHE traveled to Antigua between on or about August 9, 2012 and August 11, 2012.  On the same day that ASHE returned from Antigua he emailed YAN and PIAO the following, in relevant part:

Madam S/Madam H,

Just returned from Antigua about 90 mins ago and thought I better pen this while it is fresh in mind.

Although I was only in Antigua for 48 hrs I did managed [sic] to meet with all the key decision makers to discuss [CC-1]'s plans; that I had the initial resources in hand as proof of his intentions (and which have now been fully utilized), certainly served the intended purpose of focusing minds and getting the conversation started.  Ends result: I have been given the green light to fully engage [CC-1] and to mutually agree on a way forward.  . . .

PIAO replied to ASHE's email:  "Thank you for the wonderful news, only you can bring this matter up to the highest level within such a short time.  Sheri met with [CC-1] earlier today, and gave him a briefing, he was very pleased to hear the good news."

46.     From my review of bank records for PGA Account-1, I know that defendant JOHN W. ASHE disbursed the bulk of $300,000 payment from CC-1 discussed above as follows:

a.     ASHE sent $100,000 to the Prime Minister, in a series of five $20,000 checks

b.     ASHE sent approximately $13,000 to the political party of the Prime Minister.

c.     ASHE paid approximately $40,000 to a BMW dealership in Manhattan, where ASHE signed a lease for 2013 BMX model X5.

d.     ASHE paid approximately $35,000 to a credit card company used by him and his wife. ASHE used the money to pay off balances that he and his wife had accumulated from charges for purchases such as online shopping, restaurants, massages, video games, sporting goods, and his wife's personal travel.

e.     ASHE transferred $20,000 to his joint bank account with his wife and withdrew another $13,500 in cash.

## YAN and PIAO Begin Monthly Payments to ASHE After He Is Elected UNGA President

47.     Based on my review of emails and other documents, I know that after defendant JOHN W. ASHE was elected UNGA President in June 2013, defendants SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," began making monthly payments of approximately $20,000 to ASHE under the guise of being the "Honorary Chairman" of NGO-2 with which ASHE had no prior involvement or knowledge. Specifically, I have learned the following from my review of emails, bank records, and other documents:

a.     On or about August 2, 2013, ASHE, YAN, and PIAO arranged to have dinner at a restaurant in New York, New York. Later that same night, ASHE sent YAN and PIAO two emails, one titled "PGA Banking Info" and the other titled "Personal Banking Info," which respectively contained the account information for ASHE's PGA Account-2 and one of his personal bank accounts jointly held with his wife. In response to ASHE's personal bank account information, PIAO replied to ASHE and YAN, "Will get on it right away."

25

b.   On Saturday, August 3, 2013, PIAO sent another reply to ASHE and YAN to ASHE's email with his personal bank account information stating, "It is done.  Waiting to score."

c.   On or about August 5, 2013, ASHE's joint bank account with his wife received a wire of $19,975 from a company associated with YAN and PIAO.  ASHE replied on Monday morning, August 5, 2013, "Wish to confirm receipt of US $19,975.00 today to my personal bank account and to thank you profusely for delivering on your promise re. the same.  Grateful if you could provide me with a bit of info on the body on which I have been designated to serve as Honorary Chairman."  PIAO replied "Glad that we finally are able to implement our good will, this is just a start :)," and told ASHE that they would provide him with the information about the organization for which he would be "Honorary Chairman."  Following the initial payment to ASHE in August 2013, YAN and PIAO began paying ASHE $19,975 per month for his purported role as "Honorary Chairman" of NGO-2, which is an organization run by YAN and PIAO supposedly to promote sustainable global development.

## YAN and PIAO Arrange Additional Payments to ASHE in Exchange For Official Actions On Behalf of a Chinese Security Company

48.   Defendant JOHN W. ASHE formally assumed the role as the 68th President of UNGA in September 2013.  Based on my review of emails, bank records, and other documents, I know that on September 17, 2013, ASHE and the UN Secretary General hosted a reception to mark the opening of the 68th Session of UNGA.  At ASHE's request, defendants SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," arranged for a Chinese security technology executive ("CC-2") to send wires of approximately $100,000 to ASHE's PGA Account-2, supposedly to reimburse ASHE for half the cost of the reception.  Approximately one month later, ASHE accompanied CC-2 and PIAO to Antigua so that CC-2 could seek to sell his product to Antiguan officials.  Specifically, I have learned the following:

a.   On September 4, 2013, ASHE emailed YAN and PIAO that plans were "well underway" for the September 17 reception, although the Secretary General's office had asked ASHE to pay for the reception in its entirety.  ASHE told YAN and PIAO that he "warmly welcome[d] your generous offer to share half the cost of this reception with me."

b.   On September 12, 2013, PIAO emailed ASHE, with a copy to YAN, a list of attendees for the reception.  The list included YAN

26

and PIAO themselves, CC-2, and another Chinese media executive. Next to CC-2's name PIAO noted that CC-2 was the "sponsor."

     c.    On September 16, 2013, ASHE's PGA Account-2 received three wires from a particular bank in China (the "Chinese Bank") totaling approximately $100,000. The memo for each of the wires stated "Beijing Sponsorship," and the memo for one particular wire, in the amount of $9,985, specifically noted that it originated from CC-2. That morning, PIAO sent an email to ASHE, copying YAN, informing ASHE that "[o]ur office" had wired the funds from Beijing three days earlier. ASHE emailed YAN and PIAO confirmation that he had received the funds. Later that day, PIAO emailed ASHE, again copying YAN, and told ASHE that PIAO, ASHE, and CC-2 had "a very pleasant visit to your office this morning" and they were "warmly received." PIAO added that CC-2 had decided to visit to Antigua and that he had also wanted to make a "small contribution" the Prime Minister's upcoming trip to New York for the UNGA meeting through ASHE. ASHE replied to PIAO, "[l]et me know what he has in mind re. the PM's trip when we meet tomorrow."

     d.    Approximately one month later, YAN and PIAO arranged for PIAO, ASHE, and CC-2 to travel to Antigua together so that CC-2 could meet Antiguan officials about a possible business deal. On October 22, 2013, PIAO emailed ASHE and YAN and said that "the purpose of the visit to Antigua is about to 'help' a Chinese company [the "Chinese Security Company"] to invest $20m in Antigua to build a national internet security system." Later that day, PIAO emailed ASHE and YAN information about the Chinese Security Company and told ASHE that their agenda for the trip was "1. Meeting with the relevant ministers to present the proposal 2. If your country is interested, we would like have an one page meeting memo to show the interest from your government. 3. Invite Chinese Ambassador to have lunch or dinner to brief him on this project, 4. Invite your country Ministers to visit China and meet with the top leader of [The Chinese Security Company]."

     e.    On October 22, 2013, ASHE emailed PIAO and YAN with the subject line "Trip to Antigua." ASHE said that "[t]he Minister will be at the airport to meet you on arrival tomorrow. He is quite keen to hear the proposal so his staff will take you to a nearby tech facility so that you can make the presentation. See you onboard. Cheers." A few minutes later ASHE sent another email to PIAO and YAN and stated "[f]orgot to add that, as a testament to your importance, the Minister also wanted you to know that he would be available to meet with at 10:00 a.m. on Wednesday, October 30, in Washington D.C. for any follow-up discussions for tomorrow's meeting."

f.     On October 23, 2013, ASHE and PIAO traveled to Antigua from New York.  CC-2 flew to Antigua on or about the same date from Beijing.  ASHE and PIAO subsequently returned to New York the following day.

g.     Following the trip to Antigua, ASHE also facilitated a meeting between executives for Chinese Technology Company and officials of Kenya, where the Chinese Technology Company was also looking for business.  On October 30, 2013, PIAO emailed ASHE with a copy to YAN, telling ASHE that CC-2 was in Nairobi, Kenya, where he would be joined by other individuals from the Chinese Technology Company, and that "they hope you can arrange them to start meeting with someone from the Ministry of Internal Affairs."  ASHE replied "Noted."  On November 3, 2013, PIAO emailed ASHE, with a copy to YAN, and said that even though CC-2 had not yet received a call from a particular senior Kenyan foreign official, YAN and PIAO thanked for ASHE for "making such an effort" to set up the meeting for the Chinese Technology Company since "now [the Chinese Technology Company] recognizes our strong government connection."

h.     Two days later, on November 5, 2013, ASHE emailed YAN and PIAO: "I have been in touch with [a particular Kenyan UN official ('Kenyan UN Official-1')] . . . and informed him of your desire to meet with him when he's in Beijing.  He has agreed and will be providing me with his contact details once he gets there on Thursday.  Once he does, I will forward you the same so you (and/or the [Chinese Security Company] reps) can meet with him.  BTW he has indicated that Kenyan's [*sic*] [senior intelligence official] is now keen to meet with the [Chinese Security Company] reps when the latter return to Nairobi."  On November 7, 2013, ASHE emailed YAN and PIAO that "[Kenyan UN Official-1] informs that he is available with [the Chinese Technology Company] reps on Saturday afternoon," and provided YAN and PIAO with the Kenyan UN Official-1's contact information.  ASHE added "[t]he ball is now in your court but please let me know if anything is needed from my end to make it happen."

i.     On November 9, 2013, YAN emailed ASHE that she had "a very interesting dinner with [Kenyan UN Official-1] and the conversation was productive."  Later that day, ASHE told PIAO and YAN that he had received an update on their meeting from Kenyan UN Official-1 and that Kenyan UN Official-1 informed ASHE that he would seek to make arrangements for the Chinese Technology Company "to meet with those who are best placed to make a decision on the procurement of the equipment . . . ."  Later the same day, ASHE emailed YAN and PIAO and asked for the dates for when the Chinese Security Company

28

individuals would next be in Kenya so that ASHE would be able to "keep the pressure up" on Kenyan UN Official-1.

        j.    In December 2013, ASHE solicited $100,000 from PIAO and YAN supposedly in order to pay for his staff's holiday party. On December 4, 2013, ASHE emailed YAN:

> Re. the promised $100K, may I suggest the
> following approach re. remitting it to me.  If
> the entire amount is to be sent in one shot then
> it's best to send it to the PGA account and then
> I can withdraw it in installments without raising
> any questions by the bank.  This is my preferred
> approach since that account has been used for
> large amounts and would not raise any red flags.
> .  .  .
>
> Thanks...and lots of love

        k.    On December 11, 2013, YAN emailed ASHE that $100,000 was being sent to one of the PGA Accounts.  On December 12, 2013, PGA Account-2 received a $100,000 wire from Individual-1 who, as described above, is a United States-based business associate of YAN and PIAO, who YAN and PIAO have repeatedly asked to wire money on their behalf at times relevant to the Complaint.

        l.    On December 23, 2013, ASHE arranged for a conference call between executives from the Chinese Security Company and two Antiguan Ministers.  After the call, PIAO emailed ASHE, with a copy to YAN, and said that during the call the parties agreed on a further schedule of meetings and visits after which they would sign a memorandum of understanding ("MOU") and "move forward according to the implementation framework."

        m.    On January 16, 2014, ASHE emailed PIAO that he needed some possible dates "for the visit by the [Chinese Security Company] folks to visit Antigua, pronto.  The plan is to have them meet with the Ministers and sign the MOU.  The Prime Minister may also participate in the meeting- depending on the date of the visit and his schedule."

        n.    On April 2, 2014, PIAO wrote ASHE and informed him that the Chinese Security Company "team" would be arriving in Antigua on April 4, 2014.  On April 6, 2014, ASHE emailed PIAO and YAN and said that a senior Antiguan national security minister had told him

that he had met with the Chinese Security Company executives and that
the Minister had signed the final version of the MOU with the Chinese
Security Company. ASHE added "Bottom line: there is now a signed MOU
between the Government of Antigua and Barbuda and [the Chinese
Security Company]." The subject line of ASHE's email to YAN and PIAO
was "Delivering on a promise."[7]

       o.    Based on my review of records for PGA Account-2, I
know that during the same period that ASHE was receiving payments
from CC-2, YAN, and PIAO to facilitate the Chinese Security's Company
business interests in Antigua and elsewhere, ASHE sent the Prime
Minister himself approximately $170,000 from PGA Account-2.

### YAN and PIAO Arrange For a $200,000 Payment to ASHE in Exchange For Attending a Conference in China In ASHE's Official Capacity

      49.    I also know from review of emails that after defendant JOHN
W. ASHE became UNGA President, defendants SHIWEI YAN, a/k/a "Sheri
Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," also arranged for a
$200,000 payment to ASHE in exchange for ASHE making an official
appearance at a conference in China being organized by a Chinese real
estate developer ("CC-3"). Specifically, from my review of emails,
bank documents, and other documents, I have learned the following:

       a.    On October 18, 2013, PIAO emailed ASHE, with a copy
to YAN, and told ASHE that PIAO and YAN had been working on obtaining
additional funds for ASHE. PIAO told ASHE that "an old friend of Sheri
who is extremely wealthy" was organizing an international conference
in Guangzhou, China (the "Guangzhou Conference"), and that PIAO and
YAN had suggested that ASHE be invited to the conference. PIAO
attached a program for the conference that listed several current
and former government officials as invited attendees, including ASHE.
ASHE replied that the Guangzhou Conference was "very tempting indeed"
and that he might make it, but that his entire "team" would need to
accompany him. YAN replied to ASHE that she had "[j]ust talk[ed] to
Heidi, she is going to write to you. In short, all the people who
travel with you will be covered by the man and plus." PIAO then replied
to ASHE that "[w]e are sure that he will cover the cost of your team,"
and requested information about ASHE's team and travel plans.

_____

[7]    The prior day, ASHE wrote YAN and PIAO and requested that they
secure "the almost $300K" that ASHE supposedly needed to organize
a concert at the UN. ASHE also requested that the Chinese Security
Company pay for street lights and iPads for the Antiguan government.

b.    On or about October 24, 2013, YAN emailed ASHE and
PIAO and stated "[a]ccording to our strategy plan, [CC-3]'s office
emailed me the invitation to John this morning . . . I will ask $200,000
for this trip. . . ." A few minutes later, YAN emailed ASHE, with
a copy to PIAO, a draft invitation from CC-3 to ASHE to attend the
Guangzhou Conference. YAN told ASHE that the invitation had been
approved by CC-3, and YAN added that "[a]s you may see that I purposely
add some words on future relationship between you and him, that will
establish a good platform for you today and tomorrow." The draft
invitation was addressed from CC-3 to ASHE as UNGA President and,
in addition to inviting ASHE to the Guangzhou Conference, CC-3 stated
that, "After attending this Summit, I wish that you would remember
that you have a sincere friend in Guangdong Province – the economic
powerhouse in China. And your friend here has the pleasure to offer
you a permanent convention venue for the UN meetings on the
sustainability and climate changes in the efforts to fully realize
the Millennium Development Goals, as well as for the 193 members of
the UN to convene for multilateral discussions on the topics of
priority concerns."

c.    On October 27, 2013, PIAO emailed ASHE and YAN and
told ASHE that "in order to have [CC-3] to wire the money to 68th PGA
account, we suggest that you write a courtesy letter (in 68th PGA
letterhead) to [CC-3] to accept his invitation, and in the letter
also list out the name and title for all the people to be travelling
with you, in order to make the logistic arrangement for them." The
next day, ASHE emailed the "courtesy letter" to CC-3 suggested by
PIAO. The letter was addressed to CC-3 from ASHE and was on official
UNGA President letterhead. In the letter, ASHE told CC-3 he was
pleased to accept CC-3's invitation to him and his team to attend
the Guangzhou Conference. ASHE stated that at the conference ASHE
would "deliver a statement on the topic of 'Identifying the Parameters
of the Post-2015 Development Agenda.'" ASHE then listed four UN
officials that would attend the conference with him and asked CC-3
to contact his special assistant to "finalize the logistical
arrangements."

d.    On October 29, 2013, PIAO emailed ASHE and YAN and
told ASHE that "in order to get the funding wired in ASAP," PIAO and
YAN recommended that instead of asking CC-3 to contact ASHE's special
assistant to make the "logistical arrangements," that ASHE revise
his letter to CC-3 to ask that the arrangements be made through YAN.
Later that day, PIAO emailed ASHE again, copying YAN, asking ASHE:
"As for the $200K from [CC-3], which account would you like it to
be wired to? The 68 PGA? Please advise." ASHE replied to PIAO and

31

YAN that the money should be wired to the "PGA account" and attached a revised letter to CC-3. In the revised letter, ASHE told CC-3 to have his staff "contact my Adviser on Economic Matters, Ms. Shiwei Yan, to finalize the logistical arrangements for the trip."

       e.    Later that same day, ASHE sent two "letters of appointment" to YAN and PIAO, which were back-dated to the prior month, September 2013. In one letter, on UNGA President letterhead, ASHE informed each of YAN and PIAO that they had each been appointed "Adviser, Economic Matters" in ASHE's office. In the other letter, on Antiguan government letterhead, ASHE informed YAN and PIAO that they had each been appointed as "Adviser to Office of the Prime Minister of Antigua and Barbuda on matters pertaining to investments in Antigua and Barbuda from the entire Asia region." In the email enclosing the letters, ASHE stated, "I believe these complete the outstanding requests that were made to me."[8]

       f.    On November 3, 2013, YAN emailed ASHE, with a copy to PIAO, telling ASHE that "Guangzhou has been wired 200k to PGA office today" and that "25k" had been wired to ASHE's travel agent. YAN also asked for the name of UN security personnel who would be traveling with ASHE to the Guangzhou Conference. On November 4, 2013, ASHE's PGA Acccount-2 received a $200,000 wire from China from one of CC-3's companies. That morning ASHE emailed YAN: "[c]an confirm receipt of $200k to the PGA."

       g.    On November 17, 2013, ASHE attended the Guangzhou Conference. According to the agenda for the conference, ASHE gave a speech to the conference and then gave media interviews on global economic development.

---

[8]    Based on my discussions with the Department of State, I understand that YAN and PIAO, who are naturalized United States citizens, were later accredited as diplomatic advisers for the period between September 2013 and September 2014, based on these backdated appointments by ASHE. At most, YAN and PIAO accordingly have residual official act immunity during this time period. As described above and below, YAN and PIAO facilitated the bribes to ASHE in their personal capacities, and as executives of NGO-2 -- seeking the diplomatic status conferred by ASHE simply as a way to expedite bribe payments -- and, in any event, many of their actions predated September 2013.

## LAUNDERING OF BRIBERY FUNDS

50. Based on my review of bank records and other documents, I know that payments described above facilitated by defendants SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," to defendant JOHN W. ASHE were transmitted from China as part of the scheme to promote the bribery of the Antiguan Prime Minister detailed above, and that steps were taken to conceal the source and nature of the payments.[9] For example:

a. The $300,000 payment by CC-1 to ASHE in July 2012 to PGA Account-1, which was facilitated by YAN and PIAO, a/k/a "Heidi Park," in exchange for ASHE advocating for the business interests of CC-1 to the Prime Minister, was sent by wire from Individual-1's domestic bank account after which YAN and PIAO reimbursed Individual-1's bank account in China. As noted above, approximately $100,000 was then sent to the Prime Minister in Antigua from PGA Account-1.

b. The $100,000 payment by CC-2 to ASHE in September 2013 to PGA Account-2, which was facilitated by YAN and PIAO in exchange for ASHE advocating for the business interests of the Chinese Security Company in Antigua, was sent by wires from the Chinese Bank in China. As noted above, approximately $170,000 was sent to the Prime Minister in Antigua from PGA Account-2, including $20,000 during the month after CC-2 wired $100,000 to the account.

## ASHE'S FAILURE TO FULLY REPORT HIS INCOME TO THE IRS

51. Based on my review of the IRS Forms 1040 jointly filed by defendant JOHN W. ASHE, and his wife, a United States citizen, for tax years 2013 and 2014, I know that ASHE failed to report income sufficient to account for his payments from, among other things: (i) his self-described monthly salary as UNGA President; (ii) his and his wife's monthly payments from defendants NG LAP SENG, a/k/a "David Ng," FRANCIS LORENZO, and JEFF C. YIN, a/k/a "Yin Chuan," through NGO-1 and NGO-3; and (iii) his monthly payments from defendants SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," through NGO-2. Specifically, I learned the following from my review of ASHE's tax returns and my review of bank records:

---

[9]     From my review of documents, I know that bribery of a public official is illegal in Antigua under the Prevention of Corruption Act, which was enacted by the Antiguan Parliament on November 5, 2004.

a.    On or about April 15, 2014, ASHE and his wife jointly
filed their Form 1040 for tax year 2013.  ASHE reported his total
income as $220,500 and his wife's income as $30,000, which ASHE
declared was true and correct under the penalty of perjury.  In fact,
I know based on bank records, that during 2013, ASHE was paid
approximately $810,000 from the following sources: (i) $274,881.03
by the Government of Antigua & Barbuda; (ii) $25,000 by NGO-1;
(iii) $119,850 by NGO-2; (iv) $90,000 by NGO-3; and (v) at least
$300,000 in what ASHE described as "salary" payments and alleged
reimbursements from PGA Account-2, which was funded in large part
by bribe payments, as described above.  In total, ASHE and his wife
underreported their income by at least approximately $462,350.00 for
year 2013.

b.    On or about April 15, 2015, ASHE and his wife jointly
filed their Form 1040 for tax year 2014.  Just as the prior year, ASHE
again reported his total income as $220,500 and his wife's income
as $30,000, which ASHE declared was true and correct under the penalty
of perjury.  In fact, I know based on bank records, that during 2014,
ASHE was paid approximately $1,050,000 from the following sources:
(i) $179,562.09 by the Government of Antigua & Barbuda; (ii) $69,925
by NGO-2; (iii) $120,000 by NGO-3; and (iv) at least $678,904.28 in
what ASHE described as "salary" payments and alleged reimbursements
from PGA Account-2, which was funded in large part by bribe payments,
as described above.  In total, ASHE and his wife under reported their
income by at least approximately $796,329.28 for year 2014.

52.    Based on my review of emails between defendant JOHN W. ASHE,
his wife, and a friend, who works as an accountant and assisted ASHE
and his wife to prepare their tax returns in various years, including
in calendar years 2013, 2014, and 2015 (the "Accountant"), and my
conversations with the Accountant, I have learned the following:

a.    In or about Spring 2013, in connection with the
preparation of ASHE's federal tax return for tax year 2012, the
Accountant had conversations with ASHE and his wife concerning the
existence of PGA Account-1.  The Accountant understood that PGA
Account-1 account was used for ASHE's UNGA Presidency.  The
Accountant was not told that ASHE had transferred funds from PGA
Account-1 to personal accounts or used such funds to pay for personal
expenditures.

b.    Also in or about Spring 2013, in connection with the
preparation of ASHE's federal tax return for tax year 2012, the
Accountant was presented with a Schedule C (Profit or Loss from
Business) for PGA Account-1, containing certain amounts.  A few days

later, the Accountant was given another Schedule C, also for tax year 2012, by ASHE and his wife, with different figures. Neither ASHE nor ASHE's wife provided a basis for the changed figures. ASHE and his wife requested that the Accountant adjust the gross receipts and expenditures reported for PGA Account-1 so that the net profit reported was zero. The Accountant, who acceded to this request, was not provided with documentation supporting the request.

c. In or about Spring 2014, the Accountant again assisted ASHE and his wife to prepare their federal tax return, for tax year 2013. Neither ASHE nor his wife informed the Accountant that ASHE had opened PGA Account-2 and had transferred funds from it into one or more personal accounts. As they had the prior year, ASHE and his wife provided the Accountant with certain figures of income and expenses, and then changed those figures, without explanation or documentation. For example:

i. On March 25, 2014, ASHE's wife sent an email to the Accountant, copying ASHE, and told the Accountant that, with respect to the reporting of ASHE's income, "it should be increased from last year but not by too much," even though ASHE's income had increased by approximately $500,000 since the prior tax year.

ii. On April 1, 2014, ASHE's wife sent a draft tax return to ASHE and the Accountant, which reflected a gross income of approximately $225,000 (significantly less than their actual gross income), and told ASHE to "please reflect on gross income amount," because "as it stands we owe a sizable amount now." One week later, ASHE's wife sent ASHE their final tax return (the same return they filed with the IRS), which reduced their gross income to approximately $161,000, even less than their already significantly underreported income in the draft tax return.

d. In or about Spring 2015, the Accountant again assisted ASHE and his wife to prepare their federal tax return, for tax year 2014. Neither ASHE nor his wife informed the Accountant that ASHE still had PGA Account-2 and had transferred funds from it into one or more personal accounts.

e. The Accountant never informed ASHE or his wife that income ASHE received was tax-exempt by virtue of his position or that ASHE did not need to report income he received. On the contrary, the Accountant informed ASHE and his wife that they needed to report all income.

35

f.     Although the Accountant prepared returns for ASHE and his wife in calendar years 2013, 2014, and 2015 (for tax years 2012, 2013, and 2014), ASHE and his wife filed the returns with the IRS themselves.

53.     Based on my review of bank records and credit card records for defendant JOHN W. ASHE and his wife, I know that during the years that ASHE and his wife were significantly underreporting ASHE's income, ASHE and his wife made several expensive purchases, such as the following:

a.     In 2013 and 2014, ASHE repeatedly ordered expensive hand-tailored suits and clothing from a company in Hong Kong (the "Clothing Company"). For example, in June 2014, ASHE had total charges from the Clothing Company in the amount of approximately $59,000.

b.     In or about July 2013, ASHE and/or his wife purchased a membership to a luxury vacation club in South Carolina for approximately $69,000.

c.     On or about March 16, 2014, ASHE and/or his wife purchased two Rolex watches for approximately $54,000.

d.     In or about September 2014, ASHE paid 24 months of the lease of a new BMW X5, paying approximately $40,000.

e.     Between in or about October 2013 and March 2014, ASHE and/or his wife made approximately six purchases from Gucci stores totaling more than $5,000.

WHEREFORE, deponent respectfully requests that warrants be issued for the arrest of JOHN W. ASHE, FRANCIS LORENZO, SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," the defendants, and that they be imprisoned or bailed, as the case may be, and that NG LAP SENG, a/k/a "David Ng," and JEFF C. YIN, a/k/a

36

"Yin Chuan," the defendants, be imprisoned or bailed, as the case may be.

_____

JASON P. ALBERTS
Special Agent
Federal Bureau of Investigation

Sworn to before me this
5th day of October, 2015

_____

THE HONORABLE HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

37

# Exhibit D

# EXHIBIT D

## Touhy Request - Key documents Sought by Requesters

| Date of document | Details/Description of contents | How Requesters know document exists |
|---|---|---|
| | **EMAILS** | |
| 10/18/2013 | Email from Heidi Piao to John Ashe cc Sheri Yan and attached program<br><br>Piao told Ashe that they had been working on obtaining additional funds for ASHE. Piao stated that "an old friend of Sheri who is extremely wealthy" was organizing an international conference in Guangzhou, China (the "Guangzhou Conference") and that Piao and Yan had suggested that Ashe be invited to the conference. PIAO attached a program for the conference that listed several current and former government officials as invited attendees, including Ashe. | Referred to in Complaint (Docket Entry 1) in Ashe Proceedings, page 30-32 |
| presumed 10/18/2013 | Email from John Ashe to Heidi Piao cc Sheri Yan<br><br>Ashe replied that the Guangzhou Conference was "very tempting indeed" and that he might make it, but that his entire "team" would need to accompany him. | Referred to in Complaint (Docket Entry 1) in Ashe Proceedings, page 30-32 |
| presumed 10/18/2013 | Email from Sheri Yan to John Ashe<br><br>Yan replied to Ashe that she had "[j] ust talk[ed] to Heidi, she is going to write to you. In short, all the people who travel with you will be covered by the man and plus." | Referred to in C (Docket Entry 1) in Ashe Proceedings, page 30-32 |
| presumed 10/18/2013 | Email from Heidi Piao to John Ashe<br><br>Piao then replied to Ashe that "[w]e are sure that he will cover the cost of your team, and requested information about Ashe's team and travel plans | Referred to in Complaint (Docket Entry 1) in Ashe Proceedings, page 30-32 |
| around 10/24/2013 | Email from Sheri Yan to John Ashe and Heidi Piao<br><br>Yan stated "[a]ccording to our strategy plan [CC-3]'s office emailed me the invitation to John this morning ... I will ask $200,000 for this trip" | Referred to in Complaint (Docket Entry 1) in Ashe Proceedings, page 30-32 |
| around 10/24/2013 | Email from Sheri Yan to John Ashe cc Heidi Piao and attached draft invitation<br><br>Yan emailed Ashe a draft invitation from CC-3 to Ashe to attend the Guangzhou Conference. Yan told Ashe that the invitation had been approved by CC-3 and Yan added that "[a] s you may see that I purposely add some words on future relationship between you and him that will establish a good platform for you today and tomorrow." The draft invitation was addressed from CC-3 to Ashe as UNGA President and, in addition to inviting ASHE to the Guangzhou Conference, CC-3 stated that, "After attending this Summit, I wish that you would remember that you have a sincere friend in Guangdong Province - the economic powerhouse in China. And your friend here has the pleasure to offer you a permanent convention venue for the UN meetings on the sustainability and climate changes in the efforts to fully realize the Millennium Development Goals 1 as well as for the 193 members of the UN to convene for multilateral discussions on the topics of priority concerns." | Referred to in Complaint (Docket Entry 1) in Ashe Proceedings, page 30-32 |
| 10/27/2013 | Email from Heidi Piao to John Ashe and Sheri Yan<br><br>Piao stated that "In order to have [CC-3] to wire the money to 68th PGA account we suggest that you write a courtesy letter (in 68th PGA letterhead) to [CC-3] to accept his invitation, and in the letter also list out the name and title for all the people to be travelling with you, in order to make the logistic arrangement for them." | Referred to in Complaint (Docket Entry 1) in Ashe Proceedings, page 30-32 |

| 10/29/2013 | Email from Heidi Piao to John Ashe and Sheri Yan<br><br>Piao told Ashe that "in order to get the funding wired in ASAP" Piao and Yan recommended that instead of asking CC-3 to contact Ashe's special assistant to make the "logistical arrangements", that Ashe revise his letter to CC-3 to ask that the arrangements be made through Yan. | Referred to in Complaint (Docket Entry 1) in Ashe Proceedings, page 30-32 |
|---|---|---|
| 10/29/2013 | Email from Heidi Piao to John Ashe cc Sheri Yan<br><br>Piao asked Ashe: "As for the $200K from [CC-3], which account would you like it to be wired to? The 68 PGA? Please advise." | Referred to in Complaint (Docket Entry 1) in Ashe Proceedings, page 30-32 |
| 10/29/2013 | Email from John Ashe to Heidi Piao and Sheri Yan and attachment<br><br>Ashe replied to Piao and Yan that the money should be wired to the "PGA account and attached a revised letter to CC-3. In the revised letter, Ashe told CC-3 to have his staff "contact my Adviser on Economic Matters, Ms. Shiwei Yan, to finalize the logistical arrangements for the trip." | Referred to in Complaint (Docket Entry 1) in Ashe Proceedings, page 30-32 |
| 10/29/2013 | Email from John Ashe to Heidi Piao and Sheri Yan with two letters attached<br><br>Ashe sent two "letters of appointment" to Yan and Piao, which were back-dated to the prior month, September 2013. In one letter, on UNGA President letterhead, Ashe informed Yan and Piao that they had each been appointed "Adviser, Economic Matters" in Ashe's office. In the other letter, on Antiguan government letterhead, Ashe informed Yan and Piao that they had each been appointed as "Adviser to Office of the Prime Minister of Antigua and Barbuda on matters pertaining to investments in Antigua and Barbuda from the entire Asia region." In the email enclosing the letters, Ashe stated, "I believe these complete the outstanding requests that were made to me". | Referred to in Complaint (Docket Entry 1) in Ashe Proceedings, page 30-32 |
| 11/3/2013<br>11/4/2013 | Email from Sheri Yan to John Ashe and Heidi Piao (11/3/2013); email from John Ashe to Sheri Yan (11/4/2013)<br><br>In a November 3, 2013 email Yan told Ashe that "Guangzhou has been wired 200k to PGA office today and that "25k" had been wired to Ashe's travel agent. Yan also asked for the name of UN security personnel who would be traveling with Ashe to the Guangzhou Conference. On November 4, 2013, Ashe's PGA Acccount-2 received a $200,000 wire from China from one of CC-3's companies. That morning Ashe emailed Yan: "[c]an confirm receipt of $200k to the PGA". | Referred to in Complaint (Docket Entry 1) in Ashe Proceedings Yan trial, page 30-32 |
| On or around 10/24/2013 | Invitation from CC-3 to Ashe to speak at the event | Referred to in email from Yan to Ashe on or around 10/24/2013 |
| 10/28/2013 | Courtesy Letter from John Ashe to CC-3 with letter attached<br><br>Ashe emailed the "courtesy letter" to CC- 3 suggested by Piao. The letter was addressed to CC-3 from Ashe and was on official UNGA President letterhead. In the letter, Ashe told CC-3 he was pleased to accept CC-3's invitation to him and his team to attend the Guangzhou Conference. Ashe stated that at the conference Ashe would "deliver a statement on the topic of 'Identifying the Parameters of the Post-2015 Development Agenda.'" Ashe then listed four UN officials that would attend the conference with him and asked CC-3 to contact his special assistant to "finalize the logistical arrangements.. | Referred to in Complaint (Docket Entry 1) in Ashe Proceedings, page 30-32<br><br>Referred to in Government Sentencing Memorandum (Docket Entry 227) in Ashe Proceeding, page 6 |
| On or around 10/29/2013 | Revised Courtesy Letter sent from Ashe to CC-3 | Referred to in Complaint (Docket Entry 1) in Ashe Proceedings, page 30-32 |

| | | Referred to in email from Piao to Ashe on 10/29/2013<br><br>Referred to in Government Sentencing Memorandum (Docket Entry 227) in Ashe Proceedings, page 6 |
|---|---|---|
| On or around 10/29/2013 | Letters of Appointment<br><br>Ashe sent two "letters of appointment" to Yan and Piao, which were back-dated to the prior month, September 2013. | Referred to in Complaint (Docket Entry 1) in Ashe Proceedings, page 30-32<br><br>Referred to in Government Sentencing Memorandum (Docket Entry 227) in Ashe Proceedings, page 6 |
| 11/4/2013 | Bank and/or wire transfer records of $200,000 transfer from one of CC-3s companies to one of John Ashe's UN GA bank accounts | Referred to in Complaint (Docket Entry 1) in Ashe Proceedings, page 30-32<br><br>Referred to in email correspondence between Yan and Ashe on November 2-4, 2013<br><br>Referred to in Government Sentencing Memorandum (Docket Entry 227) in Ashe Proceedings, page 6 |

ME_155052865_1
4818-2181-5426v.2 0112212-000001