

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 24, 2019

**BY ECF**
The Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

   Re:  *United States v. Francis Lorenzo*, S6 15 Cr. 706 (VSB)

Dear Judge Broderick:

  The Government respectfully submits this letter to advise the Court of pertinent facts concerning the assistance that Francis Lorenzo has rendered in the investigation and prosecution of other targets of criminal activity involving corruption at the highest levels of the United Nations ("UN"). In light of these facts, and assuming that Lorenzo continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence Lorenzo in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines. Lorenzo is scheduled to be sentenced on November 8, 2019, at 11:30 a.m.

<u>**The Underlying Criminal Conduct**</u>

  In October 2015, Lorenzo was charged by complaint (15 Mag. 3562 (Dkt. 1)) and was arrested. An indictment was returned on or about October 20, 2015, charging him—along with John W. Ashe, Ng Lap Seng, Jeff C. Yin, Shiwei Yan, and Heidi Piao—with bribery and money laundering offenses. (Dkt. 38.) Specifically, Lorenzo was charged with conspiracy to commit bribery, in violation of 18 U.S.C. § 371 (Count One); bribery, in violation of 18 U.S.C. § 666 (Count Two); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Six); and money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) (Count Seven).

  The charges against Lorenzo were based on the role he played, in his capacity as a Deputy Ambassador from the Dominican Republic to the UN, in a bribery scheme orchestrated by his co-defendant, Ng. As the evidence at Ng's subsequent trial demonstrated, Lorenzo both accepted bribes from Ng and assisted Ng in bribing Ashe—the then-Permanent Representative of Antigua and Barbuda to the UN, and, for one year, the elected President of the General Assembly ("PGA")—for the purpose of obtaining the UN's formal, institutional support for a multi-billion dollar convention center that Ng wanted to establish in Macau, China using Ng's real estate development company (the "Macau Center"). In total, between 2010 and 2015, Lorenzo was paid

more than $1.5 million by Ng.  During the same period, Lorenzo also assisted Ng in paying over $300,000 in bribes to, or for the benefit of, Ashe.[1]

Since in or about 2008, the UN Office for South-South Cooperation ("UNOSSC") had run an annual "Global South-South Development Expo" (the "UNOSSC Expo") in a different country or city each year.  Ng wanted to establish the Macau Center as the permanent home of the annual UNOSSC Expo.  He also wanted the Macau Center to serve as a location for other meetings, forums, and events associated with the UN.  Ng, who already owned a hotel and casino in Macau, intended for the Macau Center to anchor a massive complex that would include, among other things, new hotels, restaurants, and residences to be developed by Ng's company.  Ng was also in the process of developing and marketing a luxury apartment complex near the proposed site of the Macau Center.

Ng sought to accomplish his goals by paying bribes to Lorenzo, and by enlisting Lorenzo to assist Ng in bribing Ashe.  In exchange for these bribes, Lorenzo agreed to use his position at the UN to advance Ng's interest in obtaining formal UN support for the Macau Center.  Lorenzo also agreed to, and did, use his position to influence, exert pressure on, and advise other UN officials and diplomats, intending that they, in turn, would use their positions to advance Ng's interest in obtaining formal UN support for the Macau Center.  In particular, Lorenzo played a critical role in causing Ashe to support and work to establish the Macau Center, and in causing Yiping Zhou (the then-director of UNOSSC) to support it as well.

In or about late 2009, Ng helped to found South-South News ("SSN"), ostensibly a media platform, based in New York, New York, focused on issues pertinent to developing nations.  Ng made Lorenzo the President of SSN and, acting in part through SSN, paid Lorenzo tens of thousands of dollars per month, often via wires from SSN to Terra Trading, a company in the Dominican Republic affiliated with Lorenzo's brother.  Ng also paid Lorenzo, through SSN, with checks and/or wires payable to (i) Lorenzo's siblings and (ii) third parties to cover various of Lorenzo's personal expenses.  Lorenzo had requested to be paid in this manner at least in part in order to avoid his U.S. tax obligations.  In addition, beginning in or around late 2012, Ng agreed to and subsequently did transmit funds directly from Ng's own account and/or an account of Ng's company in Macau to Terra Trading.  These payments to Lorenzo were on top of the "salary" Lorenzo was drawing as President of SSN, and were intended to, and did, cause Lorenzo to focus in particular in obtaining the UN's formal support for the establishment of the Macau Center.

Lorenzo also assisted in arranging for Ng to make regular payments to Ashe's wife, who was hired as a purported "consultant" to SSN, but who did no work (consulting or otherwise) for SSN.  Lorenzo also advised Ng to provide a lump-sum payment directly to or for the benefit of Ashe, which Ng did in the form of a $200,000 wire in June 2014 to an account that Ashe had designated.

In exchange for these bribe payments, Lorenzo and Ashe used their official positions to advance Ng's interest in obtaining formal UN support for the Macau Center.  For example, Ng

---

[1]   Because the Court presided over the lengthy trial, the Government only summarizes the facts herein, and given the purpose of this letter, focuses on Lorenzo's conduct.

wanted an official document from the UN to help implement the project. To accomplish this aim, Lorenzo enlisted the assistance of certain UN officials and employees to submit a formal document (the "UN Document")—addressed as a letter from Ashe to the UN Secretary-General—which was circulated to all UN Member States and became an official part of the UN record. More than a year later, at Ng's direction, Lorenzo obtained the assistance of various UN officials to revise the UN Document so that it would refer, specifically by name, to Ng's company.

Lorenzo, at Ng's direction, used the revised UN Document to promote the effort to develop the Macau Center and to suggest to other UN officials and diplomats that the Macau Center had the UN's support. Among other things, Lorenzo worked, at Ng's direction, to obtain the support of Yiping Zhou, the then-director of UNOSSC, to relocate the UNOSSC Expo to the Macau Center on a permanent basis. In or about late 2013 and early 2014, Lorenzo—with assistance from Ashe—obtained formal letters from Zhou committing UNOSSC to supporting the Macau Center.

Lorenzo also played an important role in assisting Ng in obtaining Ashe's agreement to travel to Macau in or about March 2014. Ng used Ashe's presence during this trip to seek to demonstrate that the Macau Center had the support of the UN and specifically the PGA. During the trip, Lorenzo and Ashe agreed to continue their efforts to obtain formal UN support for the Macau Center, and Ng agreed to provide further payments to them.

As a direct result of Lorenzo's and Ashe's efforts, Ng obtained a contract, described as a "pro bono agreement," with UNOSSC, authorizing his company to host the next anticipated UNOSSC Expo and other UNOSSC-affiliated events. Ultimately, UNOSSC held a "forum" in Macau in August 2015, co-hosted by a foundation in the name of Ng's company—which Lorenzo helped to establish—with one purpose being to officially launch the Macau Center project, and UNOSCC also made plans to hold an official Expo the following year, again in Macau. During the forum, Ng continued to press his goal of obtaining formal UN support for the Macau Center. The co-conspirators were arrested shortly thereafter.

## Lorenzo's Cooperation

Lorenzo's cooperation was an important part of the Government's successful prosecution of Ng. Lorenzo testified over the course of approximately eight days at Ng's trial—more than five of which were on cross-examination—and provided the jury with a detailed, insider's view of how Ng began his scheme and directed it over a period of over five years. Lorenzo's testimony was compelling and credible, and he consistently took responsibility for his own misconduct, both related and unrelated to the charged offenses. Lorenzo's cooperation was also valuable in obtaining the conviction of Jeff Yin, the principal deputy to Ng who pled guilty shortly before trial. And finally, Lorenzo also provided valuable information regarding Ashe and was prepared to testify against Ashe at trial.[2]

---

[2]     Ashe died pending trial and the charges against him were therefore dismissed.

## I.     Lorenzo's Initial Cooperation

Lorenzo was arrested in early October 2015, and was indicted a few weeks later.  About two months later, he moved to dismiss the indictment on grounds of diplomatic immunity. Following briefing and oral argument, the Court denied the motion in a written ruling dated February 4, 2016.  (Dkt. 155).  Days later, Lorenzo began meeting with the Government in an effort to cooperate.  Over the course of approximately three proffer sessions, Lorenzo spoke about his involvement in the criminal conduct, describing both his work for Ng and Yin, as well as his noncompliance with his U.S. tax obligations.   From the outset, Lorenzo demonstrated a commitment to accepting responsibility for his misconduct and answering the Government's questions candidly.  Lorenzo did not minimize his own role in the conduct or embellish the actions of Ng, Yin, Ashe or others.  Rather he took seriously his obligation to provide a specific and truthful account of the events that had transpired, and he did so unflinchingly.

## II.    Lorenzo's First Guilty Plea

On March 16, 2016, Lorenzo waived indictment and pled guilty to a superseding information pursuant to a cooperation agreement.  He pled guilty to conspiring to pay bribes and gratuities, in violation of 18 U.S.C. § 371 (Count One); paying bribes and gratuities, in violation of 18 U.S.C. §§ 666(a)(2) and 2 (Count Two); conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Three); money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2 (Count Four); subscribing to false and fraudulent tax returns, in violation of 26 U.S.C. § 7601(1) and 18 U.S.C. § 2 (Count Five); and failing to file Reports of Foreign Bank and Financial Records ("FBARs"), in violation of 31 U.S.C. §§ 5314 and 5322 (Count Six).  This guilty plea exposed Lorenzo to a maximum term of incarceration of 63 years.

Counts One through Four were based on Lorenzo's participation in the corrupt scheme to obtain the UN's formal support for the Macau Center.  In particular, Lorenzo admitted that he assisted Ng and Yin in bribing Ashe, and that he participated in wiring funds into and out of the U.S. in furtherance of that scheme.  Count Five was based on Lorenzo's willful filing of false tax returns which materially under-represented his income.  In particular, Lorenzo admitted to undertaking certain tactics to make it appear that his income was less than it actually was, including arranging for payments from Ng and SSN to be deposited in accounts of his family members and wired to an account in the Dominican Republic.  Similarly, Count Six was based on Lorenzo's failure to declare his overseas bank accounts to the IRS.  Although the Government was aware of certain facts relevant to Lorenzo's tax violations prior to meeting with Lorenzo, he admitted to— and pled guilty to—conduct that the Government was not previously aware of and/or might have had difficulty proving.

Based in part on the information obtained from Lorenzo during his initial proffers, the Government obtained a superseding indictment against Ng and Yin on or about June 30, 2016. (Dkt. 211.)  This superseding indictment included an expanded set of allegations, describing the bribery and money laundering scheme in greater detail.

### III.     Lorenzo's Trial Preparation and Second Guilty Plea

Beginning in or about late 2016 and early 2017, the Government began meeting with Lorenzo on a regular basis to prepare for trial against Ng and Yin.  These meetings typically lasted multiple hours and involved the review of numerous documents in detail.  Over a period of months, Lorenzo described the pertinent emails, bank records, and other documents relevant to his involvement with Ng, Yin, and Ashe between 2009 and his arrest in 2015.  He candidly answered all of the Government's questions, confirming and enhancing the Government's understanding of the series of events that had unfolded, and the roles played by all of the relevant individuals.

The information provided by Lorenzo assisted the Government in obtaining a second superseding indictment against Ng and Yin on or about November 22, 2016.  (Dkt. 322.)  This superseding indictment made more clear that Ng and Yin had not only used Lorenzo to assist them in bribing Ashe, but that they had also bribed Lorenzo himself.  This superseding indictment also added charges under the Foreign Corrupt Practices Act ("FCPA").

To account for his acceptance of bribes from Ng and Yin and violation of the FCPA—crimes that had not been included in Lorenzo's original cooperation agreement—Lorenzo entered into a new cooperation agreement.  On April 27, 2017, Lorenzo waived indictment and pled guilty to a superseding information pursuant to this updated cooperation agreement.  As a result of this guilty plea, Lorenzo faces a maximum term of incarceration of 78 years.

### IV.     Lorenzo's Trial Testimony

As the Court is aware, Lorenzo testified extensively during Ng's trial.  In fact, his testimony comprised more than half of the trial days of the Government's entire case-in-chief.  Although the Government's case included substantial email and financial evidence, Lorenzo's testimony was meaningful, powerful, and corroborative of the documentary evidence.  In particular, Ng himself did not personally send or receive email, but instead generally communicated through his deputy, Yin.  In his testimony, Lorenzo explained that Ng played the leading role throughout the scheme, and helped to establish that Ng's clear intent was to corrupt Lorenzo and Ashe for Ng's own personal benefit.  The following are just a few of Lorenzo's most salient pieces of testimony:

- Lorenzo testified that Ng was the Chairman and sole funder of SSN, and that Ng enlisted Lorenzo to serve as President, and agreed to pay Lorenzo $20,000 per month.  (Tr. 733-97.)

- Lorenzo testified that in or about October 2010, at an SSN board meeting in Macau, Ng described his desire to establish a UN convention center and requested Lorenzo's assistance in obtaining an "official" document from the UN supporting such a center.  Lorenzo explained that he was being asked—and was agreeing—to use his official power to benefit Ng personally, in exchange for bribes.  Together, Ng and Lorenzo plotted to organize two international UN meetings in order to thereafter produce a so-called "outcome document" which would create the appearance that the Macau Center had UN support.  (Tr. 799-882.)

- Lorenzo testified that in order to induce Ashe to attend a meeting in Macau in April 2011, Ng agreed to pay for Ashe and his family to take a personal vacation to New Orleans, at a cost of $9,670.  Lorenzo also explained that Ng agreed to pay Ashe's wife as a so-called "consultant" to SSN although she never did any work for SSN and never even showed up at the office.  (Tr. 893-98, 902.)

- Lorenzo described in detail how he and Ashe obtained the assistance of high-level UN officials, including Ion Botnaru (who also testified), to make the UN Document a part of the official General Assembly record and to circulate it to all UN Member States.  This testimony highlighted how Ng's scheme led to the involvement of unsuspecting senior UN officials.  (Tr. 904, 930-33, 944-46.)

- Lorenzo explained how Ng escalated his bribery scheme in December 2012, when he summoned Lorenzo to a meeting in China and offered him $30,000 per month—on top of his $20,000 monthly "salary" from SSN—in exchange for Lorenzo's commitment to focus on obtaining the UN's formal, institutional support for the Macau Center.  He explained various objectives that Ng asked Lorenzo to accomplish in service to this larger goal, including revising the UN Letter to refer to Ng's company by name, and obtaining a letter from UNOSSC endorsing the Macau Center plan.  Lorenzo also explained that he wanted these payments to go to Terra Trading in order to avoid his own U.S. tax obligations, and that Ng requested that he enter into what was effectively a sham contract.  (Tr. 962-1007.)

- Lorenzo provided helpful context for numerous emails that were sent in the 2013-14 time period.  In those emails, Yin repeatedly pushed Lorenzo to make progress in obtaining the UN's formal support for the Macau Center.  For example, on January 5, 2013, Yin emailed Lorenzo to set up a meeting, noting that "Ng's top priority right now is the South South Convention Center project."  (GX 50.)  A few weeks later, Yin emailed Lorenzo saying, "The urgent matter as of now is that Mr. Ng has given you a deadline to complete the task of obtaining approval for the Convention Center project."  (GX 58.)  Lorenzo explained that Ng and Yin were routinely flying into New York to meet with him, and that Ng would direct him to take various actions in support of his scheme.  (Tr. 980-84; 1008-10.)

- Lorenzo testified about Ng's specific plans for the Macau Center.  He explained that Ng planned to use his company, Sun Kian Ip Group ("SKI Group"), to develop a real estate complex in Macau.  (Tr. 1036).  The complex would have different sections, one of which would be the Macau Center, which would be the permanent home of an annual expo run by UNOSSC and a location for other meetings and events held by developing countries. (Tr. 1035-36).  Other sections of the complex would include residential apartments, as well as "hotels, restaurants, stores, commercial stores."  (Tr. 1037, 1079; *see also* GX 1321TX (Chinese document reflecting that Ng wanted to expand the Macau Center to include office facilities, residential apartments, and other profitable enterprises).  In consultation with Ng and at his direction, Lorenzo helped to create promotional materials for the Macau Center. (GX 968; Tr. 1114-30).  The materials included a depiction of the entire proposed complex, situated on what would become a manmade island off the coast of Macau (GX 968 p. 16; Tr. 1120-21); as well as a breakdown of the different uses of the complex (GX 968 pp. 19-

20; Tr. 1124-27), such as 7.24% to be used for the conference center/hotel and 24.53% to be used for residential apartments.

- Lorenzo described the steps that he and Ashe took to revise the UN Document to refer specifically to SKI Group, and to obtain a commitment from UNOSSC. (Tr. 1016-49; 1091-94.) He also described how Ng first sent Lorenzo a letter formally requesting his assistance, in his capacity as a UN ambassador, in bringing the Macau Center to the attention of UNOSSC and other UN bodies, and he explained that this request was basically a sham since Lorenzo already knew exactly what Ng wanted, but was a formality to give the appearance of an arms-length transaction. Lorenzo explained that he undertook these efforts only because he was being paid by Ng. (Tr. 1900-1104, 1204-06.)

- Lorenzo testified about a particular interaction with Ng and Yin that occurred in New York, New York, in or about late 2013, during which Ng, through Yin, provided $20,000 in cash to Lorenzo, for Lorenzo to provide to Ashe. Lorenzo further admitted that he kept a portion of the cash for himself. (The Government was unaware of this episode prior to Lorenzo disclosing it during his proffers.) (Tr. 1231-36.)

- Lorenzo described how Ng tasked him with persuading Ashe to travel to Macau on an official PGA trip. Lorenzo also provided the jury with an insider's view of that trip, including Ng bringing Ashe and the PGA delegation to "Windsor Arch," Ng's luxury real estate project in Macau. (Tr. 1257-96.) He also provided testimony regarding Ng's interaction with Ashe in Macau: Ng said to Ashe, "I want your support in developing this [C]enter." (Tr. 1292). Ashe told Ng that he wanted Ng to "commit to the promise" that Ng had made in the past to provide "financial support" to Ashe. (Tr. 1292). Ng responded, "I will, I will." (Tr. 1293).

- Lorenzo testified about a conversation he had with Ng, in which Ng spoke of his interest in reducing SSN's expenses because Ng wanted to focus on the Macau Center. Lorenzo testified that he advised Ng to continue paying Ashe's wife as a "consultant" to SSN— despite the fact that she did no work—because they needed Ashe's support in order to get the UN to endorse the Macau Center. (Tr. 1240, 1258).

- Lorenzo explained that by mid-2014, Ng's focus had shifted to a new immediate objective: obtaining a formal contract with the UN authorizing him to establish the Macau Center. He testified about how this led to Ng making a $200,000 payment to an account designated by Ashe, which was followed shortly thereafter by UNOSSC confirming that—based on Ashe's support—Ng would be awarded the "Pro Bono Agreement." (Tr. 1248-1334.)

## Assessment of the Defendant's Cooperation

Lorenzo was a model cooperator. He met with the Government dozens of times— occasionally by phone but usually in person and typically for multiple hours at a time—and he was always punctual, patient, and careful. Most importantly, he was honest, both about his own misconduct and about the misconduct of others. His cooperation assisted the Government in bringing to a successful conclusion a major prosecution of bribery at the highest levels of the UN— a case which has resulted not only in the conviction of multiple defendants, but which has also

spurred the UN to make reforms and has, we believe, contributed to general deterrence of diplomats, businesspeople, and others around the world who might consider using the UN or U.S. institutions to further corrupt goals. Lorenzo has also met with the Government in connection with other matters, including a meeting as recently as October 2019.

## **Analysis of Section 5K1.1 Factors**

1.  "[S]ignificance and usefulness" of assistance (5K1.1.(a)(1))

Lorenzo's cooperation was both highly significant and very useful. As discussed above, his cooperation was important in obtaining Yin's guilty plea before trial and Ng's conviction at trial. Lorenzo's testimony also strengthened the Government's proof at trial. Although the corrupt scheme was largely documented in emails and financial records, Lorenzo's testimony helped to tie it all together and provided a narrative that otherwise would have been harder for the jury to understand. Lorenzo also provided important evidence of Ng's corrupt intent, which might have been more difficult for the jury to infer from documents alone. Lorenzo has also provided useful information to the Government in connection with other investigations.

2.  "[T]ruthfulness, completeness, and reliability" of information and testimony (5K1.1(a)(2))

The Government believes Lorenzo provided truthful, complete, and reliable information from the beginning of his cooperation, which allowed the Government to further build its case without delay. He answered questions honestly, both during meetings with the Government and during direct and cross-examination. On the rare occasions where he misspoke or realized that a particular answer may have been incomplete or appear to be misleading, he immediately alerted the Government. For instance, during his direct examination, he realized that he had gotten confused by a question regarding a request by Ashe for SSN to pay for a basketball court, and he alerted the Government at the first break and then corrected his testimony. (Tr. 1208-09.)

3.  "[N]ature and extent" of assistance (5K1.1(a)(3))

Lorenzo's cooperation was extensive by virtually any measure. He met or spoke with the Government dozens of times, usually for hours at a time. He walked the Government through numerous documents. He testified over the course of eight days at trial, including more than five days of intense cross-examination. And he has continued to be available to assist the Government with other matters, including meeting with the Government as recently as October 2019.

4.  "[A]ny injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance (5K1.1(a)(4))

As Your Honor is aware, it is often risky for a criminal defendant to cooperate with the Government, particularly where his cooperation involved a scheme of such enormous magnitude and scale, and a co-defendant of virtually limitless financial means. Lorenzo's cooperation, including his testimony at a widely publicized trial, also resulted in significant harm to his reputation, given that he was a public figure and long-serving diplomat who publicly

acknowledged paying and accepting bribes, engaging in money laundering, and avoiding his tax obligations.

> 5. "[T]imeliness" of assistance (5K1.1(a)(5))

Lorenzo began cooperating almost immediately after the Court denied his motion to dismiss the indictment on grounds of diplomatic immunity. This was sufficiently timely to make Lorenzo an effective cooperator as to Ng, Yin, and Ashe.[3]

## Conclusion

In light of the foregoing, the Government respectfully submits that Lorenzo's assistance was "significan[t] and useful[]" to the Government in its investigation and prosecution of a major bribery scheme. *See* U.S.S.G. § 5K1.1(a)(1). The Government also believes that the information provided by Lorenzo was "truthful[], complete[], and reliab[le]." *See id.* § 5K1.1(a)(2). Accordingly, assuming that Lorenzo continues to comply with the terms of his cooperation, and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines and 18 U.S.C. § 3553(e), that the Court sentence Lorenzo in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

> Respectfully submitted,
>
> GEOFFREY S. BERMAN
> United States Attorney
>
> By: s/ Douglas S. Zolkind
> Daniel C. Richenthal
> Janis M. Echenberg
> Douglas S. Zolkind
> Assistant United States Attorneys
> (212) 637-2109/2597/2418
>
> ROBERT ZINK
> Chief, Fraud Section, Criminal Division
> United States Department of Justice
>
> By: s/ David A. Last
> David A. Last
> Assistant Chief, FCPA Unit
> (202) 616-5651

cc: Brian Bieber, Esq.

---

[3] The other two defendants charged in the complaint, Yan and Piao, were involved in criminal activities pertaining to Ashe, and subsequently pled guilty.