Jb81lors

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          15 Cr. 706 (VSB)

5    FRANCIS LORENZO,

6              Defendant.                  Sentencing

7    ------------------------------x

8                                          New York, N.Y.
                                           November 8, 2019
9                                          11:30 a.m.

10

     Before:
11
                    HON. VERNON S. BRODERICK,
12
                                           District Judge
13

14                       APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  DOUGLAS S. ZOLKIND
17        JANIS ECHENBERG
          DANIEL C. RICHENTHAL
18        Assistant United States Attorneys

19   HIRSCHHORN & BIEBER, P.A.
          Attorneys for Defendant
20   BY:  BRIAN H. BIEBER, ESQ.

21

     ALSO PRESENT:  DAVID LAST
22                   Assistant Chief, FCPA Unit
                     U.S. Department of Justice
23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

Jb81lors

```
1              (Case called)
2              THE COURT:  Okay.  Is counsel ready to proceed?
3              MR. ZOLKIND:  Yes, your Honor.
4              MR. BIEBER:  Yes, your Honor.
5              THE COURT:  All right.  If counsel could please
6    identify themselves for the record.
7              MR. ZOLKIND:  Good morning, your Honor.  For the
8    government, Douglas Zolkind, Janis Echenberg, and Daniel
9    Richenthal with the U.S. Attorney's Office, and David Last with
10   the Department of Justice Fraud Section.
11             THE COURT:  All right.  Good morning.
12             GOVERNMENT COUNSEL:  Good morning, your Honor.
13             MR. BIEBER:  Good morning, your Honor.  Brian Bieber
14   on behalf of the defendant Francis Lorenzo, who is present to
15   my left.
16             THE COURT:  Okay.  Good morning.  You may be seated.
17             So this matter is on for sentencing.
18             So Mr. Lorenzo, if at any point in time you don't
19   understand something I've said or if you have a question, just
20   let me know and I'll stop the proceedings and either I or
21   Mr. Bieber will try and answer your questions.  Or if you want
22   some additional time to speak to Mr. Bieber, just let me know
23   and I'll stop the proceedings and I'll allow you to do that,
24   okay?
25             THE DEFENDANT:  Okay.
```

Jb81lors

```
1            THE COURT:  All right.  So as an initial matter, I'm

2     going to review for the parties the materials I've received in

3     connection with today's sentencing -- and I should say received

4     and read: the presentence investigation report, which was

5     initially prepared on January 25th of 2019 and revised on

6     October 29th of 2019; I've also received the defendant's

7     sentencing submission, which was filed on October 29th, which

8     includes various attachments, including various awards and

9     commendations that Mr. Lorenzo has received, as well as six

10    letters written in support of Mr. Lorenzo; I also have the

11    government's letter pursuant to 5K1.1.

12            First, have the parties received each of these

13    submissions?

14            MR. ZOLKIND:  Yes, your Honor.

15            MR. BIEBER:  Yes, your Honor.

16            THE COURT:  All right.  Now are there any other

17    submissions or documents that I should have in connection with

18    today's sentencing?  From the government?

19            MR. ZOLKIND:  Your Honor, we also --

20            THE COURT:  Oh, yeah.  Is it the order --

21            MR. ZOLKIND:  The order of restitution and preliminary

22    order of forfeiture.

23            THE COURT:  Okay.  And I apologize.  I do have both of

24    those documents, which appear to have been signed by the

25    parties, which I will address later in the proceedings.
```

Jb81lors

1          Mr. Bieber, is there anything else I should have from

2     the defense?

3          MR. BIEBER:  No, Judge.

4          THE COURT:  Okay.  So there is a question I had with

5     regard to certain of the paragraphs in the presentence report,

6     and I'll leave it up to the parties (a) what the parties' view

7     of it is, and (b) if there appear to be errors or things that

8     are not relevant to Mr. Lorenzo, whether or not I need to make

9     note of that in any way.  So specifically, the paragraphs 23,

10    42, 48, 54, 56, and 64, and as a general matter, they reference

11    specifically matters that -- so 23, where it says, "Defense

12    counsel contends that the February 2012 version of the UN

13    document was not sought or used by Ng," I think these are

14    remnants from Mr. Ng's PSR that have made it into Mr. Lorenzo's

15    PSR.  There may be others.  I think I caught most of them.

16    There may be other ones.  They don't directly impact

17    Mr. Lorenzo, but I just -- and if you want more time to take a

18    look at those paragraphs, that's fine.  The issue is whether I

19    need to in some way, you know, make note or strike those

20    portions.  I don't know whether the government has a view one

21    way or the other.

22          MR. ZOLKIND:  Your Honor, I mean, I'll certainly let

23    Mr. Bieber speak for himself, but our impression is that this

24    reference here in paragraph 23 to a different view of defense

25    counsel is in fact, as the Court suggested, a remnant of Ng Lap

Jb81lors

1    Sing's sentencing, and I imagine that's the case for the other

2    paragraphs as well.  We apologize for not catching that.

3              THE COURT:  No, that's fine.  But Mr. Zolkind, do you

4    have a view as to what, if anything, we need to do, other than

5    recognizing that that's the case?

6              MR. ZOLKIND:  I think if the Court states as a finding

7    or recognizes for the record that those references to defense

8    counsel's position refer to Ng's defense counsel, I think that

9    would suffice.

10             THE COURT:  Well, let me hear from Mr. Bieber and then

11   I'll see what --

12             MR. BIEBER:  Same position.  Same apology for not

13   catching it.

14             THE COURT:  All right.  So I think what I will do is

15   I'll indicate in the judgment somewhere the specific paragraphs

16   I just mentioned, and saying that there are references to a

17   defense counsel contending and that the defense counsel

18   contending, making those assertions is not counsel for

19   Mr. Lorenzo but was counsel for Mr. Ng.  I could do that or

20   merely just strike those portions.

21             MR. ZOLKIND:  Your Honor, we'd be fine with striking

22   the references to contentions by defense counsel.  In some ways

23   that's cleaner, since Ng's counsel's contentions don't have

24   anything to do with this proceeding.

25             THE COURT:  Yeah.  Okay.

Jb81lors

1          MR. ZOLKIND:  So that may be cleaner, but I think
2    either way is fine.
3          THE COURT:  Okay.  Mr. Bieber, is that --
4          MR. BIEBER:  Yeah, I agree.
5          THE COURT:  All right.  So then I'll take care of that
6    by striking those portions from the presentence report.
7          The only other thing was in paragraph 133, I think
8    there's just a typo.  I think in the fourth full paragraph, it
9    says, "Flores and Lorenzo separated in," and it says 2019.
10   Should that be 2009?
11         MR. BIEBER:  Yes.
12         THE COURT:  Okay.  So I can make that correction also.
13         Okay.  All right.  Mr. Bieber.
14         MR. BIEBER:  The initial PSR had it at 2009.
15         THE COURT:  Yes.  And 2009 appears somewhere else, I
16   think.
17         MR. BIEBER:  Yes.
18         THE COURT:  So I'm not sure exactly what happened.
19   Oh, the initial one had it?
20         MR. BIEBER:  Yeah.
21         THE COURT:  Oh, that's -- okay.  So Mr. Bieber, have
22   you read the presentence report and discussed it with
23   Mr. Lorenzo?
24         MR. BIEBER:  Yes, Judge, in detail.
25         THE COURT:  All right.  And Mr. Lorenzo, have you read

Jb81lors

1    the presentence report?

2                THE DEFENDANT:  Yes, your Honor.

3                THE COURT:  And have you discussed it with Mr. Bieber?

4                THE DEFENDANT:  Yes, your Honor.

5                THE COURT:  And have you had an opportunity to go over

6    any errors or anything else with Mr. Bieber that you wish to

7    take up with me?

8                THE DEFENDANT:  No.

9                THE COURT:  Okay.  Well, you had an opportunity to go

10   over any errors in the report.

11               THE DEFENDANT:  Yes.

12               THE COURT:  Okay.  Let me ask Mr. Zolkind, are you

13   going to be dealing with --

14               MR. ZOLKIND:  Yes, your Honor.

15               THE COURT:  Okay.  Mr. Zolkind, does the government

16   have any objections to the report?

17               MR. ZOLKIND:  We don't.

18               THE COURT:  All right.  So the presentence report will

19   be made part of the record in this matter with the

20   modifications that we've discussed here today, and it will be

21   placed under seal.  If an appeal is taken, counsel on the

22   appeal may have direct access to the sealed report without

23   further application to me or one of my colleagues.

24               So Mr. Lorenzo, the law requires that as part of

25   determining what an appropriate sentence is for you, that I

Jb8llors

refer to a set of rules known as the Sentencing Guidelines.
Now those guidelines are produced by the United States
Sentencing Commission, and they're produced to assist judges
like myself when we impose sentences.  Now at a certain point
in time those guidelines used to be mandatory; in other words,
I would have had to apply them in just about every case.
However, they're no longer mandatory.  However, I'm still
required to consider the applicable guidelines as one factor
among others in determining what an appropriate sentence is.
So in a sense the guidelines are a starting point.

So my first task is to do the guideline calculation.
So the guideline manual that's applicable here, do the parties
agree that it's the November 1, 2018 guidelines manual?
Mr. Zolkind?

MR. ZOLKIND:  Yes, your Honor.

THE COURT:  All right.  Mr. Bieber.

MR. BIEBER:  Yes, Judge.

THE COURT:  Now Counts One through Eight are grouped
together because, pursuant to 3D1.2(d), since the offense level
is determined largely on the basis of the total value of the
funds that have been misused here, laundered, and pursuant to
3D1.3(b), since the counts involve offenses of the same type to
which different guidelines apply, the offense that produces the
highest offense level that's applied, and here it's the
guideline range for Counts Seven and Eight under 2S1.1, that

Jb8llors

results in the highest offense level.  So the base offense

level is determined with reference to Section 2S1.1, which

applies to the money laundering charge.  The offense level is

calculated using that guideline, and the most appropriate

guideline for the underlying offense is found in 2C1.1,

Mr. Lorenzo, and that results in a base offense level of 12.

Since the events involved more than one bribe, the

offense level is increased by two levels; since the bribes

totaled more than $550,000 but not more than $1.5 million,

there's an increase of 14 levels to the offense level; since

the offense involved an elected public official or any public

official in a high-level, decision-making, or sensitive

position, there's a four-level increase that is warranted; and

since there is a conviction under 18 United States Code 1956,

an additional two-level increase is warranted; for an adjusted

offense level of 34.

The offense level is then reduced by three levels for

Mr. Lorenzo's acceptance of responsibility, which results in an

offense level of 31.

And at an offense level of 31 and Mr. Lorenzo had a

criminal history category of I, the resulting guideline range

is 108 to 135 months' imprisonment.

Do the parties agree that that is the guideline range

that applies, 108 to 135 months' imprisonment?

MR. ZOLKIND:  Yes, your Honor.

Jb8llors

1          MR. BIEBER:  We do, Judge.

2          THE COURT:  Okay.  So based upon the parties'

3    agreement and my independent evaluation of the Sentencing

4    Guidelines, I'm going to accept the guideline calculation

5    that's contained in the presentence report.  I find that

6    Mr. Lorenzo's offense level is 31, he has a criminal history

7    category of I, and therefore the recommended sentence under the

8    guidelines is 108 to 135 months' imprisonment.

9          The supervised release range of one to three years on

10   Counts One through Six and one year on Count -- that is not

11   correct.  Sorry.  So it's one to three years on Counts One,

12   Two, Six, and Count Eight, and it's one year on Count Seven.

13   And then there's a fine range of 15,000 to $500,000.

14         Now there is a plea agreement in this case, and the

15   plea agreement provides that if Mr. Lorenzo provides the

16   government with substantial assistance, the government would

17   write a letter to me detailing Mr. Lorenzo's cooperation in

18   connection with this case pursuant to Section 5K1.1 of the

19   guidelines, and Section 3553(e) of Title 18.  And I did receive

20   such a letter, which is the government's letter of

21   October 24th, which I don't remember if I mentioned that

22   earlier.  Well, if I didn't mention it earlier, I received the

23   government's 5K letter.

24         MR. ZOLKIND:  You did, your Honor.

25         THE COURT:  Okay.  And so let me ask, does the

Jb81lors

1    government have an application at this time?

2              MR. ZOLKIND:  Yes, your Honor.  And if I may make a

3    few remarks.

4              THE COURT:  Sure.  You can either do it now or --

5              MR. ZOLKIND:  I'm happy to make those remarks at

6    whichever point the Court would like them.

7              THE COURT:  Just wait for a little bit.

8              MR. ZOLKIND:  That's entirely fine, your Honor.

9              Yes, the government does move, pursuant to

10   Section 5K1.1 of the guidelines, for the defendant to be

11   sentenced pursuant to the factors set forth based on that

12   section.

13             THE COURT:  Okay.  All right.  Now I've reviewed the

14   government's 5K letter in light of the factors set forth in

15   Section 5K1.1(a)(1) through (5) that relate to the significance

16   and usefulness of Mr. Lorenzo's assistance, truthfulness, and

17   completeness and reliability of the information and testimony

18   provided; the nature and extent of the assistance; any injury

19   suffered or any other risk of danger or injury to the defendant

20   or his family resulting from the assistance; and the timeliness

21   of that assistance.  And I'm going to discuss those factors

22   later in the sentencing, but having considered each of those

23   factors in my review of the government's letter, I find the

24   letter amply supports my granting the government's motion.

25             I've also independently considered whether there are

Jb81lors

1    any other appropriate bases for departure from the guideline

2    range here, and though I have the authority to depart, I do

3    find that there aren't any grounds warranting a departure.

4    However, I note that I do have the power to impose a variance,

5    and I think the defense submission is a combination of making a

6    request for variance and a departure pursuant to 5K1.1.

7          The government's letter indicates that obviously I

8    should utilize the 5K1.1 letter, but it doesn't recommend a

9    specific sentence.

10          The probation department indicates that a departure is

11    appropriate and recommends a sentence of time served.

12          So now, Mr. Zolkind, I'll hear from you with regard to

13    sentencing.

14          MR. ZOLKIND:  Thank you, your Honor.  And your Honor,

15    we will principally rely on the points we made in our 5K letter

16    of October 24th, but there are a few points that I'd like to

17    emphasize.

18          THE COURT:  Yes.

19          MR. ZOLKIND:  First, as the Court well knows,

20    Mr. Lorenzo was one of the individuals at the center of a

21    wide-ranging bribery scheme that stretched from Macau to the

22    United Nations in New York.  He served as deputy ambassador to

23    the United Nations.  It was a prestigious position, one that

24    carried a duty of trust and loyalty, both to his home country

25    of the Dominican Republic and to the UN as a global

Jb81lors

institution.  For a one-year period he also served as a close

advisor to John Ashe, who was a fellow ambassador, and for that

year was serving as President of the UN General Assembly, or

PGA.  Through his conduct in this case, Lorenzo compromised his

duties and responsibilities as an ambassador.  And he did so

for one primary reason, personal profit.  In exchange for bribe

payments from Ng Lap Sing, Lorenzo agreed to and he did take

official actions in his capacity as an ambassador, actions that

were intended to further Ng's goal of establishing a

UN-sanctioned convention center in Macau, which the idea was,

as the Court knows, to serve as the anchor of a much more

expansive real estate complex to be owned and developed by Ng's

company.  Mr. Lorenzo also assisted Ng in bribing John Ashe,

the PGA, again for the purpose of Ashe taking official action

to help bring about Ng's goal.

         Over the course of this approximately five-year

scheme, Lorenzo and Ashe made a significant amount of money.

For his part, Mr. Lorenzo was paid more than a million dollars

by Ng.

         Now Lorenzo and his co-conspirators were arrested in

early October 2015, and at that time Mr. Lorenzo believed he

might have a meritorious motion based on diplomatic immunity.

He made that motion.  But after the Court denied it in February

of 2016, Lorenzo was faced with an important decision.  He

could continue to fight the charges, take it to trial, put the

Jb81lors

government to its burden, or he could accept responsibility for

his conduct and cooperate.  And of course Lorenzo decided to

cooperate.  And it's difficult I think to overstate the

significance of that decision that he made at that crucial

moment.  Today, of course, we know that Ng Lap Sing was

convicted and the Second Circuit has upheld that conviction.

But at the time Lorenzo pled guilty and accepted

responsibility, he didn't know how the trial would play out.

But he recognized that his conduct was wrong and was criminal,

and he made the decision to take responsibility and move

forward with cooperation.  In the government's assessment,

Lorenzo made that commitment, the commitment to cooperate, a

hundred percent.

There are of course cases, the Court is I'm sure

aware, where defendants may decide to cooperate but they still

minimize their own conduct, or they try to hide facts that they

think the government will never find out about, or they focus

more on protecting their own ego than taking responsibility.

As far as the government is aware, Lorenzo did not do any of

that.  From the outset, he showed that he was completely

serious about owning up to his own misconduct and speaking

truthfully about everything the government asked him about,

everything the government wanted to know.  And indeed, he pled

guilty not only to the crimes he was originally charged with

but also additional crimes, past offenses.  Those crimes in

Jb81lors

particular were based on facts that the government did not know

entirely at the time that he started proffering.  And even if

we might have uncovered those facts in the course of our

investigation, they would have been much harder to prove at

trial.

He also pled guilty a second time in advance of Ng's

trial in order to make sure that his cooperation agreement

covered all of his applicable crimes.  And the second

cooperation agreement added FCPA offenses and offenses based on

Lorenzo's acceptance of bribes.

Lorenzo and the government met together literally for

hours at a time on dozens and dozens of occasions, in

particular as we were preparing for Ng's trial.  Those meetings

were long; they were often tedious.  We walked through hundreds

if not more emails and bank records and travel documents and

other materials, but there's no question that those meetings

provided the government with a substantially more robust

understanding of the criminal scheme in this case.

The government can also say that Mr. Lorenzo was a

consummate professional during the course of those meetings.

Even when we would meet on a Sunday afternoon, he would come

dressed in a full three-piece suit.  He was always punctual, he

was always polite.  Most importantly, your Honor, he was always

honest, even when we pressed him on facts and documents that

put him in a negative light.  It was clear to us that

Jb81lors

1    Mr. Lorenzo felt embarrassed and ashamed for his conduct in

2    this case.

3          As a witness at trial, Mr. Lorenzo was unquestionably

4    a key part of the government's case.  He testified over the

5    course of about eight trial days.  It was more than half of the

6    government's entire case in chief.  This was a case where the

7    emails themselves and other documents, but particularly the

8    emails, laid out virtually all the conduct.  But Lorenzo's

9    testimony brought those emails to life and provided context and

10   a narrative that -- there's no question that it was useful for

11   the jury and important to the government's case.

12         Mr. Lorenzo also testified about a number of

13   conversations, including numerous meetings with Ng Lap Sing for

14   which Lorenzo was the only testifying witness.  And that

15   testimony significantly bolstered the government's case.

16         No surprise that during trial, Ng's counsel

17   cross-examined Mr. Lorenzo for about five days and, in defense

18   counsel's summation, spent considerable energy trying to

19   discredit Lorenzo's testimony.  But it couldn't be discredited

20   in any meaningful way because it was well corroborated by the

21   documents and because Mr. Lorenzo came across as a very

22   credible witness.

23         There was one occasion -- I think we refer to it in

24   our 5K letter, but it struck us as significant -- one occasion

25   during the trial where Mr. Lorenzo misunderstood a question

Jb81lors

1    that I think I had asked and gave an answer that wasn't

2    accurate, and it was not accurate in a way that was detrimental

3    to the defense.  At the first break, he brought it to the

4    government's attention, and then as soon as he retook the

5    stand, he corrected the testimony.  And that really stood out

6    to us.

7             So in sum, your Honor, the government submits that

8    Lorenzo's cooperation easily meets all of the factors under

9    Section 5K1.1 of the guidelines.

10            To go through quickly, he cooperated well before

11   trial -- in fact, before anyone else had pled guilty, and it

12   was only within days of his motion based on diplomatic immunity

13   being denied.  That was clearly timely.

14            His cooperation was absolutely extensive, significant,

15   and useful, based on both his meetings with the government

16   before trial, his testimony during trial, and his continued

17   availability to meet with the government in regard to other

18   matters posttrial.

19            The testimony was truthful and complete and reliable.

20   It was extensively corroborated by other evidence.

21            And finally, his assistance, it's fair to say, brought

22   a tremendous spotlight, and at times a damaging spotlight, on

23   him and his family, and that's certainly a factor as well.

24            So for all those reasons and the reasons set forth in

25   our submission, we respectfully move pursuant to Section 5K1.1

Jb81lors

1    of the guidelines that he be sentenced under the factors of

2    that section in recognition of his substantial cooperation in

3    an important international corruption case.

4              THE COURT:  Okay.  Thank you.

5              Mr. Bieber, would you like to be heard?

6              MR. BIEBER:  Yes, Judge.  Thank you.

7              Judge, as set forth in our sentencing memorandum,

8    which of course I know you read, we're asking you to

9    collectively take the three grounds that we raised in our

10   motion into consideration in fashioning the appropriate

11   sentence.  And those three grounds are, as the government just

12   outlined: Mr. Lorenzo's complete, thorough, honest and

13   substantial cooperation; Mr. Lorenzo's prior good works and

14   charitable-related conduct, basically his life leading up to

15   this; and lastly, his low risk of recidivism.

16             So in the interest of saving time, and it kind of

17   makes sense, I'll probably take them all together, because in

18   preparing for this, I realized that they're really like

19   inextricably intertwined, and I thought of that this morning,

20   that usually I'm arguing in a 404(b) context that it's not

21   inextricably intertwined, but rarely does the defense get to

22   say that.

23             But Judge, I think it's important for me to, as

24   briefly as I can, explain to you how Mr. Lorenzo got here, how

25   this 52-year-old man who was an ambassador to the United

Jb81lors

Nations, how he wound up in federal criminal court here, how he
wound up in federal criminal court testifying.

So Judge, as you know from the PSR, he was born in the
Dominican Republic.  He grew up there, he went to high school
there, he graduated from high school there, attended some
college there, and his father, in 1980, moved here to make a
better life for his family, his wife and children.  And from
1980 to 1985, his father was primarily in the United States
trying to do that, trying to create that classic American
dream.  And Mr. Lorenzo did come here in 1985, and he attended
some college here as well, and in 1991, at the age of 24,
Mr. Lorenzo became a United States citizen.

So in the '90s, that decade, he worked in the travel
and tourism industry.  Mostly obsolete now, travel agents, but
that's what he did.  And he learned that industry, and that
kind of interested him, if you will.

And in 2000, the year 2000, is when his life changed
permanently.  And his life changed because he received an
invitation to go to the United Nations.  And there he was, at
the United Nations, at a dinner, and somehow, some way, he
wound up sitting at a table with Michael Douglas, the actor;
Muhammad Ali; and the Secretary General at the time, Kofi
Annan.  And that was it.  That was that defining moment for
him.  His eyes were opened to the United Nations, to the
purpose of the United Nations, which is generally the global

Jb8llors

1    development of peace and unity and security, for the world.

2    And it kind of sounds corny, you know, a pie in the sky, a

3    dream, but that's what the United Nations is.  That's what it

4    represents.  That's what it's supposed to represent.  It's

5    those principles.  And that's what opened his eyes to it.

6              So from 2000 to 2004, without any monetary

7    compensation whatsoever, Mr. Lorenzo immersed himself in United

8    Nations activities.  And it wasn't even until 2001 that the

9    Dominican Republic got a United Nations association, what's

10   called a UNA.  So Mr. Lorenzo is participating in the Model UN,

11   which brings students in from public schools, private schools,

12   and they act as ambassadors and they learn the ways of the UN,

13   and he's participating in this, hands on, with the children.

14   And he's a standout, a standout amongst everyone in the

15   Dominican Republic mission, to the point where he actually gets

16   to meet the then-current President of the Dominican Republic,

17   President Fernández, gets to know him, and in 2004, President

18   Fernández appoints Francis Lorenzo to be an alternate, or also

19   known as a deputy ambassador to the United Nations.  Now that's

20   2004.  He's not doing this for the money because his salary was

21   a whopping $6,000 a year -- and I say that sarcastically -- for

22   his duties as a deputy ambassador.  And the ambassadors do it

23   for the love of what they do and for advancing this purpose

24   that doesn't exist in any other entity in -- not just the

25   United States, in the world.  The United Nations.

Jb81lors

```
1              So there he is, 2004, he's a deputy ambassador to the

2      United Nations, and he's off and running.  He participates in

3      an exchange student program, has students from the Dominican

4      Republic and the United States going back and forth.  He really

5      immersed himself in the ambassador duties, because the duties

6      aren't set, and he went, just as the government said how he

7      showed up to the debriefings, even on weekends, in a suit.

8      It's not to impress.  It wasn't to impress the government.

9      That's who he is.

10             He gets appointed the ambassadorship, and he's at the

11     UN every day, five days a week.

12             He was, in 2006, just two years into it, a founder of

13     the Montessori Model UN, which, through the Montessori school

14     system, I mean, he helped found it.  So it had zero

15     participants.  At the time Mr. Lorenzo was arrested in this

16     case, it had grown to 3,000 attendees at the United Nations in

17     Geneva, at the yearly convention.  Now here we are at

18     sentencing, and it had, most recently, 4,000 attendees.  So

19     what he created has lived on and has grown.  And that's just

20     one example of one of the many things that he had done.

21             You read the commendations.  We have family support

22     here and friends and -- and I know that you have the letters as

23     well.

24             But just to finish up what he was doing at the UN, in

25     2007, 2008, he's helping forge relationships between the
```

Jb81lors

1    private sector and the public sector to help develop rural

2    areas in the Dominican Republic.

3            And then getting to this, in 2010 is when he meets Ng

4    Lap Sing, South-South News is created, and the purpose of it

5    goes along with what was going on at the United Nations and

6    what Mr. Lorenzo's passion was, which was to promote

7    informative and positive news about Africa and developing

8    countries across the world.  And I went there, and the

9    operation was a major -- I don't want to say CNN or Fox

10   knockoff, but it was for that purpose.

11           And unfortunately, Judge, you know the rest of the

12   story.  You know because you had the 50-yard line seat to the

13   cooperation that the government outlined.

14           THE COURT:  Was it 50?  I wasn't sure what yard line

15   it would be.

16           MR. BIEBER:  Judge, you know what, you're the judge,

17   you're up there, that's got to be 50.  Oh, maybe the skybox?  I

18   prefer the 50.  Anyway, you had the front row seat.  You had

19   the ability, obviously, to gauge his cooperation.  And I'm not

20   a betting man, but I would bet that you are not surprised to

21   hear what the government had said about Mr. Lorenzo's

22   cooperation, how it was thorough, but the honesty with which he

23   cooperated.  I will tell you, Judge, not once during the

24   preparation sessions did I have to be pulled out by any of the

25   prosecutors or the agents to say, you know, Mr. Bieber, he's

Jb81lors

1    hedging on this, he's trying to protect someone on this, you

2    might want to talk to him.  Not once.  And the hours were

3    extensive.  Why?  Because what he did with his life up until

4    2010 and how he went sideways during that time period, during

5    the indictment period, why did they not have to pull me out?

6    Because he treated his cooperation as seriously as he treated

7    how he lived his life and what he did at the UN before he made

8    that horrific and horrible decision to join in this conspiracy

9    and to do the criminal acts.

10          So yes, he accepted full responsibility for every

11   single thing he did wrong.  And it was a major undertaking to

12   amend all of his tax returns, and he did.  And I'm not saying

13   congratulate him for doing that; I'm just pointing out the

14   extent and the level of his cooperation on every single issue,

15   Judge.

16          So I just want to point out, your Honor, that it was

17   about a year and a week ago where you granted our application

18   to have the ankle bracelet removed from Mr. Lorenzo that he was

19   on for three years.  He has not had one single violation in

20   that year and a week, nor has he in the three years since.

21   After spending I think it was 20 days in jail and then being

22   released on bail, not one single violation.  And I point that

23   out because it shows -- I'm hoping it shows to your Honor that

24   he has the ability to live a law-abiding life, he has the

25   ability to continue to have his faith play a major role in his

Jb81lors

1   life.  And the reason why I say that is, with the ankle

2   bracelet, every single day when he would come into New York to

3   get out of bed, to try to get out of that head and that

4   depression and that cloud of what was going on, it was even

5   before the indictment period, but every single day, he went to

6   church, and on the weekends, in the church by his home.  That's

7   the kind of person he is.  And still to this day.

8          So your Honor, our sentencing recommendation will

9   permit you to permit him to continue to reside in the Bronx

10  with his 80-year-old mother, who he helps take care of.  Lives

11  with his sister as well.  It will avoid unwarranted sentencing

12  disparity.  It will satisfy the 3553 factors to promote respect

13  for the law, provide deterrence, general and specific; and it

14  will really permit this four-year dark cloud that's been

15  hanging over him, self-imposed, brought on by himself, and that

16  weight on his shoulders to be somewhat lifted, because he has a

17  long road back, a long journey back to whatever his path will

18  be, and a sentence of time served with an appropriate period of

19  supervised release and community service will set him on that

20  road.

21         Thank you, Judge.

22         THE COURT:  Okay.  Thank you, Mr. Bieber.

23         I take it from your comment with regard to the tax

24  issue, that the tax matters mentioned in the cooperation

25  agreement have been taken care of.  In other words, refiling

Jb8llors

```
 1    them, or I guess it was filing of amended returns and then the
 2    issue of civil liabilities with the FBAR violations, as well as
 3    the civil penalty issue.
 4                MR. BIEBER:  Yes, Judge.  All returns have been filed,
 5    and Mr. Lorenzo has an accountant who's dealing with the
 6    penalties and collection issues and things of that nature.
 7                THE COURT:  Okay.  All right.  Thank you.
 8                Mr. Lorenzo, would you like to be heard on your own
 9    behalf?
10                THE DEFENDANT:  Yes.
11                THE COURT:  You can either stand or you can remain
12    seated, whatever is easier.  I'd just ask you to speak into the
13    microphone.
14                All right.
15                MR. BIEBER:  Your Honor, these are his prepared
16    remarks.  I have never and never will write out for a client
17    what to say to the Court.
18                THE COURT:  Okay.  Go ahead, Mr. Lorenzo.
19                THE DEFENDANT:  Thank you, your Honor.
20                Your Honor, the past four years have been the most
21    difficult time of my life.  It has been difficult, painful,
22    shameful, and very scary.  But the cause of all of this has
23    been because of my actions and my conduct that I have been
24    charged with eight counts that I have pleaded guilty to.
25                Your Honor, from 2011 to 2015, I agreed with other
```

Jb81lors

1   individuals to pay and help pay bribes and to conduct

2   transactions to violate the law of the United States.   I

3   committed money laundering and filed false and fraudulent

4   individual tax returns, and I failed to file the reports of the

5   foreign bank accounts.   But I stand here -- as I stand here

6   before you, your Honor, it's because I take full responsibility

7   for each act.   I plead guilty, and I want to say how sorry I am

8   for my actions and misconduct and for the pain and suffering I

9   had caused to my family and my friends.   My actions have

10  brought a shameful spotlight, which they have done nothing to

11  deserve.   There is nothing that can explain the suffering that

12  I live -- that I live with on a daily basis, knowing the pain

13  and shame that my actions have brought to my family and

14  friends, and for the disrespect of the law of this great

15  country.   I blame myself for the conduct which has brought me

16  here today.   But out of all of this, I have learned that the

17  best things a human being has when he/she make a mistake is to

18  recognize it, accept it, correct it, apologize, and ask for

19  forgiveness.

20          My family has suffered, and I know it has been because

21  of my actions.   Family is most important things in my life, and

22  I can assure you, my Honor, that I will obey the law, just as I

23  did before I made the foolish decision in this case, and in

24  every possible way I will contribute in a positive way to our

25  society, to continue and do what I love the most, to serve

Jb81lors

humanity.  I did that for many years as an ambassador.  I can
and I will do this again.  I promise you that.

        Because of my misconduct, I have lost my job, my
profession, and many friends.  There have been days that I have
cried, and in my crying, I have asked god for forgiveness.
This is the reason I wake up every day in the morning and I go
to church, and I ask god for forgiveness.  My strong faith to
god is what has kept me alive.

        I want to apologize to the people of the United
States, of the Dominican Republic, the DOJ, prosecutor, law
enforcement, and to you, your Honor, for all the time you have
committed to this matter and the consideration that you are
giving to my future.

        I want to thank my family, my friends, my attorney
Brian Bieber, and those who are with me.  Just to finalize my
oath one more time, I just want to apologize and say how sorry
I am.

        THE COURT:  Okay.  Thank you, Mr. Lorenzo.

        Now is there any reason why sentence should not be
imposed at this time?

        MR. ZOLKIND:  No, your Honor.

        THE COURT:  Mr. Bieber?

        MR. BIEBER:  No, your Honor.

        THE COURT:  All right.  As stated, and the parties
agree, Mr. Lorenzo's guidelines sentencing range is 108 to 135

Jb8llors

1    months' imprisonment.

2           Now under the Supreme Court's decision in *Booker* and

3    its progeny, as I mentioned earlier, the guideline is just one

4    factor that I must consider in deciding an appropriate

5    sentence.  I'm also required to consider the other factors set

6    forth in 18 United States Code Section 3553(a), and I have done

7    so.  The factors include but are not limited to the nature and

8    circumstances of the offense and the personal history and

9    characteristics of Mr. Lorenzo, and each defendant must be

10   considered individually as a person.  I'm also required to

11   consider the need for the sentence imposed to reflect the

12   seriousness of the offense, promote respect for the law,

13   provide just punishment for the offense, and afford adequate

14   deterrence to criminal conduct and avoid unwarranted sentencing

15   disparities among other things.

16          So first I'm going to speak to Mr. Lorenzo's history

17   and characteristics.  Now, Mr. Lorenzo, you advised the

18   probation department that you were raised by your parents

19   largely in Santo Domingo until about 1980, when your father

20   immigrated to the United States to seek better economic

21   opportunities.  You and your siblings continued to be reared by

22   your mother in Santo Domingo, during which time your family did

23   experience certain financial difficulties resulting in your

24   father coming to the US, but your father continued to

25   contribute to the household in the Dominican Republic.  So

Jb81lors

after your father immigrated, your mother stopped working and

relied on the assistance that your father was providing.

Eventually you moved to this country and eventually, based upon

your father being in this country, regularized your citizenship

and eventually became a citizen of the country, I think in the

1990s.

Many of the letters from your former colleagues and

friends have expressed that you have a good heart and that any

term of incarceration would have a serious adverse effect on

yourself and your family.  Now I'm going to consider their

views, the views that were in the letters that were presented

to me, in construing what an appropriate sentence is for you.

However, I do note that those letters are of somewhat limited

weight.  I'll give them somewhat limited weight because for the

most part they don't contain any details concerning the

specific acts to support the generalized comments contained in

the letters.  I do note, though, that in your sentencing

submission and in the comments here today, that there are more

specifics that have been given concerning the good works that

you did before being involved in the conspiracy to which you've

pled guilty.

Now in addition to the letters, I also received, as I

mentioned, the commendations, certificates acknowledging your

work and dedication in various areas throughout your career.

Now as you mentioned in the submission, it's pointed out that

Jb81lors

1    these are evidence of your charitable good works and your

2    commitment to various issues, including in particular the

3    United Nations and some of the things that the United Nations

4    stands for.  So I note that in 2000, you established the United

5    Nations Association in the Dominican Republic, which is an

6    organization that you created and, according to your sentencing

7    submission, was designed to promote the value of the principles

8    of the United Nations and highlight the importance of education

9    and technology as a tool towards sustainable development.  So

10   I'm going to take those, the work that you did and the work you

11   did in getting to the position of being a representative from

12   the Dominican Republic in the United Nations, I'll take that

13   into consideration concerning what an appropriate sentence is

14   for you.

15            Next, however, I'll turn to the nature and

16   circumstances of the offense.  Now there's no question, and

17   everybody acknowledges here, that you stand convicted of

18   extremely serious offenses.  The activities were not isolated

19   incidents but instead were repeated and occurred over the

20   course of years.  I also note that there was ample opportunity

21   for you during that time period to change your mind, to go in a

22   different direction, to decide, you know what, I'm not going to

23   continue with this.  However, you know, the evidence at trial

24   showed not only did you not decide to do that -- in other

25   words, to walk away from the bribery scheme -- in fact, you

Jb81lors

1    became more involved in the bribery scheme, and by that I mean,

2    when Mr. Ng increased the pressure to move forward with regard

3    to the planning and getting the conference center on the UN's

4    radar screen, you know, he offered you additional money and you

5    offered to help in that way, and in that way also facilitated

6    the bribe, continued bribing of Ambassador Ashe and funneling

7    money to him in various ways, including through payments to

8    Ambassador Ashe's wife for work that was never done.

9            Now I will say that I don't agree with the

10   characterization in the sentencing submission that referred to

11   this as temporary lapses in judgment, because while yes, you

12   could view it as temporary lapses in judgment, it was over the

13   course of four years and it was a sustained lapse in judgment,

14   as the government pointed out and I think as you concede,

15   really for purely economic reasons -- in other words, to gain

16   money.

17           However, I do agree that your actions in this case

18   aren't and don't define you as a person; in other words,

19   they're not the sole actions of your life.  So I'm not going to

20   review the conduct here in isolation.  I'm going to obviously

21   review it in the context of the rest of your life, and as one

22   aspect of your life, an aspect which, based upon your comments

23   here today and the comments of your attorney, you've sought to

24   turn around, as well as the comments of the government.

25           Now the offense involved was extensive.  It involved

Jb81lors

1    the use of shell companies, fake contracts, and the funneling

2    of money internationally, all of which made detection of the

3    scheme that much more difficult, as well as the deception that

4    in large part you sort of developed with regard to assigning

5    monies for purposes of avoiding paying taxes.

6          Now I don't think it can be understated the damage

7    that has been done to the United Nations as an institution, and

8    it's difficult to sort of gauge that certainly in any monetary

9    way.  But the reputation of the UN, there's no question that it

10   was tarnished by your actions, the actions of Ambassador Ashe

11   and by Mr. Ng, among others, as well as the damage that has

12   been caused specifically to the diplomatic mission of the

13   Dominican Republic and to that nation itself.

14         You know, in addition, I'll note that much of the

15   recognition, or a lot of the recognition that you received in

16   the exhibits that were contained in the submission really

17   related to the work that you had started and were doing in

18   connection with the United Nations.  And, you know, it's

19   unfortunate that you decided to take the path that you did,

20   because all of that work, you know, put you in a position where

21   you could actually participate in the bribe, but on the other

22   hand, it put you in a position where you could actually help

23   people not only in your country but in other parts of the

24   world.  But by participating in the bribery scheme, you were

25   essentially rigging the system and depriving other members of

Jb8llors

the UN in considering the merits or the folly of having a

permanent conference center in Macau or really anywhere else in

the world.

Now in addition, although I recognize that the

likelihood of recidivism for someone of your age and

statistically as a general matter is low, and I'll take that

into consideration, there is the same fact that you committed

the instant offense after you had achieved a tremendous amount

in your life, and it's my hope that you continue to strive to

achieve your personal goals.  But despite having achieved that

level of success, you basically put that in jeopardy, and in

fact, as indicated in the submission, you suffered the

unfortunate part of having to go through having your life

reviewed under the microscope.  That happens when individuals

commit criminal conduct, and particularly in connection with

institutions like the United Nations and in the way that it was

done here.

Now I also understand that there is the issue of

general deterrence here, and I believe it's important to send a

message to individuals who might consider corrupting

institutions like the UN, whether from within or outside, to

achieve their personal goals or their own whims.

However, I believe that these considerations have to

be viewed in the light of your substantial cooperation in this

case.  Now there's no question that your cooperation was useful

Jb81lors

1    and substantial.  The information you provided was used, as I

2    understand it, in connection with grand jury presentations to

3    obtain indictments, and the fact is that your cooperation no

4    doubt played a role, at a minimum, in the decision of Jeff Yin

5    to plead guilty but also possibly in connection with some of

6    the other defendants to plead guilty.

7            Now according to the government, you were a model

8    cooperator -- and I think that's the exact term that they

9    used -- in that you met with the government dozens of times in

10   person, on the phone, and you were always willing to provide

11   assistance to the government and willing to give your time and,

12   as the government has indicated, you were always punctual,

13   patient, and careful with your words, which I think is, as the

14   government pointed out, the most important thing when it comes

15   to someone who decides to cooperate -- not only that they're

16   truthful but they're careful in what they say, and understand

17   that what they say has to be accurate but it also has to be

18   measured.

19           Now you testified for approximately eight days during

20   the trial.  Much of that was on cross-examination, so I

21   witnessed firsthand, as Mr. Bieber said, your efforts to

22   provide truthful information to the jury.  You maintained your

23   composure during extensive and probing and sustained

24   cross-examination, which is the nature of our judicial system.

25   But I also believe that without your testimony, and

Jb8llors

particularly your insight with regard to the emails and

documents that came in evidence, that the jury's deliberations

would have become much more challenging and difficult in a way;

in particular your testimony regarding establishing the intent

of the other individuals involved, since much of the defense

involved the argument that there was nothing nefarious going on

and that this was a legitimate project being pursued in

legitimate ways and that people were paid legitimate salaries

for legitimate work.  So in particular, in light of that

defense, having someone who was, so to speak, on the inside, it

provided a perspective to the jury that was useful to them in

their deliberations.

          So there's no question in my mind that your

cooperation was substantial and, as I mentioned earlier, that

the information that you provided to the government was useful,

timely, and I take the government at its word that you were a

model cooperator.

          So I'm ready to impose sentence.  Mr. Lorenzo, if you

could please rise for the imposition of sentence.

          It is the judgment of this Court that you be committed

to the custody of the Bureau of Prisons for a period of time

served.

          I'm going to impose a period of supervised release of

two years on Counts One through Six and Eight and one year on

Count Seven, to run concurrently.

Jb81lors

1              You may be seated.

2              Now you'll be subject to the mandatory conditions of

3    supervised release set forth on page 43 of your PSR, and the

4    standard and special conditions that are set forth on pages 43

5    through 45 of the PSR.

6              Now one of the special conditions -- and I agree with

7    the probation department -- is that you do 250 hours of

8    community service, as will be approved by your supervising

9    probation officer.

10             There will be no fine here.

11             You are required to pay a special assessment of $100

12   on each count, for a total of $800.

13             I will sign the restitution order, which requires a

14   payment of restitution in the amount of $243,965.  And so I'll

15   sign that restitution order now.

16             In addition, there is a consent preliminary order of

17   forfeiture.  Well, let me ask, Mr. Lorenzo, am I correct, did

18   you sign this order of restitution earlier today?

19             THE DEFENDANT:  That's correct.

20             THE COURT:  Okay.  I'm sorry.  Actually, did you see

21   the order of restitution?

22             THE DEFENDANT:  I did.

23             THE COURT:  Okay.  And you understand that it requires

24   a payment of $243,965?

25             THE DEFENDANT:  Yes, your Honor.

Jb8llors

```
1          THE COURT:  Okay.  And I misspoke when I said signed.
2   The order is only signed by me.  However, with regard to the
3   Consent Order of Forfeiture/Money Judgment, Mr. Lorenzo, did
4   you sign that document earlier today?
5          THE DEFENDANT:  Yes, your Honor.
6          THE COURT:  Okay.  And did you have an opportunity to
7   read it before you signed it?
8          THE DEFENDANT:  Yes, your Honor.
9          THE COURT:  And did you review it with Mr. Bieber?
10          THE DEFENDANT:  Yes, your Honor.
11          THE COURT:  Okay.  All right.  So I'm going to sign
12   the consent order of forfeiture also.  And we'll take care of
13   getting those placed on the docket.
14          So I believe that this sentence is sufficient but not
15   greater than necessary to comply with the purposes set forth in
16   18 United States Code Section 3553(a).
17          Does either counsel know of any legal reason why this
18   sentence should not be imposed as stated?
19          MR. ZOLKIND:  No, your Honor.
20          THE COURT:  All right.  Mr. Bieber.
21          MR. BIEBER:  No, your Honor.
22          THE COURT:  All right.  So that's the sentence that
23   I'm imposing.
24          Now you know, Mr. Lorenzo, you have the right to
25   appeal your conviction and sentence.  The notice of appeal must
```

Jb81lors

1    be filed within 14 days of the judgment of conviction.  If

2    you're not able to pay the cost of an appeal, you may apply for

3    leave to appeal *in forma pauperis*.  If you request, the clerk

4    of the court will prepare and file a notice of appeal on your

5    behalf.

6              Now, Mr. Lorenzo, obviously you stand convicted of

7    serious crimes, but you did what you needed to do to start

8    making amends for that.  The only other thing you can do is

9    continue to lead a law-abiding life going forward, and I hope

10   that you do so.  And I hope during the two years of supervised

11   release that I don't see you, because if I do see you, other

12   than maybe riding on the subway -- and I'm not saying whether I

13   ride on the subway or not, but I may.  But I hope I don't see

14   you in connection with this case.  So I wish you luck going

15   forward.

16             Now with regard to any open counts or underlying

17   indictments, I will dismiss those at this time.

18             Let me ask, is there anything else that we need to

19   deal with today?  Mr. Zolkind?

20             MR. ZOLKIND:  No, your Honor.

21             THE COURT:  Mr. Bieber?

22             MR. BIEBER:  No, your Honor.

23             THE COURT:  Okay.  Thank you very much for coming in.

24   We'll stand adjourned.

25             ALL COUNSEL:  Thank you, your Honor.
                            o0o